No. 15-10803

*In The*

# United States Court of Appeals

*for the*

# Fifth Circuit

———————————————•———————————————

JAY AUBREY ISAAC HOLLIS, Individually and as
Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust,

*Plaintiff-Appellant,*

v.

LORETTA E. LYNCH, Attorney General of the United States;
THOMAS E. BRANDON, Acting Director of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives,

*Defendants-Appellees.*

———————————————————

*On Appeal from the United States District Court for the Northern District
of Texas, Dallas Division, USDC No. 3:14-CV-3872
The Honorable Judge Barbara M.G. Lynn*

## BRIEF FOR PLAINTIFF-APPELLANT

ALAN ALEXANDER BECK, ESQ.
LAW OFFICE OF ALAN BECK
4780 Governor Drive
San Diego, California 92122
(619) 905-9105

STEPHEN DEAN STAMBOULIEH, ESQ.
STAMBOULIEH LAW, PLLC
P.O. Box 4008
Madison, Mississippi 39130
(601) 852-3440

*Attorneys for Plaintiff-Appellant
Jay Aubrey Isaac Hollis, Individually and as
Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust*

COUNSEL PRESS • (888) 700-3226

# CERTIFICATE OF INTERESTED PERSONS

*Jay Isaac Hollis v. Loretta Lynch, et al*., No. 15-10803

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff**:

Jay Aubrey Isaac Hollis, Individually and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust

**Defendants**:

Loretta Lynch
Thomas E. Brandon

**Counsel**:

Stephen D. Stamboulieh
Stamboulieh Law, PLLC

Alan Alexander Beck
Law Office of Alan Beck

Elisha M. Hollis
Attorney at Law

Daniel M. Riess
Eric J. Soskin
Michael S. Raab
Patrick J. Nemeroff
U.S. Department of Justice

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh
Counsel for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully requests oral argument in this case. The district court held that the Appellant did not have standing to challenge various federal laws on Second Amendment and Fourteenth Amendment grounds and also that the Second Amendment does not extend to machineguns. The Appellant believes that oral argument could provide substantial assistance to this Court in understanding the important issues in this case.

# TABLE OF CONTENTS

**Pages(s)**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... ii

TABLE OF AUTHORITIES ................................................................................v

STATEMENT OF JURISDICTION....................................................................1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE.............................................................................1

      A.      STATUTORY AND REGULATORY BACKGROUND....................1

      B.      FACTUAL BACKGROUND AND PROCEDURAL
              HISTORY.........................................................................................6

STANDARD OF REVIEW ..................................................................................8

SUMMARY OF THE ARGUMENT ..................................................................10

ARGUMENT ......................................................................................................11

I.      STANDING.................................................................................................17

      A.      Mr. Hollis Has Standing To Bring His Second Amendment
              Complaint ........................................................................................17

II.     THE CHALLENGED LAWS ARE UNCONSTITUTIONAL
      FACIALLY AND AS-APPLIED TO HOLLIS ...........................................20

      A.      The Challenged Laws Burden Second Amendment Rights................20

             i.       Defendants Misapply *Heller's* Dangerous and Unusual
                   Language ................................................................................20

             ii.     Defendants Complete Ban on Machineguns is
                   Categorically Invalid.............................................................26

             iii.    *U.S. v. Marzzarella* Supports Applying a Categorical
                   Approach ................................................................................27

iv. The 1934 Hearing on National Firearms Act Supports That A Categorical Ban Would Be Unconstitutional ...............29

v. The Ban on Machineguns in § 922(o) is not Longstanding or Presumptively Lawful ...................29

vi. If Means End Scrutiny is Necessary, Strict Scrutiny Should Be Applied ...................32

vii. Even if Means End Scrutiny Applies, Defendants Fail Their Burden ................................39

viii. Defendants Misread *United States v. Miller* ............................45

ix. *Miller* Provides the Outer Limits for the Second Amendment Right ...................47

x. "Common Use" Cannot Be a Test ...........................49

III. THE DISTRICT COURT COMMITTED TWO ADDITIONAL ERRORS .......................................50

A. The District Court Erred in Denying Appellant's Rule 56(d) Motion .........................................50

B. The District Court Erred in Dismissing Appellant's Complaint Without Allowing Appellant to Amend His Complaint ........................................52

CONCLUSION .........................................................55

CERTIFICATE OF SERVICE .................................57

REQUIRED CERTIFICATIONS .............................58

# TABLE OF AUTHORITIES

*Cases*

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996)..........................................................................40

*Baron Snigge v. Shirton*,
   79 E.R. 173 (1607)..................................................................... 21, 22

*Beverly v. Wal-Mart Stores, Inc.*,
   428 Fed. Appx. 449 (5th Cir. 2011)(unpublished) ..............................50

*Bustos v. Martini Club Inc.*,
   599 F.3d 458 (5th Cir. 2010) ................................................................9

*Citizens United v. Fed. Election Commn.*,
   558 U.S. 310 (2010)..........................................................................33

*Conley v. Gibson*,
   355 U.S. 41, 48, 78 S. Ct. 99, 2 L. Ed. 2d 80 ....................................54

*Davis v. Bayless*,
   70 F.3d 367 (5th Cir. 1995) ..........................................................9, 51

*Davis v. FEC*,
   554 U.S. 724 (2008)..........................................................................17

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)................................................................ *passim*

*English v. State*,
   35 Tex. 473 (1871)............................................................................25

*Foman v. Davis*,
   371 U.S. 178 (1962)..................................................................... 53, 54

*Fotoudis v. Honolulu*,
  2014 WL 4662385 (D. Haw. 2014) .....................................44

*Friedman v. City of Highland Park, Illinois*,
  784 F.3d 406 (7th Cir. 2015) ...........................................36

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
  2014 WL 7172253 (3d Cir. Dec. 17, 2014).........................34

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011).................................. 26, 36

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008) ......................................... 9-10

*Intl. Shortstop, Inc. v. Rally's, Inc.*,
  939 F.2d 1257 (5th Cir. 1991) ..........................................50

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) .............................................54

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001)...........................................................40

*Mance v. Holder*,
  74 F. Supp. 3d 795 (N.D. Tex. 2015) ................................18

*Mance v. Lynch.*
  Case No. 15-10311 .............................................................19

*McClure v. Ashcroft*,
  335 F.3d 404 (5th Cir. 2003) .............................................10

*McDonald v. City of Chicago*,
  130 S. Ct. 3020 (2010)......................................... 10, 12, 13

*Meese v. Keene*,
  481 U.S. 465, 107 S. Ct. 1862, 95 L. Ed. 2d 415 (1987) .....................................34

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) ...........................................................44

*Nat'l Rifle Ass'n of Am., Inc. v.*
  *Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012). ..................................................... *passim*

*Natl. Fedn. of the Blind of Texas, Inc. v. Abbott*,
  647 F.3d 202 (5th Cir. 2011) ...........................................................17

*O'Neill v. State*,
  16 Ala. 65 (1849) ..............................................................................25

*Priester v. JP Morgan Chase Bank, N.A.*,
  708 F.3d 667 (5th Cir. 2013) ..............................................................9

*Ramming v. U.S.*,
  281 F.3d 158 (5th Cir. 2001) ...............................................................9

*Rex v. Knight*,
  90 Eng. Rep. 330 (K.B. 1686) .........................................................23

*Rex v. Rowland Phillips*,
  98 E.R. ( 1385 ) ................................................................................22

*State v. Langford*,
  10 N.C. (3 Hawks) 381 (1824) ........................................................25

*State v. Lanier*,
  71 N.C. 288 (1874) ..........................................................................26

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
  450 U.S. 707 (1981)..........................................................................39

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) ..............................................................8

*Turner Broad. Sys. v. F.C.C.*,
  520 U.S. 180 (1997)..........................................................................40

*Tyler v. Hillsdale County Sheriff's Dept.*,
   775 F.3d 308 (6th Cir. 2014), *reh'g en banc granted, opinion vacated*
   (Apr. 21, 2015) .................................................................................................33

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) ................................................................. 37, 40

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ..........................................................................40

*United States v. Clark, et al.*,
   2:10-cr-01047-ROS .........................................................................................51

*United States v. Emerson*,
   270 F.3d 203 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002) .......................55

*United States v. Golding*,
   332 F.3d 838 (5th Cir. 2003) ............................................................................31

*United States v. Hare*,
   26 F. Cas. 148 (C.C.D. Md. 1818) ....................................................................21

*United States v. Kirk*,
   105 F.3d 997 (5th Cir. 1997) .............................................................................31

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ..................................................................... 27, 28, 38

*United States v. Miller*,
   307 U.S. 174 (1939) ................................................................................. *passim*

*United States v. Reese*,
   627 F.3d 792  (10th Cir. 2010) .........................................................................40

*Wright v. Barnhart*,
   37 Fed. Appx. 88 (5th Cir. 2002) ........................................................................9

***Statutes***

10 U.S.C. § 311(b) ...................................................................14

18 U.S.C. § 921 ...................................................................5, 34

18 U.S.C. § 922(o) ............................................................. *passim*

18 U.S.C. § 3571(b) ...................................................................2

18 U.S.C. § 921(a)(1) .................................................................6

26 U.S.C. § 5812 .......................................................................2

26 U.S.C. § 5822 .......................................................................2

26 U.S.C. § 5845 ...................................................................1, 52

26 U.S.C. § 5845(b) ...................................................................2

26 U.S.C. § 5861(d) ...................................................................2

26 U.S.C. § 7701(a)(1) .............................................................5-6

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1343 .......................................................................1

28 U.S.C. § 1346 .......................................................................1

28 U.S.C. § 2201 .......................................................................1

28 U.S.C. § 2202 .......................................................................1

Militia Act of 1903 ...............................................................13, 46

Tex. Penal Code Ann. § 46.01 .....................................................52

The Militia Act of 1792 ...........................................................13, 46

The National Defense Act of 1916 .........................................................13

*Other Authorities*

132 Cong. Rec. H1750 (1986) ...............................................................4

*Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132 (1984).* ...................................................................................................42

Centers for Disease Control: Number of Deaths from 113 Selected Causes - Table 13 (2011) ..............................................................................43

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822)..................................................24

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789 (1982) ...................................................23

Declaration of Independence, Clause 2, July 4, 1776.............................16

James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) .......................................................................24

John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) ........................24

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994)..............................23

Marianne W. Zawitz, Guns Used in Crime, U.S. DEPARTMENT OF JUSTICE (July 1995).........................................................................42

Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D., Firearm Violence, 1993-2011, U.S. DEPARTMENT OF JUSTICE (May 2013) ............43

National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 6 (1934) ...........................................2

*Treatises*

4 William Blackstone, COMMENTARIES ON THE LAWS OF
ENGLAND 148-49 (1769) ......................................................................................23

A Treatise on the Criminal Law of the United States by Francis Whartson
(1874) ......................................................................................................................21

TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed.,
6th ed. 1788) ...........................................................................................................23

William Oldnall Russell, A TREATISE ON CRIMES AND
INDICTABLE MISDEMEANORS 271 (1826)....................................................25

# STATEMENT OF JURISDICTION

Appellant invoked the district court's jurisdiction under 28 U.S.C. §§ 2201, 2202, 1331, 1343 and 1346. ROA.10. The district court dismissed Appellant's claims on August 7, 2015. ROA.788, RE-47. Appellant timely filed his Notice of Appeal on August 18, 2015. ROA.829, RE-48. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

Whether the district court erred in granting Defendants' Motion to Dismiss or in the Alternative for Summary Judgement, when it held that: (A) Defendants' conduct does not violate the Equal Protection Clause of the Fifth Amendment; (B) 18 U.S.C. § 922(o) and 26 U.S.C. § 5845 are constitutional facially and as-applied to Appellant; (C) Appellant's Due Process rights were not violated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"); (D) Appellant was not entitled to leave to amend his Complaint; and (E), Appellant lacked standing to bring his Second Amendment challenge.

# STATEMENT OF THE CASE

## A. STATUTORY AND REGULATORY BACKGROUND

The National Firearms Act ("NFA") regulates the manufacture and transfer of certain firearms by, in sum, requiring a person proposing to make or transfer an NFA firearm to: (1) file an application with the BATFE; (2) obtain BATFE

approval; (3) have the firearm registered in the National Firearms Registration and Transfer Record (completed by BATFE upon approval); and (4) pay a $200.00 tax which is evidenced by the BATFE's attachment of a tax stamp on the application, which is then returned to the maker or transferor. 26 U.S.C. §§ 5812 and 5822. Possession of an NFA firearm not registered to the possessor is a felony punishable by ten years imprisonment and a fine of $250,000.00. 26 U.S.C. § 5861(d), 18 U.S.C. § 3571(b). Machineguns, defined under federal law as any firearm capable of firing more than one round automatically by a single function of the trigger, fall under the NFA's purview. 26 U.S.C. § 5845(b).

The constitutionality of the original NFA bill was debated, with then-Attorney General Homer Cummings admitting that a ban on machineguns may not survive Constitutional scrutiny unless reached through Congress' power to tax. National Firearms Act: Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 6 (1934). Cummings denied that machineguns could be banned, because "we have no inherent police power to go into certain localities and deal with local crime. It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act." ROA.469. Specifically, Cummings felt that, if it were purely a taxing statute, it would survive scrutiny. The following exchange is on point:

**Mr. David J. Lewis, Maryland:** … Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various states; there is a legal theory upon which we prohibit the carrying of weapons – the smaller weapons.

**Attorney General Homer Cummings**: … Machine guns, however, are not of that class. Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

**Mr. Lewis**: I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

**AG Cummings**: Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. *You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved.* But when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated," you are easily within the law.

**Mr. Lewis**: In other words, *it does not amount to prohibition, but allows of regulation.*

**AG Cummings**: That is the idea. We have studied that very carefully.

ROA.480.

Prior to 1986, registered machineguns were involved in so few crimes that the

then Director of the BATFE, Stephen E. Higgins, stated during congressional

hearings that "machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." ROA.439-440. Despite no evidence of machineguns having any effect on interstate commerce, Congress banned an entire class of firearms that were rarely, if ever, used in crime, without evidence it would yield to a reduction in crime.

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
> (2) This subsection does not apply with respect to—
>> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

This provision was enacted in 1986 as §102(9) of the Firearm Owners' Protection Act, which amended the GCA of 1968. The legislative history of this amendment is, for the most part, nonexistent, except for the mention on the floor by its sponsor, Representative Hughes, when he stated "I do not know why anyone would object to the banning of machine guns." 132 Cong. Rec. H1750 (1986)

(statement of Rep. Hughes). While the House vote on the amendment failed, the amendment still made it into the final bill.[1]

The prohibition on machineguns does not apply to all machineguns. Any machinegun lawfully owned before May 19, 1986 may still be transferred or possessed. Accordingly, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals and, but for §922(o), there would likely be hundreds of thousands more lawfully possessed by private individuals. In fact, one of the most popular sporting rifles in existence today, the AR-15 rifle, is merely a semi-automatic version of the M-16 machinegun.

The term "person" is defined in the GCA to mean "any individual, corporation, company, association, firm, partnership, society, or joint stock company." See 18 U.S.C. § 921. The term "person" does not include an unincorporated trust. The BATFE, in an opinion letter dated March 17, 2014 to Dakota Silencer in Sioux Falls, South Dakota, referenced the "person" definition and stated: "[u]nlike individuals, corporations, partnerships, and associations; unincorporated trusts do not fall within the definition of "person" in the GCA." ROA.28-29. Since by the BATFE's own admission, the term "person" in the GCA does not include an unincorporated trust, such a trust is not subject to the prohibition in § 922(o). While an unincorporated trust falls under the definition of "person" in the NFA, 26

---

[1] See Floor Vote on Hughes Amendment: https://www.youtube.com/watch?v=a6Mx2UcSEvQ

U.S.C. §7701(a)(1), a trust is not included in the definition of "person" under the GCA. 18 U.S.C. §921(a)(1). Accordingly, a trust wishing to make a machinegun on a Form 1 is subject to the provisions of the NFA, but is not subject to the GCA's prohibition on possession of post-1986 machineguns.

## B. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Appellant Jay Aubrey Isaac Hollis, as trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust ("the Trust"), submitted the proper application to the BATFE pursuant to the NFA for authority to manufacture an M-16 style machinegun from an AR-15 semi-automatic lower receiver owned by the Trust. On May 14, 2014, an application was submitted to the BATFE on ATF Form 5320.1 (this form is referred to in the industry as a "Form 1") to make a machinegun. Along with the Form 1, Appellant submitted the required $200.00 making tax. That Form 1 was approved on September 8, 2014. On or about September 10, 2014, Hollis received a phone call from the BATFE stating that the application was mistakenly approved. ROA.366.

A few days later, Special Agent Aaron R. Wheeler, BATFE, Dallas Division, contacted Plaintiff to arrange a time to meet so he could deliver a letter. The letter, from William J. Boyle, III, Chief of the NFA Branch, advised Plaintiff that the "[B]ATF[E] may not approve any private person's application to make and register a machinegun after May 19, 1986" and "if you have already made this

machinegun, please abandon it to the ATF Special Agent who is delivering this letter to you." ROA.34.

The letter stated, in part,

> The fact that an unincorporated trust is not included in the definition of "person" under the GCA does not mean that an individual may avoid liability under section 922(o) by placing a machinegun "in trust." Where a trust is not an entity recognized as a "person" under the applicable law, it cannot make or hold property and is disregarded. Consequently, in terms of an unincorporated trust, ATF must disregard such a non-entity under the GCA and consider the individual acting on behalf of the trust to be the proposed maker/possessor of the machinegun.

> ROA.35.

Mr. Hollis then filed his Complaint for Declaratory and Injunctive Relief on October 30, 2014. ROA.8. Defendants filed their Motion to Dismiss, or in the Alternative, For Summary Judgement on January 16, 2015. ROA.74. Hollis filed his Response in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgement on February 4, 2015. ROA.310. The Appellant's Brief in Opposition was filed simultaneously with his Response in Opposition. ROA.315. The Appellant additionally included an Affidavit in his Brief in Opposition to support his request for discovery under Rule 56(d). ROA.367.

Defendants' filed their Reply Brief on February 23, 2015. ROA.542. Appellant filed his Sur-Reply on March 3, 2015. ROA.592. Defendants filed their Response

to Appellant's Sur-Reply on March 11, 2015. ROA.605. The district court heard argument from both parties on April 23, 2015. ROA.833.

The district court entered its Memorandum Opinion and Order August 7, 2015, granting Defendants' 12(b)(1) Motion to Dismiss Plaintiff's Second Amendment and Commerce Clause claims for lack of standing; and granting Defendants' 12(b)(6) Motion to Dismiss Plaintiff's due process, equal protection, and alternative request for declaratory relief that §922(o) does not apply to Appellant. ROA.788. RE-7.

The district court's standing analysis found that the Appellant had satisfied the injury-in-fact requirement but "…he failed to satisfy the traceability and redressability of Article III standing with respect to his Second Amendment and Commerce Clause claims…" ROA.808. RE-27. The district court however, went on to analyze Hollis' Second Amendment claim on the merits under the two step framework adopted by the Fifth Circuit in *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir.2012). ROA.808. RE-27.

## STANDARD OF REVIEW

This Court reviews questions of standing *de novo*. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir.2012). This Court reviews the constitutionality of federal statutes *de novo*. *National Rifle Ass'n of Am., Inc. v.*

*Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 192 (5th Cir. 2012). "… [A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) (additional citation omitted).

This Court reviews "a dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'" *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 672 (5th Cir. 2013) cert. denied sub nom. *Priester v. JPMorgan Chase Bank, N.A.*, 134 S. Ct. 196 (2013) (quoting *Bustos v. Martini Club* Inc., 599 F.3d 458, 461 (5th Cir.2010)). "Federal courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss." *Davis v. Bayless*, 70 F.3d 367, 372 (5th Cir. 1995) (citation omitted).[2]

This Court reviews "a denial of leave to amend a complaint for abuse of discretion." *Priester,* 708 F.3d at 672. "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *In re Volkswagen of Am., Inc.*, 545

---

[2] "PACER, or the Public Access to Court Electronic Records System, is used by many federal courts to offer **public access** to docket information over the internet." *Wright v. Barnhart*, 37 Fed. Appx. 88 (5th Cir. 2002) (unpublished) (bold added).

F.3d 304, 310 (5th Cir. 2008) (quoting *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir.2003)).

**SUMMARY OF THE ARGUMENT**

Since the adoption of §922(o) and the NFA, the United States Supreme Court issued the landmark decision *District of Columbia v. Heller*, 554 U.S. 570 (2008). In that case, the Court held that "ban[s] on handgun possession in the home violate the Second Amendment as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Heller,* 554 U.S. at 635. Two years after *Heller*, in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Court held that the right to keep and bear arms was a fundamental right, made applicable to the states through the Fourteenth Amendment.

In *Heller,* the Court ruled the "Second Amendment extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of founding." *Heller*, 128 S. Ct. at 2817. In order to strike down the ban on handguns, it ruled a complete ban on a protected arm cannot withstand any level of scrutiny. *Id.* This case is analogous and ultimately rises out of the federal government's maintaining a complete ban on the ownership of post-1986 machineguns. Similar to Washington D.C.'s ban on handguns, Defendants ban on a complete class of arms cannot withstand constitutional muster. Moreover, even if

this ban were to survive constitutional muster if equally applied, Defendants current application of the law violates the Equal Protection Clause of the United States Constitution. Likewise, the BATFE's unilateral revocation of an approved Form 1 denies Hollis his Due Process protection.

Additionally, the plain language of §922(o) mandates a finding that a "trust" is not precluded from making a machinegun and the district court failed to allow Appellant to allow his Complaint and the court also conflated the NFA and GCA as providing the same basis for the Complaint.

## **ARGUMENT**

Mr. Hollis is a law abiding citizen, a United States Marine Corps reservist, and maintains a Top Secret clearance. ROA.365. The M-16 at issue is considered a rifle by the military, even though it is referred to as a machinegun under federal law because it fires more than one shot by a single function of the trigger. This brief will address the M-16 rifle as a machinegun, consistent with federal law. Mr. Hollis makes that distinction to the Court to alleviate any confusion between the terms "rifle" and "machinegun" in this case.

The instant matter brings into question the constitutionality of the Firearm Owners' Protection Act of 1986's ban on the ownership of machineguns found in 18 U.S.C. § 922(o). It is a decades-old law; one of many now unconstitutional laws passed prior to the United States Supreme Court holding that the Second

Amendment confers an individual right to keep and bear arms in *Heller*. This law was passed during a time of uncertainty regarding the nature of the Second Amendment. Now that this uncertainty has passed, this complete ban on the ownership of a type of bearable arm cannot pass constitutional muster. This ban is analogous to the one struck down in *Heller*, and for many of the same reasons it is unconstitutional.

When the United States Supreme Court ruled in the case *District of Columbia v. Heller*, 554 U.S. 570 (2008) that the Second Amendment confers an individual right to self-defense, it did not overrule *United States v. Miller*, 307 U.S. 174 (1939).[3] *Miller's* core holding is that:

> in the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument…it is not within the judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id* at 177. Accordingly, *Miller* holds that, if evidence is presented or judicial notice can be taken of whether an item is part of the ordinary military equipment, then it is protected by the Second Amendment.

---

[3] "…the *Heller* plaintiff sought only dispensation to keep an operable firearm in his home for lawful self-defense, see *id.,* at ——, 128 S.Ct., at 2788, and n. 2), and the Court's opinion was bookended by reminders that its holding was limited to that one issue…" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 885 (2010) (Stevens, J. dissenting).

In *McDonald v. City of Chicago*, Ill., 130 S. Ct. 3020 (2010), the Supreme Court held that the Second Amendment confers an individual right by ruling on an arm; specifically, a handgun. It applied *Heller*'s analysis as to arms in finding that the Second Amendment as a whole has been made applicable to the States. Accordingly, *Miller's* holding is now applicable to the States.

The Militia Act of 1903, or better known as the Dick Act, was named after former congressman and Senator of Ohio Charles Dick, Chairman of the House Militia Affairs Committee, who also served as President of the National Guard Association of the United States. Charles Dick held the rank of Major General as commander of the Ohio National Guard, reformed the Militia Act of 1792 and created the National Guard distinctly separated into two classes: (1)the uniformed and organized militia under service to the State or Federal governments that receive federal support; and (2) the non-uniformed "unorganized" reserve militia of all able-bodied men between the ages of 18 thru 45 or former military veterans or retirees from the Army, Navy, Air Force, Marines, or National Guard or Army Reserve. The Militia Act of 1903 was further modified by several amendments in 1908, and again modified with the National Defense Act of 1916.

The Anti-Federalists feared that Congress would permit the militia to atrophy, leaving the states defenseless against the central government. They argued that the national Congress could render the militia useless by disarming

them.  Under various pretenses, Congress may neglect to provide for arming and disciplining the militia; the state governments cannot do it, for Congress has an exclusive right to arm them. The desire to prevent enfeebling state militias, which provided a check to a standing army, prompted the ratifying conventions to call for an amendment guaranteeing the right of citizens to bear arms.  The First Congress responded, but the Second Amendment did not remove national control over armed forces or the state militias.  However, the Second Amendment, by saying that the "…Right of the People to keep and bear arms shall not be infringed" and that the Right was a constitutionally protected, individual right, it qualified and defended against U.S. Constitution, Article I, Section 10, Clause 4:  "No State shall, without the consent of Congress … keep troops, or ships of war in time of Peace…." Hence, forthwith, there exists two classes of Militias the "organized" and the "unorganized." (10 U.S.C. § 311(b)).

Both State and Federal governments provide no support to the "unorganized" militia as far as financial, equipment, or arms, with the exception that there is an avenue to voluntarily obtain former military surplus individual arms, i.e. rifle, pistol, bayonet, ammunition, and equipment; formerly through the Civilian Marksmanship Program. Both the President of the United States and the National Congress can call forth the "militia," both organized and unorganized. The "unorganized" militia, on a voluntary basis and through their own financial

means, obtain military or "militia" standard rifles, magazines, and ammunition, to practice shooting to gain familiarity, knowledge and competency.

The Federal government and the State government, by banning the "Standard" arms, would diminish, denigrate, and render impotent the efficiency of a reserve pool of the "unorganized" militia, which is every able-bodied male between the ages of 18 and 45, and, as of 2011's veterans survey, is also composed of 21.5 million veterans of foreign wars who have had first-hand familiarity and knowledge of the M-16 and AR-15, .45 cal. Model 1911 semi-automatic pistol, and the Beretta 9mm, 15-round magazine capacity semi-automatic pistol.  Ever since 1963 and the introduction to the Vietnam war, every single soldier and veteran possesses military experience, tactical knowledge, military leadership and discipline and - quite naturally - in-depth familiarity and knowledge of the M-16, hand-held, shoulder-fired, gas-operated, 30-round individual rifle.

The Second Amendment exists, not as a privilege granted by the Constitution, Federal Government or even State Governments, but it acknowledges the fact that the "right to keep and bear arms" is an individual right and that it is a right that was specifically withheld by the People, who have exercised their individual right to cast one vote as a citizen of the United States.  It is not created for hunting, target-shooting, or other "sporting purposes."  It exists in support of "…That whenever any Form of Government becomes destructive to these ends, it

is the Right of the People to alter or abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness…." (Declaration of Independence, Clause 2, July 4, 1776).

As such, one must take into consideration today's environment and militarization of civilian law enforcement. Local law enforcement is routinely equipped with .50 caliber sniper rifles and "personal defense weapons" to include machine guns (M-16s with 30 round magazines and semi-automatic handguns with standard capacity 15 round magazines). This "load-out" is routine, either when serving simple warrants or court-ordered subpoenas or an office search with a fully armed SWAT or Hostage Rescue Team.[4]

The Second Amendment ensures that there is equality on an individual basis with the "organized" militia, in preparation for one on one conflicts or violent confrontations, limited to land war. The Federal and State governments have no authority to subordinate the individual firearms of the "unorganized" militia or to limit magazine content and lesser quality or inferior ammunition. Nor can the Federal or State governments single out and subject constitutionally protected firearms, magazines, and ammunition to excessive and punitive taxes, insurances,

---

[4] Even the Department of Agriculture arms itself with machineguns .https://www.fbo.gov/index?s=opportunity&mode=form&id=9fc3a01217d03b0354e1e18b69aa7bad&tab=core&_cview=0 (last accessed October 7, 2015).

or over burdensome qualifying factors to exercise such protected rights. Simply being a citizen of the United States and acknowledgement that the Second Amendment exists is sufficient.

## I.    Standing

### A. <u>Mr. Hollis Has Standing To Bring His Second Amendment Complaint</u>

To demonstrate standing, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Natl. Fedn. of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 208-09 (5th Cir. 2011) (quoting *Davis v. FEC*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)). The district court found Hollis faced an "injury-in-fact." ROA.797-798. The district court held that Hollis' Second Amendment challenge was both facial and as-applied. ROA.802. The district court's further noted a similar case in the Eastern District of Pennsylvania, with almost identical fact patterns, where the plaintiff in that case was found to have standing to assert his Second Amendment and NFA challenges. ROA.807. RE-27. *See also* ROA.758-781. The district court distinguished the Pennsylvania case with the instant case and noted:

> [t]hat the differences in the Texas statute and the NFA are meaningful enough for this Court to refrain from concluding that the Texas statute merely 'piggybacks' on the NFA, or that a ruling that the NFA is violative of the Second Amendment would automatically 'sweep away' the Texas statute.

ROA.807.  However, the Texas statute does piggyback upon the NFA, as the court noted, "It is a defense to prosecution under this section that the actor's possession was pursuant to registration pursuant to the [NFA]…."  ROA.802.  RE-18.

Texas does not independently ban machineguns, and but for the federal machinegun ban, Hollis would be allowed to possess machineguns registered with the BATFE.  A ruling from this Court (or the district court) that the machinegun ban is unconstitutional as-applied to Hollis would redress his injury-in-fact.  Stated a different way, Texas law does not prohibit Hollis from having his machinegun and Texas is an unnecessary party.  The district court did not take into account that Hollis' approved machinegun *was* registered before the BATFE unilaterally revoked his issued Form 1, and *was* compliant with the Texas safe harbor. Therefore, at the time of the filing of the Complaint, Texas was not a necessary party, as Hollis challenged the revocation of his Form 1 approval and thus ability to make a machinegun, registered to him in the National Firearms Registration and Transfer Record and fully compliant with Federal (and Texas) law.  The conduct challenged is not only fairly traceable to Defendants, but is actually traceable to Defendants, as the BATFE revoked his approved Form 1 and generally bans post-May 19, 1986 machineguns.

The district court additionally distinguished another Northern District of Texas case, *Mance v. Holder*, 74 F.Supp.3d 795 (N.D. Tex. 2015) wherein that court

found an almost identical attack on the *Mance* plaintiffs' standing to be without merit.[5]  In any event, to avoid this issue, as discussed below in further detail, Hollis requested he be allowed to amend his Complaint to either add Texas as a party or voluntarily dismiss his challenge against the NFA.  However, the district court then stated, "Even if the Court were to find that Hollis has standing to assert his Second Amendment Claim, Hollis' Second Amendment claim is unsustainable as a matter of law," and analyzed the challenge under the familiar Fifth Circuit framework. The district court did so because the analysis was required for the court to reach its holding for Hollis' Equal Protection claim.  ROA.824. RE-43.

Finally, even if this Court finds that Hollis does not have standing to pursue his claim against the NFA, it still should find that Hollis has standing to pursue the remainder of his claims against the GCA's complete ban on post-1986 machineguns.  The two provisions operate as independent regulatory schemes. The NFA regulates the ownership of machineguns already in existence.  The GCA bans the creation of new machineguns.  The bulk of Hollis's relief can be obtained, even if his NFA. challenge were to fall away.  A successful challenge to the GCA allows Hollis the relief of building a machinegun that would be regulated under the

---

[5] Now styled *Mance v. Lynch*, that case is currently pending before this Court; Case No. 15-10311.  It is worth noting that, while the same attack on the *Mance* plaintiffs' standing was made in the district court, the government did "not press the standing argument on appeal."  Footnote 5 of Appellant's Opening Brief.

NFA. Defendants' standing argument deals with the NFA only, and the lower court erred by conflating the two statutes as one single regulatory scheme which could not be reviewed independent of one another. The NFA and GCA are two analytically distinct statutes. The lower court standing analysis erred by finding that lack of standing for one equates to lack of standing for the other. Even if this Court finds Hollis does not have standing to pursue his NFA, this Court should allow him to pursue his GCA claim.

## II.  THE CHALLENGED LAWS ARE UNCONSTITUTIONAL FACIALLY AND AS-APPLIED TO HOLLIS

### A. <u>The Challenged Laws Burden Second Amendment Rights</u>

### i.  Defendants Misapply *Heller's* Dangerous and Unusual Language

As set forth below, the dangerous and unusual doctrine does not pertain to the mere *possession* of a firearm (or other weapon), but only applies to the *manner* in which that right is exercised. This case is not about the *carrying* of "dangerous and unusual weapons", but mere possession of a firearm.

Justice Scalia clarified this recently: "For example, there was a tort called affrighting, which if you carried around a really horrible weapon just to scare people, like a head ax or something that was, I believe, a misdemeanor," he explained.[6]

---

[6] *See* http://cnsnews.com/news/article/justice-scalia-2nd-amendment-limitations-it-will-have-be-decided (last visited 10/7/2015). Justice Scalia further stated, "I mean, obviously, the (2nd)

Justice Scalia's comments likely stem from A Treatise on the Criminal Law of the United States by Francis Whartson (1874):

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted) There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). ... yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute. *Id.* at 527.

In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force. ("[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life … is … the use of dangerous weapons" *United States v. Hare*, 26 F. Cas. 148, 163 - 64 (C.C.D. Md.1818)). "Any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt" *See Baron Snigge v. Shirton* 79 E.R. 173 (1607). In this context, "unusual" meant to use a protected arm in a manner which creates an affray. Timothy Cunningham's 1789 law dictionary defines an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror."

---

amendment does not apply to arms that cannot be hand-carried. It's to 'keep and bear.' So, it doesn't apply to cannons. But I suppose there are hand-held rocket launchers that can bring down airplanes that will have to be -- it will have to be decided."

An unusual use of weapons in common use led to *Baron Snigge v. Shirton* 79 E.R. 173 (1607), this case involved a landlord - lessee dispute. The tenant "kept the possession [of the house] with drum, guns, and halberts". The Court found he used "unusual weapons" to maintain possession of the house. *Id. Rex v. Rowland Phillips* 98 E.R. (1385) holds "if an officer in the impress service, fire in the usual manner at the hallyaras of a boat, in order to bring her to, and happen to kill a man it is only manslaughter". *Id.*

The "dangerous and unusual" doctrine is not merely a restatement of *Heller*'s tests for protected arms. *Heller* offered that its test for what arms are protected by the Second Amendment is "supported by" the prohibition on the carriage of dangerous and unusual weapons, *Heller*, 554 U.S. at 627 (citations omitted), but that is not to say the two concepts—the scope of the arms protected by the Second Amendment, and the "dangerous and unusual" doctrine—are identical. They are very different.

As the sources *Heller* cited indicate, the longstanding prohibition on the carrying of "dangerous and unusual weapons" does not, in fact, refer to types of weapons, but to types of conduct with weapons. A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to

terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[ ] act of violence or disturbance of the peace." TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as

where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … But here it should be remembered, that in this country the constitution guar[]anties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, at 588 n.10 (quoting same). It is the *manner* of how the right is exercised, not the type of weapon that is carried, that constitutes the crime. At no point is a test referred to regarding the commonality of the usage of the weapons carried. Said another way, just because a firearm or other weapon is in common usage at the time does not make the *manner* in which the right is exercised excused or excusable simply due to the type of firearm or weapon carried.

"[T]here may be an affray … where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons … in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land").  In fact, one does not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine.

*See State v. Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

As *Heller* summarized, the traditional right to arms "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller* at 626. Thus, carrying of dangerous and unusual weapons refers to a time, place, and manner restriction on the carrying of protected arms. As Hollis' challenge is about mere possession of a machinegun, and not carrying, the dangerous and unusual doctrine simply does not apply. Accordingly we are left with the proposition that Hollis's machinegun is a protected arm. Hence we must determine the constitutionality of government's prohibition on this arm.

### ii. Defendants Complete Ban on Machineguns is Categorically Invalid

In *Heller*, applying heightened scrutiny was unnecessary. The Court found, no matter what standard of review to which the Court might have held the D.C. restrictions, "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id*. at 628–629 (internal quotation marks and citation omitted). A law effecting a "destruction of the right," rather than merely burdening it, is, after all, an infringement under any light. *Heller* at 629 (emphasis added) (quoting *Reid*, 1 Ala. at 616–17); *see also Heller v. D.C., 670 F.3d 1244, 1271 (D.C. Cir. 2011)*

(Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

This matter is analogous. Here, the government completely bans a class of bearable firearms. Hollis concedes that the ownership of machineguns can be regulated to a point, just as all firearms are regulated. However this complete ban can fulfill no level of scrutiny. *See Heller* 628–35. "[C]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them…." *Id*. at 634-635. (A law that "under the pretense of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional"). However, if this Court rejects the approach applied by *Heller* then, at a minimum, strict scrutiny should apply.

### iii. *U.S. v. Marzzarella* Supports Applying a Categorical Approach

*U.S. v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010) supports applying a categorical approach to this complete ban on a class of arms. The defendants in *Marzzarella* argued that the Court should apply a categorical approach finding the ban on firearms with obliterated serial numbers unconstitutional. The Court found this argument unpersuasive:

> His argument rests on the conception of unmarked firearms as a constitutionally recognized class of firearms, in much the same way

handguns constitute a class of firearms. That premise is unavailing. *Heller* cautions against using such a historically fact-bound approach when defining the types of weapons within the scope of the right. 128 S.Ct. at 2791 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way"). Moreover, Marzzarella himself asserts that serial numbers on firearms did not exist at the time of ratification. Accordingly, they would not be within the contemplation of the pre-existing right codified by the Second Amendment. It would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms.

Furthermore, it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility. *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality. ... But unmarked firearms are functionally no different from marked firearms. The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic. *Marzzarella* at 93-94.

Clearly, *Marzzarella* supports applying a categorical approach on bans on arms functionally different from a handgun. Such is the case here, as Hollis's M-16 is considerably different in form and function than a handgun. As established above, it is a protected arm. Accordingly, the government's complete ban on these protected arms should be deemed categorically invalid. However, if any level of scrutiny need apply, then strict scrutiny must apply.

### iv. The 1934 Hearing on National Firearms Act Supports That A Categorical Ban Would Be Unconstitutional

Unlike the machinegun ban in § 922(o), the constitutionality of the original NFA bill was actually debated, with then-Attorney General Homer Cummings admitting that a ban on machineguns may not survive Constitutional scrutiny unless reached through Congress' power to tax. Cummings denied that machineguns could be banned, because "we have no inherent police power to go into certain localities and deal with local crime. It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act." ROA.480.

While Congress may have the power to regulate under the auspices of a tax, Section 922(o) goes beyond that and is treated as a categorical ban on a bearable arm. Even in 1934, Congress understood (and the Attorney General conceded) there may be a constitutional issue with a categorical ban.

### v. The Ban on Machineguns in § 922(o) is not Longstanding or Presumptively Lawful

The government argued that the restrictions on possession of a machinegun are longstanding and presumptively lawful.[7] ROA.810. RE-29. The federal ban on machineguns, as stated *supra*, is not a longstanding law, as it became law only in

---

[7] As shown below, *Heller* does not hold longstanding doctrines are presumptively lawful, however, even if it did, the federal ban on machineguns discussed *supra* is not a longstanding law as it only became law in 1986.

1986. And *Heller*, not a case about machineguns, did not stand for the proposition that the ban is presumptively lawful.

The government cited to a number of cases regarding machineguns being regulated at the state level, so that must mean that the ban on machineguns is longstanding. But that demonstrates nothing other than states regulate firearms. The district court stated that:

> At least twenty-one states have enacted restrictions on the possession, acquisition, and sale of machine guns, and Defendants argue that many of those states had Second Amendment analogues in their respective States constitutions, which shows that machine guns are presumptively not protected from regulation by the Second Amendment.

ROA.810. RE-29. This begs the question about the remaining twenty-nine states and further, how could a minority of States "show machineguns are presumptively not protected from regulation by the Second Amendment?"

The federal ban is the statute being considered, and that the states regulate or regulated machineguns is a matter for another time. What matters is that Texas does not prohibit machineguns, as long as they are properly registered per federal law, and Hollis would be able to manufacture a machinegun, pursuant to federal law, if Defendants were not prohibiting him from doing so. If it did matter that machineguns were subject to longstanding regulations, the D.C. gun ban would likewise have been classified a "longstanding law," forbidding residents from keeping and bearing arms in the home, and thus the *Heller* court would have found

in D.C.'s favor. But as we know, D.C.'s categorical ban did not survive, no matter how long it had been in effect.

While the Fifth Circuit has held that the "unlawful possession of a machine gun is a crime of violence" under the Sentencing Guidelines (*see U.S. v. Golding*, 332 F.3d 838, 839 (5th Cir. 2003)) and has affirmed convictions for the unlawful possession (i.e., not in compliance with the NFA) of a machinegun (*see U.S. v. Kirk*, 105 F.3d 997, 998 (5th Cir. 1997)), those cases are easily distinguishable as those cases dealt with a *felon* in possession and an *unregistered* machinegun, respectively. In fact, most of the cases dealing with machineguns are those entwined in criminal prosecutions, not remotely close to the Plaintiff in this case that applied for and received permission from the BATFE to build a machinegun. Cases regarding *criminal* behavior are simply not applicable to the case at hand, as Hollis is not prohibited from owning firearms.

When *Heller* refers to certain longstanding prohibitions surviving it is not giving a temporal test. It simply is providing examples of existing firearms laws which are constitutional post-*Heller*. It is a misreading of *Heller* to argue all long standing prohibitions are presumptively constitutional. *Heller* states:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools

> and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller* at 626-27. This passage is simply to give assurances that reasonable regulations would continue to be constitutional post-*Heller*. This is evidenced by *Heller* referencing both modern restrictions such as those on commercial sales and historical restrictions on Common law felons and the mentally ill. Moreover, a natural reading of this passage supports that these are simply examples of restrictions that survive constitutional muster. While *Heller* teaches us that text and history are essential to analyzing the scope and nature of the Second Amendment right, Defendants position finds no support in *Heller*.

### vi. If Means End Scrutiny is Necessary, Strict Scrutiny Should Be Applied

The Fifth Circuit applies a two-step analysis as framed out in *Natl. Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 194 (5th Cir. 2012). Accordingly, if the Second Amendment right is implicated at all, the presiding Court must apply (at the very least) some form of means end scrutiny. Here, the complete ban on a protected class of arms should trigger a categorical approach. However, if means end scrutiny applies, then this Court should adopt the Sixth Circuit recent approach.

While the opinion in the United States Court of Appeals for the Sixth Circuit was vacated and rehearing *en banc* granted, that court recently stated that:

"*Heller*'s footnote 27—even aside from the Court's flat rejection of Justice Breyer's interest-balancing inquiry—strongly suggests that intermediate scrutiny 'could not be used to evaluate' Second Amendment challenges." *Tyler v. Hillsdale County Sheriff's Dept.,* 775 F.3d 308, 328 (6th Cir. 2014), reh'g en banc granted, opinion vacated (Apr. 21, 2015). Under strict scrutiny, a challenged law will satisfy scrutiny "if it furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Commn*., 558 U.S. 310, 312 (2010). Section 922(o) furthers no compelling interest, or if it does, is not narrowly tailored, as it is a categorical ban on machineguns.

We turn back to the two-pronged approach in *Natl. Rifle Ass'n.* First, the court must ascertain "whether the conduct at issue falls within the scope of the Second Amendment right." *Natl. Rifle Ass'n*, 700 F.3d at 194. "To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id*. If the conduct is not burdened, then the court's inquiry is complete as the "conduct … falls outside the Second Amendment's scope…." *Id.* However, if the conduct is burdened, the court will "then proceed[ ] to apply the appropriate level of means-end scrutiny." *Id*.

The court's first inquiry is whether 18 U.S.C. § 922(o) regulates conduct within the scope of the Second Amendment. The first prong is not difficult to

answer in the affirmative; § 922(o) regulates conduct within the Second Amendment. As stated in *Heller*, "… the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582. The Second Amendment does not only protect "those arms in existence in the 18th century." *Id*. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id*. at 634.

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986. This provision was enacted in 1986 as §102(9) of the Firearm Owners' Protection Act, which amended the GCA of 1968. Further, the term "person" is defined in the GCA to mean "any individual, corporation, company, association, firm, partnership, society, or joint stock company." *See* 18 U.S.C. § 921. The statutory definition of the term "person" does not include an unincorporated trust. As the plain language excludes "unincorporated trust" from the definition, this court (and the BATFE) should not read into the statute what is not there. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 14-2767, 2014 WL 7172253, at *6 (3d Cir. Dec. 17, 2014) (citing *Meese v. Keene,* 481 U.S. 465, 484, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) ("It is

axiomatic that the statutory definition of the term excludes unstated meanings of that term.").

Defendants, mindful of the definition of the term "person," stated in an opinion letter on March 17, 2014 to Dakota Silencer in Sioux Falls, South Dakota, referenced the "person" definition and stated: "[u]nlike individuals, corporations, partnerships, and associations; unincorporated trusts do not fall within the definition of "person" in the GCA." ROA.8-24. By the BATFE's admission, the term "person" in the GCA does not include an unincorporated trust and such a trust cannot be subject to the prohibition in § 922(o). ROA.25-26.

But delving further into the constitutionality of § 922(o), *Heller* does not stand for the proposition that the types of firearms at issue in this case are not protected by the Second Amendment, only that it would be a "startling reading of the [*Miller*] opinion since it would mean that the NFA's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624. (*See U.S. v. Miller*, 307 U.S. 174 (1939) (Absence of evidence showing that short-barreled shotguns have reasonable relationship to preservation or efficiency of well-regulated militia, Court cannot say Second Amendment protects such a firearm). It is also important to note the Supreme Court's "startling" language was directed at the NFA, not the GCA which encompasses the categorical ban on post-May 19, 1986 machineguns. The NFA

places restrictions on machineguns by taxing them and making the possessor file certain paperwork. The GCA, 18 U.S.C. § 922(o), is the provision that bans possession by "persons" for any machinegun not lawfully possessed prior to its enactment.

The district court mistakenly conflated the GCA and NFA when it enlarged upon the Supreme Court's dicta regarding the "startling" provision, when it stated, "It is also worth noting that the Supreme Court clearly found startling the prospect that the machine gun ban would have been unconstitutional, thereby suggesting the constitutional validity of the machine gun restrictions in the NFA and GCA." ROA.814. Yet as discussed above, the Supreme Court in *Heller* never stated the ban under the GCA is constitutional.

The lower court cites to *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid ") and *Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) ("Fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*.") for the proposition that machineguns are not protected by the Second Amendment ROA.814. However, these opinions misinterpret *Heller*. Machineguns are bearable arms and they have not "traditionally been banned," but only highly regulated and taxed. It was not until 1986 that the federal ban came into existence. The circuit

court opinions relied upon by the district court are plainly incorrect in their post-*Heller* analysis.

Section 922(o) is simply overbroad as it bans <u>all</u> machineguns; machineguns that are protected by the Second Amendment as bearable arms and machineguns that are not bearable arms. But reading *Miller* and *Heller* together, clearly an M-16 (under *Miller*) has "some reasonable relationship to the preservation or efficiency of a well-regulated militia" as every branch of the armed forces (and multitude of federal and state agencies) utilizes the M-16 for some purpose. *Miller*, 307 U.S. at 178. Thus, Hollis's desire to own one falls within Second Amendment protection. Accordingly the question is what level of constitutional scrutiny is to be applied.

Under the second prong, the court will "then proceed[ ] to apply the appropriate level of means-end scrutiny." *Natl. Rifle Ass'n*, at 194. The level of scrutiny that is appropriate "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right. *See Chester*, 628 F.3d at 682 (observing that "a 'severe burden on the core Second Amendment right of armed self-defense should require a strong justification,' but 'less severe burdens on the right' and 'laws that do not implicate the central self-defense concern of the Second Amendment[ ] may be more easily justified' (quotation and citation omitted))." *Id*. at 195. The intermediate scrutiny test cannot be a rational basis review, as *Heller* forbids a rational basis application to evaluate an

"enumerated right."  *Id*.  If intermediate scrutiny applies, the government must demonstrate a "reasonable fit between the challenged regulation and an important government objective."  *Id*. (internal quotations and additional citations omitted).

The ban contained in § 922(o) is a complete ban on the possession of post-May 19, 1986 machineguns.  All of them.  The ban discriminates not on bearable arms or crew served machineguns.  If the firearm fires more than one shot with a single function of the trigger, then it is classified as a machinegun.  The burden imposed by § 922(o) severely limits the possession of a protected class of firearms. Substituting machineguns for handguns, it is not difficult to make the leap that § 922(o) does "not just regulate possession of [a machinegun]; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home."  *U.S. v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010) (citing *Heller*, 128 S. Ct. at 2818). Thus, strict scrutiny must apply.

However, under any means end scrutiny, Defendants have failed their burden in showing a compelling or important government interest in banning machineguns as applied to Hollis.  Defendants cannot, in fact, demonstrate a compelling government interest, or if they can demonstrate *an* interest, it is not a *compelling* interest.  If the Defendants were serious about banning machineguns, then they would attempt to simply ban them.  But Defendants instead ban machineguns solely based upon date of manufacture, even though the NFA already

regulates the ownership, possession and transfer of <u>all</u> machineguns. Section 922(o) simply goes too far.

### vii. Even if Means End Scrutiny Applies, Defendants Fail Their Burden

Here, the burden is on the government to show that their complete ban on machineguns meets the requisite level of scrutiny. As the government did not address a strict scrutiny analysis in the district court, they presumably concede that, if the Court applies strict scrutiny, then their complete ban on a protected arm is unconstitutional. In order to fulfill strict scrutiny, the government must show that there is compelling governmental interest and that the restriction is narrowly tailored and is the least restrictive means. *See Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Here, protecting public safety and combating crime is what Defendants offer as their interest in regulating machineguns. However, a complete ban is not in any way, shape, or form narrowly tailored and it is certainly not the least restrictive means to achieve this government interest. Defendants could simply regulate their use, such as requiring strict registration, background checks, imposing storage requirements, and otherwise making it possible for Hollis and other law abiding citizens to own automatic firearms while ensuring that these weapons are stored safely so that they do not fall into the hands of criminals. The BATFE does this already within the purview of the already onerous NFA.

However, even if this Court finds intermediate scrutiny is proper, Defendants complete ban on these protected arms still fails. Why? Defendants have not actually shown that lawfully owned machineguns are actually linked to crime. Under intermediate scrutiny, "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *United States v. Reese*, 627 F.3d 792, 802 (10th Cir.2010).

Defendant bears the burden of proving a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective. *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir.2013) (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)). This requires a demonstration that the law is likely to advance that interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

The government's "burden is not satisfied by mere speculation or conjecture"; instead, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (emphasis added). Defendants must prove with "substantial evidence" that the statute "will alleviate" the identified harm "in a material way." *Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180, 195 (1997) (*Turner II*); *Edenfield*, 507 U.S. at 770-71 ("will in fact alleviate them to a material degree").

While machineguns certainly can be dangerous weapons (as can be cars, knives, and even matches to an arsonist), no evidence was presented that, even if available, they are the weapon of choice for criminals. That is the case because Appellees cannot produce that evidence. The weapon of choice for criminals are cheap handguns that can be disposed of easily, not $10,000.00 machineguns that are worth more than any convenience store register could possibly have. Thus, applying <u>any</u> level of heightened scrutiny; Appellees' complete ban fails.

Specifically with regard to crime, as Defendants repeatedly pointed to government's *compelling* interest in protecting public safety and combating crime, if we look at the actual statistics and congressional testimony, they do not demonstrate the parade of horribles posited exists. ROA.114. In fact, in 1984 at a hearing before Congress, then-Director Stephen E. Higgins testified about the NFA and <u>lawfully registered machineguns</u> specifically. Director Higgins stated,

> These weapons are held by collectors and others; only rarely do they figure in violent crime. In this connection, the question of why an individual would want to possess a machinegun or, more often, a silencer, is often raised. We would suggest that ATF's interest is not in determining why a law-abiding individual wishes to possess a certain firearm or device, but rather in ensuring that such objects are not criminally misused. <u>The regulatory scheme for dealing in or legally possessing NFA weapons and silencers is straightforward and provides safeguards which are adequate, in normal circumstance, to ensure that the firearms remain in the hands of law abiding individuals.</u>

*Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132* (1984). ROA.439-440. (underling added). Further, Director Higgins testified that "registered machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." *Id*.

Director Higgins testified that, as of September 30, 1984, there were 105,125 registered machineguns, with 20,499 registered to governmental entities (law enforcement agencies and the like), 41,419 registered to Special Occupational Taxpayers (dealers and manufacturers), and 43,207 registered to individuals. ROA.443. Adding together the "private" owners, dealers, and individuals; 84,626 of those machineguns did not belong to a governmental entity, or approximately 80.5% of registered machineguns were in private hands.

The statistics from the Bureau of Justice Statistics ("BJS"), a U.S. Department of Justice, Office of Justice Program, tell the same tale. In the Highlights section of the 1995 Firearms, crime, and criminal justice report by Marianne W. Zawitz, BJS Statistician, it states "Although most crime is not committed with guns, most gun crime is committed with *handguns*." (italics added). ROA.493. The report states that "Of all firearm-related crime reported to the survey, 86% involved handguns," and that 57% of all murders in 1993 were

committed with handguns, 3% with rifles, 5% with shotguns and 5% where the type was unknown.  ROA.496. With regard to machineguns, the report states that in 1995, the BATFE had 240,000 automatic weapons registered.  ROA.496. However, the number of "trace requests," (meaning when a firearm is used in a crime and a police agency requests the National Tracing Center at the BATFE to trace the original point of sale) for machineguns barely registered on the report.  In 1994, handguns constituted 79.1% of all trace requests; Rifles 11.1%; Shotguns 9.7%; and "Other including machinegun" 0.1%.  ROA.496. Out of the ten most frequently traced firearms in 1994, (a mere eight years after the ban) not surprisingly, machineguns <u>do not appear</u>.  In fact, nine out of those ten are pistols, with the majority of those pistols being inexpensive handguns, commonly referred to as "Saturday night specials."  ROA.497.

In May 2013, another report from the BJS regarding Firearm Violence from 1993-2011 shows the government's position regarding machinegun crime or public safety is untenable.  The report's findings show that handguns account for "about 83% of all firearm homicides in 1994, compared to 73% in 2011 … For nonfatal firearm violence, about 9 in 10 were committed with a handgun…." ROA.500. In 2011, there were 11,101 firearm homicides, down from 18,253 in 1993.  Compare that with 38,023 deaths related to motor vehicle accidents; 27,483 deaths due to

falls, 43,544 deaths related to drugs; and 26,654 deaths related to alcohol. ROA.530. Yet vehicles and alcohol are not banned.

Assuming arguendo that public safety and/or the prevention of crime was a serious contention for the banning of an entire category of weapons, handguns would not have been allowed or specifically protected under *Heller*. This bears repeating. Despite the majority of homicide and firearms crime being committed with handguns, the *Heller* court protected that category of firearm. *See Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (the "mere possibility" that a gun control law may save lives is not enough or "*Heller* would have been decided the other way" if it were).

Yet even if we ignored the government's own statistics, the Supreme Court has rejected the notion that arms bans for the law-abiding are justified to prevent unlawful use by criminals. *Heller* at 636; *McCullen v. Coakley, Id.* at 712 (Breyer, J., dissenting) (arguing that lawfully-owned handguns could be stolen by criminals); *cf. Fotoudis v. Honolulu*, 2014 WL 4662385 at *5 (D. Haw. 2014) (prohibition of gun ownership by lawful permanent resident aliens is not "narrowly tailored," because it applies "regardless of whether they are otherwise qualified to acquire firearms, and regardless of whether they might pose a threat to others"). And there is no argument that Hollis is a prohibited person or would be dangerous with a machinegun.

### viii.  Defendants Misread *United States v. Miller*

Defendants misread the holding of *United States v. Miller*, 307 U.S. 174 (1939) and argue it holds short-barrel shotguns are not protected by the Second Amendment. *Miller* holds that

> … in the absence of any evidence tending to show that a possession or use of 'a shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or the efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.  Certainly it is not within the judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.*

For background on *Miller*, Jack Miller and Frank Layton were accused of transporting a double barrel, a Stevens Shotgun, with a barrel length of less than 18 inches, without registering it and paying a $200.00 tax; a violation of the NFA. Jack Miller, Frank Layton and their representative attorney-at-law did not appear in court for the hearing. The lower trial court found the NFA violated the Second Amendment's right to keep and bear arms and ultimately dismissed the government's case. The government then appealed to the Supreme Court. Interestingly, neither Miller nor his counsel filed any briefing with the Court nor did they appear.  As such, the Court ruled as it did and remanded the case to the lower Court for further proceedings consistent with its opinion. Unfortunately this did not occur, as both Miller and Layton died shortly after the Court's decision.

*Heller* relies on *Miller* for the historical fact that when militia men "were called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." While this historical fact has been misinterpreted as a test, *Miller* cites this historical fact solely to support its holding. The Court provided one example of how something can aid in the preservation or the efficiency of a well-regulated militia. That is to show something is "part of the ordinary soldier's equipment." *Heller* expands on *Miller* to hold handguns (and other arms) designed for personal self-defense receive Second Amendment protection regardless of whether they have military value.

Defendants argue that the Second Amendment right does not foreclose "categorical legislative prohibitions [as] … the right protected by the Second Amendment is a right to 'keep and bear Arms,' not a right to possess a specific firearm or type of firearm." This argument borders on the frivolous as it was explicitly rejected in *Heller*. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller* at 629. The Supreme Court rejected the argument that a ban on handguns is constitutional as long as long arms are legal to own. Further, Defendants' reference to the Militia Acts is unpersuasive. Hollis has no duty to standardize his small arms collection for mandatory military training, nor were members of colonial militias limited to owning weapons

authorized for militia duty. However, Defendants' concession that arms tied to militia duty are part of the historical right supports finding an M-16 is protected by the Second Amendment.

Defendants argue that bearable machineguns are not needed for personal self-defense. This fails to acknowledge there are millions of veterans who are most comfortable defending themselves with this arm due to training received in the armed forces. However, even if Defendants' argument was valid, the M-16 machinegun receives Second Amendment protection on independent grounds as it is the standard issue weapon of the ordinary soldier. As such, it is the quintessential militia arm. Accordingly, just as colonial Americans had a fundamental right to own and familiarize themselves with the rifles which constituted the militia arms of the time, Hollis has a fundamental right own his modern day equivalent which is the M-16 rifle for the Defense of himself and the State.

### ix.    *Miller* Provides the Outer Limits for the Second Amendment Right

This Court may have legitimate concerns that a ruling in Hollis' favor will open the floodgates to legalizing deadlier bearable weapons, such as surface-to-air missiles.  This Court should be assured that it will not.  *Heller*'s ruling that the Second Amendment right extends prima facie to all bearable arms should be read in tandem with *Miller*'s holding that the Second Amendment right extends to items

that are part of the ordinary soldier's equipment.  Hollis' M-16 rifle clearly falls within the scope of the military equipment issued to the average infantry soldier. Moreover, they are bearable upon the person. Thus, M-16s fall within Second Amendment protection in lock step with the framework established by *Heller* and *Miller*. Arms such as shoulder-fired rockets, mortars, and heavy machineguns probably do not.  Either the aforementioned weapons require a crew of two or more, *or* they are not part of the ordinary soldier's equipment.

The M-16 is the quintessential militia-styled arm for the modern day. Since the Founding of Jamestown in 1607 the militia firearm has evolved from the following:

- Muzzleloader – Musket.
- Manual breach load – rifle or pistol.
- Clip load (normally five rounds on an inline clip) deposited into a built in magazine located in the mechanics of the firearm.
- Detachable Box-magazine from the firearm usually holding 5, 10,15,20,30 rounds.
- Detachable Drum-type magazine holding up to 100 rounds.
- Belt-fed ammunition expending indefinite number of rounds.

The M-16 service rifle is the standard issue firearm for all branches of the military. Since 1965 and the introduction of the M-16 rifle, from conscription draft days to the modern volunteer armed forces, every single man and woman has been trained and possesses knowledge and experience with the firearms, and is familiar with the maintenance and care and repair of the firearm.  The advantage to owning and training with the standard military weapon is the shortness of time to re-

familiarize returning personnel back to active duty; assisting in instructing new and unfamiliar personnel; standardizing the ammunition and maintenance tools; and to lessen the burden of the State and Federal government to resupply the returning forces with arms and ammunition. Accordingly, Hollis' M-16 fulfills the *Miller* test of aiding in the preservation or the efficacy of the militia and *Heller*'s bearable on the person requirements for Second Amendment protection.

### x. "Common Use" Cannot Be A Test

There is much discussion about some undefined "common use" test. This cannot be a legitimate test. There is no other Amendment to the Constitution that relies on consumerism to dictate whether citizens have rights. Further, even if it were a test, a musket, the "commonly used" rifle at the time the Second Amendment was ratified, would not be a protected firearm in 2015 as it is not "commonly used." It simply produces absurd results and should not even be considered a legitimate test. It cannot be a test because, if a new weapon was developed at some point in the future, the government could quickly move to ban it before its ownership met this mythical standard, and thus would not be considered protected. No other Amendment suffers from this consumerist mindset, and the Second Amendment should not be subject to it either.

## III.    THE DISTRICT COURT COMMITTED TWO ADDITIONAL ERRORS

### i.  <u>The District Court Erred in Denying Appellant's Rule 56(d) Motion</u>

A central theme of the case is that the BATFE has allowed other post-May 19, 1986 machineguns to be transferred and possessed by non-governmental entities.  This is a fact, although not considered by the district court as it was not "attached to the Complaint…." ROA.824. RE-43. BATFE maintains these records and a simple query could provide Appellant the necessary information.  Appellant argued in his Brief in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment that he "be allowed discovery on these issues to ascertain how many more approvals since 1986 exist."  ROA.358.

Fed. R. Civ. P. 56(d) provides that the party opposing a summary judgment motion can request additional discovery if he is unable to present facts to justify the opposition to the motion.  The non-movant must request the continuance from the court and "present an affidavit containing specific facts explaining [his] failure to respond to the adverse party's motion for summary judgment via counter affidavits establishing genuine issues of material fact for trial."  *Intl. Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991) (additional citations omitted).  The Fifth Circuit has "observed that Rule 56(d) motions are generally favored and should be liberally granted."  *Beverly v. Wal-Mart Stores, Inc.*, 428 Fed. Appx. 449, 451 (5th Cir. 2011)(unpublished).

The BATFE denies that any Form 1 machineguns have ever been approved for manufacture for non-governmental entities after May 19, 1986. However, Appellant provided an affidavit averring that he has knowledge of at least one, and a reasonable belief that at least two more have been approved in requesting that the district court allow discovery under Rule 56(d) on this issue. ROA.365-368. The district court, however, denied Appellant's Motion for Discovery under Rule 56(d) as moot, even though Appellant complied with the affidavit requirement, and even though this Court stated that type of motion is "generally favored and should be liberally granted." *Id.* Had the district court allowed this discovery to take place, it would prove that the BATFE allows non-governmental entities to possess post-May 19, 1986 machineguns, eliminating the BATFE's argument that it has never allowed their possession. Of course, it is known that the BATFE has allowed this, as evidenced (but not considered) by the district court. ROA.433.

"Federal courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss." *Davis v. Bayless*, 70 F.3d 367, 372 (5th Cir. 1995) (citation omitted). There is no doubt that the document attached as evidence of the BATFE allowing post-May 19, 1986 machineguns to exist is a "matter of public record." That document was first filed in the case *US v. Clark*, et al; 2:10-cr-01047-ROS in the United States District Court for the District of Arizona. ROA.619-624. As such, the district court could have considered the

attached filing evidencing other post-May 19, 1986 machineguns, easily demonstrating that the BATFE allows certain classes of non-governmental entities to possess "forbidden" machineguns.

## ii. The District Court Erred in Dismissing Appellant's Complaint Without Allowing Appellant to Amend His Complaint

Appellant requested in at least two places that he be allowed to amend his Complaint. The amendments were discussed with regard to the standing issue Defendants raised in their Motion to Dismiss. In Appellant's sur-reply, Appellant requested that "if this Court were to entertain the Defendant's argument regarding the necessity of Texas being a defendant, [Appellant] should simply be allowed to revise his complaint and name the State of Texas as an additional Defendant." ROA.579. It was not necessary to add Texas as a defendant in the case, because Texas law defines machineguns differently than federal law. Machineguns are defined under federal law as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C.A. § 5845. Under Texas law, a machinegun is defined to mean "any firearm that is capable of shooting more than two shots automatically, without manual reloading, by a single function of the trigger." Tex. Penal Code Ann. § 46.01. This is not a distinction without a difference. Under federal law, if it shoots more than one shot by a single function of the trigger, it is a machinegun. Under Texas law, it needs to shoot more than

two shots by a single function. Since the Appellant could have made his machinegun a two-round burst machinegun and remain legal under Texas law, Texas was not a necessary party. Of course, federal law would still classify the two-round burst firearm as a machinegun. This was explained to the district court during oral argument. ROA.865. However, to avoid the issue of whether Texas was a proper party, the Appellant sought to either add Texas as a party or to voluntarily dismiss the NFA claim to eliminate the necessity of Texas as a party.

The district court stated that, since there was "…no allegation or evidence before the Court that Plaintiff sought to make such a [two-round burst] machine gun, which makes Plaintiff's argument merely academic." ROA.805. RE-24. This is a tacit admission that, had Appellant placed these words in his Complaint (or been allowed to amend his Complaint), the outcome might have been different.

During the oral argument, Appellant requested that, if the district court was inclined to "dismiss the case because the [NFA] is doing an adequate job of regulating machineguns…", he be allowed to dismiss his challenge to the [NFA] "…[and] proceed against the ban…" ROA.849. The district court later asked counsel for the government if the court "should [] let them amend to try to flesh that out?" ROA.866. The government answered in the negative. ROA.866.

The district court should have allowed Appellant to amend his Complaint. As the Supreme Court said in *Foman v. Davis*, 371 U.S. 178, 182 (1962):

If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

"The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman*, 371 U.S. at 181-82 (quoting *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80.) The Fifth Circuit stated, "Not surprisingly, denying leave to amend, absent articulable reason, is 'not an exercise of discretion' but rather 'abuse of ... discretion.'" *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 367 (5th Cir. 2001). It is clear from the record and the supporting evidence attached to Appellant's Response to the government's Motion to Dismiss, that the Appellant should have been allowed to amend the Complaint.

There can certainly be no argument that leave to amend would be futile because, if the Appellant dismissed his NFA claim, standing would not be an issue. Alternatively, if Appellant pursued the NFA claim and amended the Complaint to add Texas as a party, that would satisfy the standing argument as well.

There is likewise no bad faith, undue delay, or dilatory motive on behalf of the Appellant in requesting leave to amend. The Appellant, while not filing a

formal motion for leave to amend, requested leave to amend from the court at least twice. The district court stated in its Order that Appellant "has not sought leave to amend." ROA.800. RE-19. However, it is clear from the record that Appellant did so request leave to amend. At the oral argument, the court could have simply ordered an amendment within a certain number of days, however there was no such authority given to Appellant at the hearing. Additionally, no prejudice would come from such an amendment to the Complaint, as a scheduling order had not been entered and the government could certainly renew its Motion to Dismiss after the amendment if it so chose.

## CONCLUSION

When the constitutional rights of every single U.S. citizen were jeopardized by the collective rights theory, this Court's Circuit stood up for the Second Amendment. Thus, in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), cert. denied, 536 U.S. 907 (2002), the Fifth Circuit looked to the text, history, and tradition of our nation and became the first Circuit to find the Second Amendment confers an individual right to keep and bear arms. If this Court does the same, and it would not be a stretch for it to do so, it will find that Defendants' ban on the quintessential militia arm of the modern day defies the protections our Constitution guarantees.

For the foregoing reasons, the Fifth Circuit should review the district court's analysis of Hollis' Second Amendment challenge as it is a crucial component of Hollis' Equal Protection argument upon which the district court ruled. Hollis submits that this Court should reach the merits as to whether the Second Amendment protects Hollis' M-16 or, in the alternative, to remand this case to the district court with instructions to allow Hollis to amend his Complaint and to be allowed discovery on matters which would be applicable under the mooted Rule 56(d) motion.

Respectfully Submitted,

/s/ Alan Beck                      /s/ Stephen D. Stamboulieh

Alan Alexander Beck             Stephen Dean Stamboulieh

Counsel for Appellant            Counsel for Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 26, 2015, a true and correct copy of the foregoing Brief for Plaintiff-Appellant were served via electronic filing with the Clerk of Court and all registered ECF users.

Patrick G. Nemeroff
Email: patrick.g.nemeroff@usdoj.gov
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 305-8727

Daniel M. Riess
U.S. Department of Justice
Civil Division Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
(202) 514-1259

Dated: October 26, 2015

/s/Stephen D. Stamboulieh

# CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 13,612 words.

/s/ Stephen D. Stamboulieh