No. 15-10803

## In the
## United States Court of Appeals for the Fifth Circuit

JAY AUBREY ISAAC HOLLIS, INDIVIDUALLY AND AS TRUSTEE OF THE JAY
AUBREY ISAAC HOLLIS REVOCABLE LIVING TRUST,
*Plaintiff-Appellant*,

v.

LORETTA E. LYNCH, ATTORNEY GENERAL OF THE UNITED STATES;
THOMAS E. BRADEN, ACTING DIRECTOR OF THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, AND EXPLOSIVES,
*Defendants-Appellees.*

## On Appeal from the United States District Court
## for the Northern District of Texas

## Brief *Amicus Curiae* of Gun Owners of America, Inc.,
## Gun Owners Foundation, Gun Owners of California, Inc.,
## The Heller Foundation,
## Conservative Legal Defense and Education Fund,
## Institute on the Constitution, and
## Sheriff Bradley D. Rogers (Elkhart County, Indiana)
## in Support of Appellant and Reversal

HERBERT W. TITUS*
ROBERT J. OLSON
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  *Attorney for Amici Curiae*

*Attorney of Record
November 2, 2015

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

HOLLIS,

Plaintiff-Appellant,

v.

LYNCH, *et al.*,

Defendants-Appellees.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Loretta Lynch, *et al*., Appellees

Jay Hollis, Appellant

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., The Heller Foundation, Conservative Legal Defense and Education Fund, Institute on the Constitution, and Sheriff Bradley D. Rogers, *Amici Curiae*.

Herbert W. Titus, Robert J. Olson, William J. Olson, John S. Miles, and Jeremiah L. Morgan, counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *amici curiae* Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., The Heller Foundation, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them. *Amicus* Institute on the Constitution is not a publicly traded corporation, nor does it have a parent company which is a publicly traded corporation.

   /s/ Herbert W. Titus
Herbert W. Titus,
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

Page

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Interest of the *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument

I.  MACHINEGUNS ARE PROTECTED "ARMS" UNDER THE SECOND
    AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  <u>Heller</u> Did Not "Expressly Foreclose" the Argument that
        Machineguns Are Protected "Arms". . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  <u>Miller</u> Does Not "Expressly Foreclose" the Argument that
        Machineguns Are Protected "Arms". . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  The District Court Mischaracterized Founding-Era Militia
        Firearm Requirements as Limits Not to Be Exceeded, rather
        than Minimum Standards to be Met. . . . . . . . . . . . . . . . . . . . . . . . 11

    D.  Machineguns Are Not Dangerous and Unusual Weapons, but
        rather the Lineal Descendants of Founding Era Firearms, and
        thus within the Scope of the Second Amendment. . . . . . . . . . . . . . 12

II.  BY ITS CLEAR LANGUAGE, THE GUN CONTROL ACT DOES NOT APPLY
     TO THE HOLLIS FAMILY TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.  The Hollis Trust Machinegun Transaction is Exempt From the
        NICS Check. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.  If, as ATF Admits, a Trust is Not A Person, Then a Trust Can
        Register and Possess a Machinegun. . . . . . . . . . . . . . . . . . . . . . . . 19

III.    JUST AS THE FIFTH CIRCUIT LED THE NATION WITH ITS RESTORATION OF THE SECOND AMENDMENT IN <u>EMERSON</u> V. <u>UNITED STATES,</u> IT IS NOW CALLED ON TO RESTORE THE SECOND AMENDMENT IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
I Samuel 13:19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**U.S. CONSTITUTION**
Amendment II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**
18 U.S.C. § 921(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 21, 22
18 U.S.C. § 922(o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22
18 U.S.C. § 922(t)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
18 U.S.C. § 922(t)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19
26 U.S.C. § 7701(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

**REGULATIONS**
27 C.F.R. § 479.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22
27 C.F.R. § 479.85. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**CASES**
Ashwander v. TVA, 297 U.S. 288 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . 7
District of Columbia v. Heller, 554 U.S. 570 (2008). . . . . . . . . . . . . . . 2, *passim*
Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . 8
Jackson v. City of San Francisco, 135 S.Ct. 2799, No. 14-704 (dissent)
    (June 8, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Lawson v. Suwannee Fruit & Steamship Co., 336 U.S. 198 (1949). . . . . . . . . . . 22
Marbury v. Madison, 5 U.S. 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
McDonald v. Chicago, 561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . 2
Meese v. Keene, 481 U.S. 465, 484 (1987). . . . . . . . . . . . . . . . . . . . . . . . . 22
Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . 9
NRA v. ATF, 700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . 2, 16
Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . 8
Staples v. United States, 511 U.S. 600 (1994). . . . . . . . . . . . . . . . . . . . . . . 12
United States v. Emerson, 46 F.Supp.2d 598 (N.D. Tex. 1999). . . . . . . . . . . . . 24
United States v. Emerson, 270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . 25
United States v. Miller, 307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . 4, 24
United States v. King,735 F.3d 1098 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . 22

**MISCELLANEOUS**

78 *Fed. Reg.* 55014, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19, 23

F. Bastiat, <u>The Law</u> (Ludwig vonMises Institute: 2007). . . . . . . . . . . . . . . . . . . . 27

J. Blocher, "Categoricalism and balancing in First and Second
    Amendment Analysis," 84 NYU L. REV. 375 (May 2009). . . . . . . . . . . . 10

G.L. Carter, Ph.D., <u>An Encyclopedia of History, Politics, Culture, and</u>
    <u>the Law</u>, ABC-CLIO (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federalist No. 28, *The Federalist* (G. Carey & J. McClellan, eds.,
    Liberty Fund: 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

J. Mayhew, *A Discourse Concerning Unlimited Submission and*
    *Non-Resistance to the Higher Powers,* 1750. . . . . . . . . . . . . . . . . . . . . . . . 26

A. Scalia & B. Garner, <u>Reading Law</u> (West: 2012). . . . . . . . . . . . . . . . . . . . . . . 19

J. Story, Commentaries on the Constitution (1833). . . . . . . . . . . . . . . . . . . . . . . 25

Yuri Suhl, ed., <u>They Fought Back</u> (N.Y.: Paperback Library, 1968;
    1st pub. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. Wexler, <u>50 Guns that Changed America:  An Illustrated Guide,</u>
    (Skyhorse Publishing: 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., The Heller Foundation, and Conservative Legal Defense and Education Fund are nonprofit organizations, and each is exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Institute on the Constitution is an educational organization. Bradley D. Rogers is the Sheriff of Elkhart County, Indiana. Each of the *amici* is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

## I.     MACHINEGUNS ARE PROTECTED "ARMS" UNDER THE SECOND AMENDMENT.

The district court below erroneously decided that Hollis did not have standing to bring his complaint, but that, "[e]ven if" Hollis has standing, his Second Amendment claims fail.  2015 U.S. Dist. LEXIS 103656, at *34.  On the Second Amendment issue, the district court relied on the decision of a prior panel of this Court,[2] which "adopted a two-step framework for analyzing gun restrictions challenged on Second Amendment grounds...." *Id.* at *34.  Step two of that "two-step framework" is deeply flawed, utilizing exactly the sort of "judge-empowering 'interest-balancing inquiry'" rejected in Heller.  *See* District of Columbia v. Heller, 554 U.S. 570, 634 (2008).[3]  However, in this case the district court applied only step one of the "two-step framework," finding it unnecessary to proceed to step two because it decided machineguns are not even "within the scope of the Second Amendment." *Id.* at 41.  The district court used several different approaches to reach

_____

[2] NRA v. ATF, 700 F.3d 185, 194 (5th Cir. 2012).  Some of these *amici* filed an *amicus curiae* brief in support of Supreme Court review of that case, detailing the inconsistencies between the approaches taken in that opinion and the Heller opinion. http://www.lawandfreedom.com/site/firearms/NRAvBATFE_Amicus.pdf?84a79e

[3] *See also* McDonald v. Chicago, 561 U.S. 742, 785 (2010) ("In Heller ... we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing....").

that conclusion. Each approach was misguided, and the court's conclusion was demonstrably false.

### A. <u>Heller</u> Did Not "Expressly Foreclose" the Argument that Machineguns Are Protected "Arms."

The district court cobbled together fragments and *dicta* from <u>Heller</u> to support its ruling that machineguns do not constitute "arms" protected by the Second Amendment. The district court first asserted that the Second Amendment right is "not unlimited," that some "longstanding prohibitions" may be constitutional, that there may be various "presumptively lawful regulatory measures," and that the right does not apply to "*dangerous and unusual weapons*." *Id.* at *35-36. Although the district court quoted extensively from <u>Heller</u>, it decidedly did not follow the approach taken in <u>Heller</u> to conduct a principled historical and textual analysis of Second Amendment rights, including the types of "arms" that the Amendment protects.[4]

---

[4] The district court several times notes that weapons that are "in common use at the time" are protected by the Second Amendment. *Id.* at *36, *40, *42, *43. And the district court cited to cases where other courts have decided that machineguns are not currently in common use. *Id.* at *37, *44. But the district court never adopted those findings, apparently not believing it necessary to determine whether machineguns are in common use — because <u>Heller</u> *sub silentio* had already resolved the issue. The district court certainly never discussed the irrationality of the "common use" test which, if taken seriously, would exclude weapons that the federal government has drastically restricted for the past 80 years for no other reason than they have been restricted. If "common use" is the guide, then a long period of unconstitutional infringement of a Second Amendment right would transform a protected firearm into an unprotected one.

Attempting to marshal further support from <u>Heller</u> for its conclusion, the district court relied on what it called the "Supreme Court's discussion of the *exact automatic weapon* at issue in this case." *Id.* at 41. The full <u>Heller</u> quotation is ambiguous at best:

> [r]ead in isolation, *Miller's*[5] phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns ... might be unconstitutional, machineguns being useful in warfare. [*Id.* at 624.][6]

The district court first characterized <u>Heller</u>'s discussion of machinegun restrictions as "suggesting the constitutional validity of the machine gun restrictions...." *Id.* at 43. Then the district court provided only selective quotations to <u>Heller</u> where, in a hypothetical argument, the Court used M-16 rifles as an illustration in refuting an argument about the militia clause:

> It may be objected that if weapons that are most useful in military service — **M-16 rifles and the like** – may be banned, then the Second

_____

[5] <u>United States</u> v. <u>Miller</u>, 307 U.S. 174 (1939).

[6] The <u>Heller</u> Court may have found it "startling" that this language could apply to the M-16, but it never came to the opposite conclusion — nor could it, given that the issue was not before the Court. It was a logical fallacy for the district court below to hang its hat on this *dicta* from <u>Heller</u>. *Amici* trust that judges do not decide cases based on their subjective reaction to the result required by law — deciding issues based on what "startles" them, but rather seeking the result that accords with the law and the Constitution.

Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the **militia** at the time of the Second Amendment's ratification was the **body of all citizens** capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, **would require sophisticated arms** that are **highly unusual** in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks.[7] But the fact that **modern developments** have limited the degree of fit between the prefatory clause and the protected right **cannot change our interpretation of the right**. [Heller at 627-28.]

Actually, the full quotation from Heller seems to state that, even though military rifles cannot stop tanks, they are no less needed by a citizen militia and therefore protected by the Second Amendment. The fact that a military rifle is

---

[7] In no way did Justice Scalia's comment about the lack of utility of small arms resisting bombers and tanks indicate that small arms are not the mainstay of an effective militia organized to resist tyranny. Indeed, no weapon that has ever been made has been useful for all purposes. Those in power who were tyrants, or who sought to be tyrants, have sought to limit the weapons owned by the people over whom they rule. For a time, the children of Israel were not allowed to have blacksmiths who could fashion weapons against the Philistines. *See* I Samuel 13:19. Shogun Toyotomi Hideyoshi issued an edict in the Sixteenth Century that "[t]he people in the various provinces are strictly forbidden to have in their possession any swords, short swords, bows, spears, firearms or other arms. The possession of unnecessary implements ... tends to foment uprisings." G.L. Carter, Ph.D., An Encyclopedia of History, Politics, Culture, and the Law, ABC-CLIO (2012). During World War II, the importance of small arms was demonstrated in the Warsaw Ghetto, where hundreds of Jewish families were reported to have had fewer than a dozen handguns among them, yet they were able to frustrate well-armed Nazi troops. *See generally* Yuri Suhl, ed., They Fought Back (N.Y.: Paperback Library, 1968; 1st pub. 1967). Indeed, virtually no one in 1776 imagined that a rag-tag group of disorganized colonists could engage the British Empire in war and emerge victorious.

"highly unusual" today does not cause it to lose its protection as an "arm" under the Second Amendment. The common-use test cannot override the text of the Second Amendment, whose purpose is to allow the people to take up effective arms against a tyrant.[8]

Yet, shortly after calling <u>Heller</u>'s *dicta* on machineguns a mere "suggest[ion]," the district court reversed its position and converted the <u>Heller</u> suggestion into binding precedent, ruling that "<u>Heller</u> **expressly forecloses** Plaintiff's Second Amendment challenge." *Id.* at 44-45 (emphasis added):

> [T]he Court's holding in *Miller*, read in conjunction with the Court's discussion of *Miller* and **M-16 rifles** in *Heller*, **establishes** that possessing a machine gun, and specifically an M-16 rifle, does not fall within the scope of the Second Amendment. [<u>Hollis</u> at *41.]

This statement is wrong on every count. There was no such holding in <u>Miller</u> or <u>Heller</u>. Moreover, the district court's conclusion is directly at odds with the <u>Heller</u> statement that "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms...." *Id.* at 582. In order to come to a contrary conclusion,

---

[8] Alexander Hamilton understood that the federal government could become a tyrant, and the people's need to be able to defend themselves was essential: "If the representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defense, which is paramount to all positive forms of government...." Federalist No. 28, *The Federalist* at 138 (G. Carey & J. McClellan, eds., Liberty Fund: 2001).

that presumption must be rebutted because, by the Supreme Court's own words machineguns are *prima facie* protected "arms."

The district court fails to mention that directly after its reference to fully automatic weapons, the <u>Heller</u> Court stated that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." <u>Heller</u>, at 626. The parties in <u>Heller</u> never litigated whether machineguns were arms.[9]  There was no indication in the <u>Heller</u> opinion that the Court meant to violate its cardinal rule governing constitutional litigation:  "not [to] pass upon the constitutionality of legislation in a friendly, non-adversary, proceeding....'"  <u>Ashwander</u> v. <u>TVA</u>, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring).

Any comments in <u>Heller</u> about fully automatic weapons were, first and foremost, comments as to the scope of the issue being decided and, at worst, *dicta* — never intending to foreclose future consideration of the issue presented in this case. The <u>Heller</u> opinion, however, did establish the manner in which challenges to firearms restrictions should be considered by courts.  Yet the district court upheld the law banning machinegun possession by "the people" without engaging in any further analysis.  That reason alone is enough to warrant reversal.

---

[9]  *See* <u>D.C.</u> v. <u>Heller</u>, Brief for *amicus curiae* United States at 20-24; Brief for respondent Heller at 50-52

**B.** <u>Miller</u> **Does Not "Expressly Foreclose" the Argument that Machineguns Are Protected "Arms."**

In <u>Miller</u>, the Supreme Court stated that weapons which are "part of the ordinary military equipment" are the sorts protected by the Second Amendment. 307 U.S. at 178. Under that <u>Miller</u> test, as understood by Judge Silberman in his opinion for the D.C. Circuit (in the case that became the <u>Heller</u> case in the Supreme Court), machineguns would seem to fall within the definition of protected "arms."[10]

> The modern handgun – and for that matter the rifle and long-barreled shotgun – is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a **lineal descendant of that founding-era weapon, and it passes *Miller's* standards**. [<u>Parker</u> v. <u>District of Columbia</u>, 478 F.3d 370, 398 (D.C. Cir. 2007) (emphasis added).]

This reading of the D.C. Circuit is not just the position of these *amici*, it was also the position advanced by then-Solicitor General Paul D. Clement before the U.S. Supreme Court. In his *amicus* brief in <u>Heller</u>, the Solicitor General stated:

> because automatic rifles like the **M-16** are now standard-issue military weapons for rank-and-file soldiers, the court's reference to the **"lineal descendant[s]"** of the weapons used in Founding-era militia operations ... **on its face would cover machineguns**.... [<u>D.C.</u> v. <u>Heller</u>, U.S. *amicus* brief at 22 (Jan. 11, 2008) (emphasis added).][11]

---

[10] Further discussion of this issue can be found in Section II.D, *infra*.

[11]   http://www.americanbar.org/content/dam/aba/publishing/preview/publiced_preview___briefs_pdfs_07_08_07_290_PetitionerAmCuUSA.authcheckdam.pdf

Of course, General Clement was not asking the Court to rule on government regulation of machineguns, particularly since that issue was not before the Court. Rather, he raised the issue of machineguns in his effort to motivate the Court to reject the D.C. Circuit's categorical approach to understanding the Second Amendment. General Clement was arguing for a balancing test based on reasonableness because he asserted that "a categorical approach would cast doubt on the constitutionality of the current federal machinegun ban ..." *Id.* at 21.[12] Nevertheless, the Heller Court expressly rejected the balancing test favored by the Solicitor General (Heller at 634-35), which was urged in dissent by Justice Breyer (*id*. at 681-82).

In Second Amendment litigation since Heller, most judges have embraced the very un-Heller notion that the touchstone in determining which "arms" are protected by the Second Amendment is **what judges feel** to be "reasonable" based on a balancing of governmental versus private interests, not **what the founders intended** the term to mean.[13] Most judges have embraced Justice Breyer's dissent as if it were

---

[12]  To bolster his opposition to the definition of arms adopted by the D.C. Circuit to include machineguns, the Solicitor General in Heller falsely claimed — or at least implied — the existence of a general federal police power when he asserted that Congress has "general authority to protect the public safety by identifying and proscribing particularly dangerous weapons." *Id.* at 21.

[13]  Notable exceptions include Judge Kavanaugh in the D.C. Circuit writing in dissent (Heller v. District of Columbia, 670 F.3d 1244, 1269-96 (D.C. Cir. 2011) known as "Heller II"), and Judge Richard Posner in the Seventh Circuit writing for

the majority opinion, and have continued to employ judicial balancing tests, exhibiting hostility to <u>Heller</u>'s clear instruction:

> The very enumeration of the right takes **out of the hands of government — even the Third Branch of Government** — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with **the scope they were understood to have when the people adopted them**, whether or not future legislatures or (yes) even future judges think that scope too broad.... The Second Amendment ... is the very *product* of an **interest balancing by the people** — which Justice Breyer would now conduct for them anew. [<u>Heller</u> at 634-635 (emphasis added).]

Thus, the approach of the <u>Heller</u> Court can only be described as adopting a "categorical" approach.[14]

If a machinegun is an "arm" under the Second Amendment, it is quite irrelevant how a modern federal judge feels about whether "the people" made a good decision in fashioning their Constitution.

––––––––––––––––––

the court (<u>Moore</u> v. <u>Madigan</u>, 702 F.3d 933 (7th Cir. 2012). Some of these *amici* filed an *amicus* brief in <u>Heller II</u>. http://www.lawandfreedom.com/ site/firearms/HellerII_Amicus.pdf?84a79e.

[14] *See generally* Joseph Blocher, "Categoricalism and balancing in First and Second Amendment Analysis," 84 NYU L. REV. 375, 381 (May 2009) ("Categoricalism asks only whether the case falls inside certain predetermined, outcome-determinative lines.... [C]ategorization 'binds a decisionmaker to respond in a determinative way to the presence of delimited triggering facts.'" *Citation omitted*.)

**C.** **The District Court Mischaracterized Founding-Era Militia Firearm Requirements as Limits Not to Be Exceeded, rather than Minimum Standards to be Met.**

In its one attempt at historical analysis, the district court fared badly. The district court argued that Congress has the authority to ban classes of firearms because founding-era "government officials specified the type of weapons militia members **could** procure and maintain" (emphasis added). *Id.* at *43 n.8. In their brief below, defendants noted that some founding-era "government officials ... specif[ied] the weapons that ... militia members ... **would be required to** procure and maintain." Govt. Br. below at 15 (emphasis added). With that slight change in verbiage from "would" to "could," the district court reversed the obvious meaning of the founding-era requirements.

It is indisputable that the founding-era statutes **established minimums** on the sorts of weapons militia members "would be required" to obtain, **not maximums** on what they "could" obtain. Replete through these founding-era statutes is the requirement that the weapons be "good and sufficient." *See* Govt. Br. below at 15. The government obviously was concerned that militia members might show up with substandard weapons that were either obsolete or in poor repair. Thus, the requirements were designed to ensure the militia would be armed, at least, with fully functional weapons. The idea is laughable that, if someone showed up at Lexington

11

and Concord with an M-16, his commanders would have turned him away, saying "Take it home, that's far too effective a weapon to use against the Redcoats." The district court, however, twisted those statutory requirements to support exactly the opposite conclusion — that Congress can restrict Americans to owning only neutered versions of firearms that are in common use by military units, police, and civilians in the United States and across the world.

### D. Machineguns Are Not Dangerous and Unusual Weapons, but rather the Lineal Descendants of Founding-Era Firearms, and thus within the Scope of the Second Amendment.

Both the defendants and the district court have alleged that machineguns are "dangerous and unusual" weapons. *See* Defendants' Br. at 19, 24, *passim*; *see also* 2015 U.S. Dist. LEXIS 103656 at *44.[15] Defendants argue, somewhat inaccurately,[16] that such weapons "enabl[e] rates of fire far in excess of those available from a semi-

---

[15] Appellant has argued that "dangerous and unusual" applies to the "manner" in which a firearm is used and not to the "possession" of a certain type of firearm. *See* Appellant's Br. at 20. This argument seems to find some support in Staples v. United States, 511 U.S. 600 (1994), where the Supreme Court noted that simply because "an item is 'dangerous,' in some general sense, does not necessarily suggest, as the government seems to assume, that it is not also entirely innocent. ... guns generally can be owned in perfect innocence." *Id.* at 611.

[16] A fully automatic M-16 has a maximum rate of fire of about 700 rounds per minute. *See* http://www.military-today.com/firearms/m16.htm. A trained shooter, however, can articulate the trigger of a semi-automatic AR-15 to achieve over 500 rounds per minute. *See* https://www.youtube.com/watch?v=ddPTyoV-Irc. And, of course, semi-automatic fire is more accurate than fully automatic fire.

automatic firearm." Defendants' Br. at *25. But while fully automatic weapons like the M-16 may seem unusual to some, their functionality is best viewed as an evolutionary improvement over their predecessors. Indeed, at each level in the evolutionary chain of firearms over the past 230 years, one could anticipate this same objection bring raised to each new advancement in the technology of firearms — that they are now too powerful and frightening to be owned by civilians.

Presumably, when **semi**-automatic firearms were developed over a century ago, they too may have seemed frightening when compared with the bolt-action, lever-action, pump-action, and revolver firearms that preceded them. The famous M-1 Garand, a semi-automatic rifle with 8-round "clips" of ammunition that can be quickly loaded, became the first semi-automatic rifle to be standard issue for a nation's army in World War II.[17] Consequently U.S. troops outclassed the limited firepower of the Soviets' fixed-magazine, bolt-action Mosin Nagants and the Germans' fixed-magazine, bolt-action Mausers.[18]

---

[17] *See* http://www.americanrifleman.org/articles/2011/8/22/the-first-garands/.

[18] *See* http://worldwar2headquarters.com/HTML/weapons/american/garand.html ("A well trained soldier could place 32 rounds per minute on target, more than twice the number of rounds that could be well aimed and fired from a bolt action rifle in one minute.").

When "repeating" arms became popular roughly one and one-half centuries ago, their firepower seemed incredible to some, since such weapons "gave a single man the firepower of a dozen marksmen armed with muzzle-loading muskets."[19] Henry Repeating Arms Company marketed its lever-action rifles as being able to fire "sixty shots per minute." B. Wexler, 50 Guns that Changed America: An Illustrated Guide, (Skyhorse Publishing: 2015), at 65. Indeed, "[d]ue to its revolutionary design and rapid rate of fire, the Henry quickly found popularity both with the military and civilian purchasers." *See* n.19.

And finally, when the firearm cartridge itself — consisting of a bullet, powder, casing and primer all contained in a single unit — gained a foothold in the mid to late 1800's, this development also greatly increased a weapon's rate of fire. Some breech-loading rifles were found to have a 250 percent faster rate of fire than muzzle-loading rifles that had preceded them, which required that each component be loaded individually. Wexler at 56.

And with muzzle-loading muskets and rifles, we have come back full circle to the weapons used during the founding era when the Second Amendment was adopted.

---

[19] https://www.henryrifles.com/henry-history/.

At each step along the evolutionary chain,[20] the same claims about lethality, rate of fire, and effectiveness could be made that are now being made regarding machineguns: these firearms have a rate of fire far in excess of those available from their predecessors. That puts these firearms on a different plane than those which came before. These firearms have 'murderously effective firepower' compared to the last generation of firearms. These firearms enable the shooter to engage a far greater number of targets more effectively than their predecessors. But <u>Heller</u> rejected such arguments as:

> bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, ... and the Fourth Amendment applies to modern forms of search, ... the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. [*Id.* at 582.]

Because machineguns clearly are protected "arms," the district court erred when it concluded that such firearms are not even within the scope of the Second Amendment. Because this Circuit's "two-step framework" is precisely the sort of "judge-empowering, interest-balancing inquiry" that <u>Heller</u> rejected, and clearly

---

[20] This section is not intended to give a comprehensive history of the development of modern small arms. Volumes have been written on that subject. The idea is to give some examples of firearms that, in their day, were considered revolutionary in their firepower, yet today seem all but obsolete.

contrary to the teachings of <u>Heller</u>, this panel should not be bound by the panel decision in <u>NRA</u> v. <u>ATF</u>[21] which adopted that power-usurping test. This panel should interpret the Second Amendment in a matter consistent with the approach mandated in the <u>Heller</u> case, rather than adopt the flawed approach of other panels which seem unable to understand the ban on interest balancing in <u>Heller</u>. <u>Heller</u> does not allow any court "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon" (<u>Heller</u> at 634).

## II. BY ITS CLEAR LANGUAGE, THE GUN CONTROL ACT DOES NOT APPLY TO THE HOLLIS FAMILY TRUST.

### A. The Hollis Trust Machinegun Transaction is Exempt From the NICS Check.

For many years, Americans have commonly placed rare and expensive NFA firearms into family trusts. In such cases, the trust is the entity which applies to obtain the NFA weapon. In processing that application, the FBI could not run a background check on the trust because, unlike a human being, a trust does not have a photograph, fingerprints, or a criminal record. *See* 27 C.F.R. § 479.85; *see also* 78 *Fed. Reg*. 55016. Once the trust application was approved, any eligible trustee or trust representative could take possession of the weapon, exempt from the NICS background check under 18 U.S.C. § 922(t)(3)(B).

---

[21] 700 F.3d 185 (5th Cir. 2012).

In 2013, ATF changed its regulatory policy, proposing the adoption of a new rule,[22] which ATF has set in motion to be final.[23]  ATF asserted that there "has been an increase in the number of individuals who have access to NFA firearms but who have not undergone a background check."  78 *Fed. Reg.* 55016.  Thus, ATF's new rule would, *sue sponte*, require the identification of a "responsible person," acting "on behalf of [a] legal entity" (such as a trust) before taking possession of an NFA-approved weapon.  Pursuant to this new regulation, the person taking possession of the weapon would be required to submit to a NICS check.  *Id.*

In creating this new requirement, ATF has conveniently overlooked the plain language of 18 U.S.C. § 922(t)(1), which states that the NICS check applies only to "transfers" of firearms by a Federal Firearms Licensee ("FFL") to a "person."  Section 921(a)(1), in turn, defines a "person" only to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company" — but not a "trust."

Furthermore, ATF has also ignored the historic fact that 18 U.S.C. § 921(a)(1) became law after the NFA which, because it was enacted earlier under Congress's taxing power, applied to persons as defined by the IRC which included a "trust" as

---

[22]  78 *Fed. Reg.* 55014.

[23]  http://goo.gl/c1MMaz.

a person subject to the Act.[24]  Despite this plain language differentiating the classes of persons subject to the two laws, ATF forged ahead on its mission to conflate the two definitions so as to make the NICS check to apply when a "person" (as defined by the GCA, not by the NFA), acquires an NFA-approved firearm.

The ATF Dakota Silencer letter of March 17, 2014, on which the ATF relies, twice correctly recognized that a trust is not a "person," but then misstated the NICS rule as one that applies to **every transfer** of a firearm, regardless of whether the transferee was a person as defined in the GCA or the NFA:

> Federal firearms law at 18 U.S.C. Section 922(t)(1) requires [FFLs] to run a NICS check "before completion of the transfer," and verify the identity of the transferee.  [Hollis at *2-3.]

Conspicuously missing from ATF's purported recitation of section 922(t)(1) is the phrase that limits the application of the FFL's obligation to run a NICS check only as to a transfer of a firearm "to any other **person** who is not licensed under this chapter."  *Id.* (emphasis added).

---

[24]    Implementing the NFA, 27 C.F.R. § 479.11 defines "person" as a "partnership, company, association, trust, estate, or corporation, as well as a natural person."  The district court claimed that, since the NFA does not define "person," the general IRS definition of 26 U.S.C. § 7701(a)(1) — "an individual, a trust, estate, partnership, association, company or corporation" — should apply.

ATF claims to be concerned that a "person," who would otherwise not pass a NICS check, would attempt to evade that check by obtaining a NFA firearm in the name of a "trust." 78 *Fed. Reg*. 55016. In seeking to close that alleged "loophole," ATF changes both the NFA process and the GCA process. By regulatory fiat, ATF would first rewrite 18 U.S.C. § 922(t)(1) so as to include all firearms transfers, not just to those involving "persons" as defined in section 921(a)(1). ATF would also erase the NFA exemption to the NICS check provided by section 922(t)(3)(B), by still requiring "responsible persons" to submit to NICS checks, even though the statute exempts the transfer from NICS.

Instead of applying the law as it is written, ATF seeks to usurp Congress's authority — apparently because it appears to ATF that the Brady Bill as it was written does not extend the NICS check as far as ATF wanted. It is not, however, for the ATF to remedy a statute that it deems is inadequate. Rather, that task is for "those who write the laws, but not ... those who apply them." *See* A. Scalia & B. Garner, Reading Law at 352-53 (West: 2012).

**B.      If, as ATF Admits, a Trust is Not A Person, Then a Trust Can Register and Possess a Machinegun.**

With certain limited exceptions, 18 U.S.C. § 922(o) makes it illegal for "any person to transfer or possess a machinegun." 18 U.S.C. § 921(a)(1) defines "person"

as including "any individual, corporation, company, association, firm, partnership, society, or joint stock company." This definition clearly does not include a "trust." *See* n.24, *supra*. As noted above, ATF has affirmed that "unincorporated trusts are not 'persons' under the GCA...." And because they are not persons, presumably a trust could manufacture or possess a machinegun, if approved by the Attorney General under NRA, and not be in violation of 18 U.S.C. § 922(o).

Pursuant to ATF's March 17, 2014 letter's acknowledgment that a trust is not a "person," the Hollis family trust applied to the ATF for permission to manufacture a machinegun. ATF initially approved the request, but quickly revoked that approval. By letter, ATF explained its reversal, insisting that the "fact that an unincorporated trust is not included in the definition of 'person' under the GCA does not mean that an individual may avoid liability ... by placing a machinegun 'in trust.'" 2015 U.S. Dist. LEXIS 103656, *6.

ATF claims that Congress' omission of "trust" in the list of entities that qualify as "persons" in the GCA could not possibly mean that trusts are not restricted by the statute. Instead, ATF argues, the omission must mean that trusts — unlike individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies — "cannot make or hold property." *Id.* According to ATF,

under the GCA a "trust" must be completely "disregarded" as a "non-entity" —
unrecognized as a matter of law.  Appellant's Br. at 7.

Having disqualified a trust as an entity entitled to "make or hold property," and
therefore not entitled to possess or manufacture any firearm, a trustee would be
subject to the GCA as a "person."  By stripping the trustee of his fiduciary duties,
ATF would recognize him as a mere "individual acting on behalf of the trust to be the
proposed maker/possessor of the machinegun...."  Thus, as an "individual," ATF has
transformed the trustee into a "person" within the meaning of 18 U.S.C.
§ 921(a)(1)(A) and, as an individual, the trustee would be prohibited from
manufacturing or possessing a machine gun.

Sadly, the district court failed to stop ATF's lawless ways.  The district court
disregarded that, under state law, there are all sorts of actions a trustee may take on
behalf of the trust, such as buying and selling property, where he is acting as trustee
— not in his "individual capacity."  Purportedly acting in accordance with State law,
the district court reasoned that, because a trust is not a "separate legal entity but rather
[a] *fiduciary* ... with respect to the trust property,"[25] the trustee alone can take
possession of trust property, but only for the benefit of the trust's beneficiaries.
Despite this nod towards fiduciary duty, the district court reasoned that a trustee

---

[25] <u>Hollis</u> at *62.

could be considered an "individual human being" (*id*.) within the meaning of 18 U.S.C. § 921(a)(1), and therefore be subject to 18 U.S.C. § 922(o). However, the court cited only one case, <u>United States</u> v. <u>King</u>, 735 F.3d 1098 (9th Cir. 2013), to support its effort to apply the plain language of the two different definitions of "person" in the GCA and the NFA. *See id*. But <u>King</u> addressed an entirely different question, concerning the singular meaning of person in 18 U.S.C. § 921(a)(1)(A) (which governs who must obtain a federal license to deal in firearms), not the interrelation between the two different definitions of person in 18 U.S.C. § 921(a)(1)(A) and 26 U.S.C. § 7701(a)(1). *See* 27 C.F.R. § 479.11.

Instead of relying on the inapposite <u>King</u> precedent, the district court should have followed the well-established rule to "respect ... the Legislature's power to define the terms that it uses in legislation." *See* <u>Meese</u> v. <u>Keene</u>, 481 U.S. 465, 484 (1987). Indeed, the district court failed to follow the usual rule that "[s]tatutory definitions control the meaning of statutory words...." <u>Lawson</u> v. <u>Suwannee Fruit & Steamship Co.</u>, 336 U.S. 198, 201 (1949).

Hollis was not acting in his individual capacity, but in his capacity as a trustee. However, if the district court essentially "pierced the veil" of trusteeship to get at the "individual human being" underneath, why would it be necessary for section

921(a)(1) to include corporations and other entities in its definition of person, since corporate officers are nothing more than individuals acting on behalf of corporations?

When it comes to the NFA, the ATF claims that a trust **is** a legal entity. 78 *Fed. Reg.* 55016. Apparently the district court found no problem applying **state law when it suits** ATF's purposes, and deferring to ATF's contrary **federal definition when it also suits** those purposes. If someone asks "is a trust an entity, or is it a non-entity?" ATF's answer must be "yes!"

There is nothing in GCA that authorizes ATF to dislodge Hollis from his trusteeship in order to treat him as an individual human being, and thereby to place him in his capacity as an individual under the machinegun ban. It was clear error for the district court below to have ruled otherwise. *See* <u>Hollis</u> at *61.

## III. JUST AS THE FIFTH CIRCUIT LED THE NATION WITH ITS RESTORATION OF THE SECOND AMENDMENT IN <u>EMERSON</u> V. <u>UNITED STATES</u>, IT IS NOW CALLED ON TO RESTORE THE SECOND AMENDMENT IN THIS CASE.

There was a time, not that long ago, when the federal judiciary viewed the Second Amendment only as protecting the States' right to arm its state militia. So hostile to the notion that the "right to keep and bear arms" belonged to the People, the courts routinely ignored the Second Amendment text and history that spoke unmistakably of a preexisting right enjoyed by all Americans. Not only that, the

courts compounded their error ignoring the fact that the Second Amendment was

placed in a Bill of Rights sandwiched between two obvious individual rights the First

and the Third. Indeed, it was not until one reached the Tenth Amendment that there

was any mention of the states, and even then, that amendment protected not just the

states but all the people. Nevertheless, the courts routinely swept aside — with nary

a care for text, history, and logic — challenge after challenge that the right to keep

and bear arms surely did not reside in the states, but in the People as a safeguard

against a tyrannical state.[26]

Then, in 1999, one district court judge in Texas determined that he would

carefully consider the arguments of those litigants who embraced the exact opposite

view — that Congress proposed and the states ratified the Second Amendment to

protect individual American citizens from their government. Standing alone, District

Judge (now Senior District Judge) Sam Cummings of the Northern District of Texas

concluded that the entire federal judiciary had been plain wrong. *See* United States

v. Emerson, 46 F.Supp.2d 598 (N.D. Tex. 1999). On appeal to this Court, and, after

all the years of denial, this Court of Appeals affirmed, adding an equally courageous

---

[26] Prior to Heller, the U.S. Supreme Court had only heard one Second Amendment challenge — United States v. Miller, 307 U.S. 174 (1939) — which was never really litigated in an adversarial manner. *See* Appellants' Br. at 45-47.

opinion confirming that the common judicial wisdom was completely wrong. *See* United States v. Emerson, 270 F.3d 203 (5ᵗʰ Cir. 2001).

Although it took seven years to progress from Emerson to Heller, it should always be remembered that it was this Circuit that took seriously the Second Amendment challenge, and when persuaded of the rightness of the challenge, opened the door to the restoration of the Second Amendment to its original purpose — to secure to the people a "free State." As Justice Joseph Story explained:

> The right of the citizens to keep and bear arms has justly been considered, as **the palladium of the liberties of a republic**; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them. [J. Story, Commentaries on the Constitution, section 1890-91 (1833) (emphasis added).]

In the case now before it, this Court has the duty to "say what the law is"[27] in determining the type of "arms" protected by the Second Amendment. The argument that "the People" cannot be trusted with machineguns would have had no appeal in the Founding era. In a sermon that John Adams reported "was read by everybody" of the founding era, Pastor Jonathan Mayhew of the Old West Church in Boston, Massachusetts explained:

---

[27] Marbury v. Madison, 5 U.S. 137, 177 (1803).

To say that subjects in general are not proper judges when their governors oppress them, and play the tyrant; and when they defend their rights, administer justice impartially, and promote the public welfare, is as great *treason* as ever man uttered.... The people know for what end they set up, and maintain, their governors. [Jonathan Mayhew, *A Discourse Concerning Unlimited Submission and Non-Resistance to the Higher Powers,* 1750.[28]]

Prior to <u>Emerson</u>, "as judges of their governors," gun owners better understood who was protected by the Second Amendment than did the federal judiciary. Since <u>Heller</u>, gun owners, "as judges of their governors," have been shocked by the narrowing of the right to keep and bear arms in many respects, including the definition of "arms."[29] And if the federal government rejects the limitations imposed on it by the Constitution, limiting the ability of the People to resist tyranny by the possession of effective weapons "necessary for the preservation of a free State," is

---

[28]    http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1044&context=etas

[29]  Increasingly, the U.S. Supreme Court indicates a willingness to correct the approach being taken by the lower federal courts. Recently, Justices Thomas and Scalia issued an unusual dissenting opinion in the denial of a petition for *certiorari* in <u>Jackson</u> v. <u>City of San Francisco</u>, 135 S.Ct. 2799, No. 14-704 (June 8, 2015), in which they expressed frustration that the lower courts have employed balancing tests in direct conflict with <u>Heller</u>. http://www.supremecourt.gov/opinions/14pdf/14-704_jiel.pdf

that not reminiscent of the actions taken by the British toward the colonists prior to the American revolution?[30]

In 1850, political theorist Frederic Bastiat exposed the illogic of those who would trust the people in government, while, at the same time, distrusting the People whom they are supposed to serve:

> Since the natural tendencies of mankind are so bad that it is not safe to allow them liberty, how comes it to pass that the tendencies of organizers are always good?  Do not the legislators and their agents form a part of the human race?  Do they consider that they are composed of different materials from the rest of mankind?  [Frederic Bastiat, The Law (Ludwig vonMises Institute: 2007) at 46.]

If a machinegun is an "arm," as discussed in Section I, it is protected by the Second Amendment, no matter whether members of Congress or federal judges think it wise or not.  It must be remembered that the chief stated end of the Second Amendment is not hunting, or target shooting, or even just self-defense against a neighbor, but also self-defense against the state, to the end that a "free State" be preserved.

---

[30] *See* discussion in Gun Owners of America, *et al*. *amicus* brief in Heller (Feb. 11, 2008) at 22-27 http://www.lawandfreedom.com/site/constitutional/DCv HellerAmicus.pdf?84a79e

## CONCLUSION

This case provides yet another opportunity for this Court to reject the prevailing legal wisdom when it is wrong. At the end of its review of the district court's opinion below, and for the reasons stated above, this Court should find that a faithful interpretation of the U.S. Constitution requires it to conclude that machineguns are most certainly protected "arms" under the Second Amendment. The decision of the district court should be reversed.

Respectfully submitted,

/s/ Herbert W. Titus

_____

HERBERT W. TITUS*
ROBERT J. OLSON
WILLIAM J. OLSON
JOHN S. MILES
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
November 2, 2015          Vienna, VA  22180-5615
*Attorney of record       (703) 356-5070
                          *Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief Amicus Curiae of Gun Owners of America, *et al*. in Support of Appellant and Reversal, was made, this 2nd day of November, 2015, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

    /s/ Herbert W. Titus
Herbert W. Titus
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief Amicus Curiae of Gun Owners of America, *et al*. in Support of Appellant and Reversal complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,746 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32(a)(1), because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 14.0.0.756 in 14-point Times New Roman.

        /s/ Herbert W. Titus
        Herbert W. Titus
        Attorney for *Amici Curiae*

        Dated: November 2, 2015