# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

JAY AUBREY ISAAC HOLLIS, Individually and as
Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust,
Plaintiff-Appellant,

vs.

LORETTA E. LYNCH, Attorney General of the United States;
THOMAS E. BRANDON, Acting Director of the Bureau of Alcohol,
Tobacco, Firearms and Explosives,
Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Northern District of Texas, Dallas Div.
Case No. 3:14-CV-3872
Hon. Barbara M.G. Lynn, Judge

_____

**BRIEF OF AMICI CURIAE FIREARMS POLICY COALITION, INC., FIREARMS POLICY FOUNDATION, INC., COLORADO SECOND AMENDMENT ASSOCIATION, LONE STAR GUN RIGHTS, THE MADISON SOCIETY, INC., AND MISSISSIPPI CARRY, INC.**

**IN SUPPORT OF PLAINTIFF-APPELLANT JAY AUBREY ISAAC HOLLIS**

Filed with the Consent of All Parties
Pursuant to Fed. Rule of Appellate Procedure 29(a)

_____

George M. Lee, Esq.
SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Tel. (415) 979-0500
Email: gml@sezalaw.com

November 5, 2015      Attorneys for *Amici Curiae*

Jay Isaac Hollis v. Loretta Lynch, et al., Case No. 15-10803

The undersigned counsel of record for Amici Curiae adopts and certifies the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, and as identified in Appellant's opening brief. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff:**     Jay Aubrey Isaac Hollis, Individually and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust

**Defendants:**  Loretta Lynch, Attorney General of the United States
Thomas E. Brandon, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

**Counsel:**    Stephen D. Stamboulieh, Stamboulieh Law, PLLC
Alan Alexander Beck, Law Office of Alan Beck
Elisha M. Hollis, Attorney at Law
*Attorneys for Plaintiff and Appellant*

Daniel M. Riess
Eric J. Soskin
Michael S. Raab
Patrick J. Nemeroff
U.S. Department of Justice
*Attorneys for Defendants and Appellees*

In addition, Amici Curiae would identify the following parties who are submitting this amicus brief:

- Firearms Policy Coalition, Inc.

- Firearms Policy Foundation, Inc.

- Colorado Second Amendment Association

- Lone Star Gun Rights

- The Madison Society, Inc.

- Mississippi Carry, Inc.

None of the Amici Curiae identified herein has a financial interest in the outcome of this case.

Pursuant to Fed. Rule of App. P. 26.1, counsel undersigned certifies that each of the foregoing Amici Curiae is a non-profit association, or a non-profit corporation that does not issue stock, and therefore has no parent corporation that issues stock.

Attorneys for Amici Curiae are:

George M. Lee, Seiler Epstein Ziegler & Applegate LLP

Dated: November 2, 2015   SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


       *s/ George M. Lee*
       George M. Lee

       Attorneys for *Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT OF AMICI CURIAE...................................................................4

I. *HELLER*'S DETACHMENT OF THE SECOND AMENDMENT'S
PREFATORY CLAUSE FROM THE OPERATIVE CLAUSE DOES
NOT PRECLUDE THE RIGHT TO BEAR ARMS WHICH ARE USEFUL
TO A MILITIA AND IN COMMON USE FOR OTHER LAWFUL PURPOSES. ...............4

    A. *HELLER* AFFIRMED, AND DID NOT RENDER MEANINGLESS,
THE PREFATORY CLAUSE OF THE SECOND AMENDMENT.........................4

    B. APPELLANT SHOULD BE ENTITLED TO A TRIAL UNDER
*UNITED STATES V. MILLER*........................................................8

II. THE GOVERNMENT HAS NOT PROVEN THAT THE M-16 AT
ISSUE IS AN UNCOMMON, DANGEROUS AND UNUSUAL WEAPON....................19

    A. THE M-16 STYLE SERVICE RIFLE APPELLANT WISHES TO
MANUFACTURE AND POSSESS MAY BE IN COMMON USE. .....................19

    B. THE M-16 STYLE SERVICE RIFLE MAY NOT BE A "DANGEROUS
AND UNUSUAL" WEAPON....................................................22

CONCLUSION ........................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) ........... *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................20

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) .... 20, 24

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) ........................................24

*McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010) ...............7, 17

*Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997) .............................6, 7

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) ............................ 16, 17, 24

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ............................................24

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................................24

*United States v. Miller*, 307 U.S. 174, 59 S. Ct. 816 (1939) .......................... *passim*

**Statutes**

18 U.S.C. § 922(o) ..................................................................................... *passim*

18 U.S.C. § 924(a)(2)................................................................................................16

National Firearms Act, 26 U.S.C. § 5801 *et seq.*.............................................. *passim*

26 U.S.C. § 5841 .......................................................................................................16

26 U.S.C. § 5845(b) ...................................................................................................8

26 U.S.C. § 5861(d) ..................................................................................................16

26 U.S.C. § 5871 .......................................................................................................16

Tex. Pen. Code § 46.05(c) .......................................................21

**Other Authorities**

4 Blackstone (1769) ..............................................................23

Brannon P. Denning, *Can the Simple Cite Be Trusted?: Lower Court Interpretations of United States v. Miller and the Second Amendment*, 26 Cumb. L. Rev. 961 (1996)...........................................6, 15

Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J.L. & Liberty 48 (2008)...................................6, 8

Cathal J. Nolan, 1 *The Age of Wars of Religion, 1000-1650* (2006)........................26

Elliot, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1836).......................................18

Gary Kleck, *Targeting Guns: Firearms and Their Control* (1997) ........................14

John Childs, *The Military Revolution I: The Transition to Modern Warfare*, in *The Oxford History of Modern War* (Charles Townshend, ed. 1997) .............22

Robert A. Rutland ed., 1 *The Papers of George Mason* (1970) ..............................19

Robert H. Churchill, *Gun Ownership in Early America: A Survey of Manuscript Militia Returns*, 60:3 Wm. & Mary Q. 615 (2003)................... 10, 25

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008)........................................ 18, 19

Thomas Cooley, *General Principles of Constitutional Law* (1880)........................21

William H. Hallahan, *Misfire: The History of How America's Small Arms Have Failed Our Military* (1994).......................................21

William J. Helmer, *The Gun That Made the Twenties Roar* (1969) ........................13

**Regulations**

27 C.F.R. § 479.105(a)................................................................16

The Firearms Policy Coalition, Inc. (FPC) is a non-profit organization that serves its members and the public through direct and grassroots advocacy, legal efforts, litigation and education. The purposes of FPC include defending the United States Constitution and the People's rights, privileges and immunities deeply rooted in the Nation's history and tradition, especially the fundamental right to keep and bear arms.

The Firearms Policy Foundation, Inc. (FPF) is a non-profit organization that serves the public through charitable and educational purposes, with a focus on advancing the fundamental right to keep and bear arms.

The Colorado Second Amendment Association (CSAA) is a membership organization, the mission of which is to defend and expand Second Amendment rights through public education, growth of the shooting community, and its close involvement in the legislative and legal advocacy process. Through its membership and community outreach, the CSAA seeks to create awareness of the

---

[1] Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, counsel undersigned certifies that all parties have consented to the filing of this brief. Pursuant to Rule 29(c) of the Federal Rules of Appellate Procedure, counsel further certifies that no party to this appeal has authored this brief, in whole or in part, that no party has contributed money intended to fund the preparation or submission of this brief, and that no other person or organization, other than Amici Curiae herein, its members or its counsel, contributed money intended to fund the preparation or submission of this brief.

importance of their Second Amendment rights and to promote an individual desire to protect those rights.

Lone Star Gun Rights is a Texas non-profit association, dedicated to the preservation of natural rights of Texans, including the right to keep and bear arms, through non-partisan, grass-roots advocacy.

The Madison Society, Inc. is a non-profit membership organization whose purpose is preserving and protecting the legal and constitutional right to keep and bear arms for its members and all responsible, law-abiding citizens. The organization spends time and resources on outreach, education and training related to assisting its members – and the law-abiding public in general – in obtaining and maintaining licenses to carry firearms for self-defense and for other Second Amendment purposes.

Mississippi Carry, Inc. is an independent, non-profit, non-partisan, grassroots organization dedicated to advancing the fundamental civil right of all Mississippians to keep and bear arms for self defense as guaranteed by the Second Amendment to the United States Constitution and Article 3 Section 12 of the Mississippi Constitution.

The argument of Amici Curiae advanced herein is twofold. First, the district court erred when it did not give Appellant the opportunity to prove that the arm at issue was "in common use for lawful purposes."

Secondly, the district court failed to undertake the required constitutional analysis and require the government to prove, by sufficient facts, that the arm at issue in this case was "dangerous and unusual," and therefore potentially outside of the scope of Second Amendment protection.

The district court found that the Supreme Court's holding in *United States v. Miller*, read in conjunction with the Court's discussion in *Heller*, was supportive of the conclusion that possessing a machine gun does not fall within the scope of the Second Amendment. We read the *Miller* decision differently, and through the lens of *Heller* which affirmed an individual's right to keep and bear arms for self-defense. Faithfully honoring *Miller* as precedent today compels the conclusion that the Second Amendment protects an individual's right to bear arms which are useful to militia service, in common use for lawful purposes, and not "dangerous and unusual."

Amici recognize that every circuit court of appeals has assumed that machine guns meet that "dangerous and unusual" test to permit their prohibition as a class of arms; however, to our knowledge, no court has directly tried the issue of

whether a fully-automatic weapon is necessarily dangerous *and* unusual. At the very least, we believe there would be conflicting testimony on the issue. And since the *Miller* holding was never revisited, we are confident that there are at least some items regulated by the National Firearms Act, 26 U.S.C. § 5801 *et seq.*, that are within the scope of the Second Amendment's protection.

For these reasons, Amici respectfully submit that the district court erred when it granted relief in the government's favor, and at the very least, Appellant is entitled to a trial on the merits of his claims.

■ ■ ■

ARGUMENT OF AMICI CURIAE

**I.** ***HELLER*'S DETACHMENT OF THE SECOND AMENDMENT'S PREFATORY CLAUSE FROM THE OPERATIVE CLAUSE DOES NOT PRECLUDE THE RIGHT TO BEAR ARMS WHICH ARE USEFUL TO A MILITIA AND IN COMMON USE FOR OTHER LAWFUL PURPOSES.**

    A. *HELLER* AFFIRMED, AND DID NOT RENDER MEANINGLESS, THE PREFATORY CLAUSE OF THE SECOND AMENDMENT.

A fresh and honest reading of *United States v. Miller*, 307 U.S. 174, 59 S. Ct. 816 (1939), taken after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), compels the conclusion that the Second Amendment protects an individual's right to bear arms which are both useful to militia service, and in common use for other lawful purposes.

*Heller* began with an analysis of both the prefatory clause ("A well regulated Militia, being necessary to the security of a free State, […]") and the operative clause ("the right of the people to keep and bear arms shall not be infringed.") of the Second Amendment. 554 U.S. at 577-578, 128 S. Ct. at 2789. Ultimately, the Court concluded that the text and history of the operative clause of the Amendment were supportive of an individual's right to keep and bear arms, which was neither limited, nor expanded by the prefatory clause. But in so doing, the Court did not simply throw out the prefatory clause as completely without meaning, or as some unnecessary anachronism. Rather, the Court reaffirmed those principles as, indeed, being necessary to the security of a free state and people. "[T]he Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia." Id., 554 U.S. at 599, 128 S. Ct. at 2801. After engaging in a lengthy analysis of the original meaning of the prefatory clause, the founders' concerns of the evil it was intended to proscribe, as well as all historical precedent dealing with the Amendment up to that point (including *Miller*), the Court concluded that "nothing in our precedents forecloses our adoption of the original understanding of the Second Amendment." Id., 554 U.S. at 625, 128 S. Ct. at 2816.

Prior to *Heller*, and for 70 years, the Court's decision in *Miller* had stood alone as virtually the only Supreme Court opinion to consider the Second

Amendment at all.  See, Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J.L. & Liberty 48, 49 (2008).  And thus, *Miller* had typically been cited for the proposition that the Second Amendment did not provide an absolute right to own and possess any particular type of firearm, and moreover, that firearm regulations could be upheld in spite of the Second Amendment.  See Brannon P. Denning, *Can the Simple Cite Be Trusted?: Lower Court Interpretations of United States v. Miller and the Second Amendment*, 26 Cumb. L. Rev. 961, 981-998 (1996) (citing and discussing examples of lower court decisions holding that the Second Amendment did not guarantee an individual right); see also, *Heller*, *supra*, 554 U.S. at 638-639, 128 S. Ct. at 2823 (Stevens, J., dissenting) ("Since our decision in *Miller*, hundreds of judges have relied on the view of the Amendment we endorsed there.")

This view interpreting the holding of *Miller* as a restriction on the Second Amendment went virtually unchallenged, and the National Firearms Act ("NFA") stood firm as a virtually untouched firearms regulation scheme for many years. However, as Justice Thomas first pointed out in his concurring opinion in *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997): "Our most recent treatment of the Second Amendment occurred in *United States v. Miller* […], in which we reversed the District Court's invalidation of the National Firearms Act, enacted in 1934.  In *Miller*, we determined that the Second Amendment did not guarantee a

citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be 'ordinary military equipment' that could 'contribute to the common defense.' [307 U.S. at 178, 59 S. Ct. at 818]. The Court did not, however, attempt to define, or otherwise construe the substantive right protected by the Second Amendment." *Printz*, 521 U.S. at 938, 117 S. Ct. at 2386, fn. 1.

The latter issue, of course, was definitively settled in 2008, with the Court's landmark decision of *District of Columbia v. Heller*, *supra*. The plain holding of *Heller* is that a complete ban on handgun possession in the home violates the Second Amendment, "as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." 554 U.S. at 635, 128 S. Ct. at 2822. See also *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020 (2010) (Second Amendment right to keep and bear arms is fundamental and fully applicable to the States by virtue of the Fourteenth Amendment). In *Heller*, the Court undertook a lengthy historical analysis of the Second Amendment, before concluding that it protected an individual right to keep and bear arms. That historical analysis began with the prefatory clause ("A well regulated Militia, being necessary to the security of a free State …"), which was to be construed in conjunction with the operative clause.

In so examining the prefatory clause, the *Heller* Court elucidated the holding of *Miller*, moreover, to state that it supported the individual right to keep and bear

arms for purposes of self-defense, even outside of the context of militia service.

Today and here, we take both *Heller* and *Miller*, in tandem, for the proposition that

the Second Amendment protects a fundamental, individual right to own and

possess a firearm, in common use at the time, and for lawful purposes, which

necessarily includes at least some weapons appropriate for use in a militia.

Amici Curiae believe that *Heller* and *Miller*, today, support Appellant's right

to a trial that determines whether creating and possessing a service rifle which also

meets the definition of a "machine gun," as defined by 26 U.S.C. § 5845(b) is

constitutionally-protected conduct.  At the very least, as discussed next, the issue

of whether Appellant's particular arm is subject to constitutional protection should

be tried on the merits.

B.    APPELLANT SHOULD BE ENTITLED TO A TRIAL UNDER *UNITED STATES V. MILLER*.

In *Miller*, the defendants, two Depression-era bank robbers, challenged their

indictments for interstate transportation of a sawed-off shotgun (i.e., a shotgun

having a barrel less than 18 inches in length), without having registered them or

having the requisite stamp, which was then (and now) prohibited by the National

Firearms Act.  Under circumstances that were questionable at best,[2] the district

---

[2] Professor Frye has suggested that the district court overseeing the prosecution of Miller, Judge Hiram Heartsill Ragon, was eager to "tee up" an ideal test case of the National Firearms Act. See, Frye, *supra*, 3 N.Y.U. J.L. & Liberty at 63-65.  The district court's memorandum opinion was immediately issued, twice, and written with no facts or argument. Id. at 65.  And the day after Judge Ragon sustained a second demurrer to the defendants' reindictments, the Governor of

court refused to take the defendants' guilty plea, appointed counsel, and sustained a demurrer to the indictments in an immediately-issued memorandum opinion. The stated ground for the defendants' challenge to the indictment was that the NFA was unconstitutional, both because it usurped police powers reserved to the states, and because it violated the Second Amendment of the U.S. Constitution. 307 U.S. at 176, 59 S. Ct. at 817. The Supreme Court's opinion avoided the issue of whether the Second Amendment provided a collective right or an individual right to bear arms.[3] Instead, Justice McReynolds announced the Court's decision as such: "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." 307 U.S. at 178, 59 S. Ct. at 818. The Court's opinion devotes

---

Arkansas appointed the defendants' counsel to fill a legislative vacancy, leaving defendants with no counsel to oppose the government's appeal. Id. at 60. Ultimately, defendants' counsel did not submit a brief or appear at the hearing. It has thus been repeatedly pointed out by commentators and litigants such as Appellant herein that the government's appeal of the *Miller* case was unopposed at the Supreme Court. This was, indeed, a case that was tailor-made to uphold the NFA under circumstances that were ideal to the government.

[3] The *Miller* Court declined to decide the nature of the Second Amendment right despite the Solicitor General's argument, made in the alternative, that the right was collective. *District of Columbia v. Heller*, *supra*, 554 U.S. at 622, 128 S. Ct. at 2814.

most of its pages to analyzing historical service in a militia, from the time of the founding of the Republic.  In so doing, Justice McReynolds pointed out:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.' *And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time*.

307 U.S. at 179, 59 S. Ct. at 818 (emphasis added.)  The Court again pointed out that many militia required periodical but common musters of able-bodied male citizens, and that these citizens were expected to keep and maintain arms suitable for this purpose.[4]  307 U.S. at 182, 59 S. Ct. at 819-20.  See also, *Heller*, *supra*, 554 U.S. at 627, 128 S. Ct. at 2817 ("*Miller* said […] that the sort of weapons protected were those 'in common use at the time.'")

Mr. Miller was dead before he had the opportunity to present evidence that his shotgun was "in common use at the time for lawful purposes," or otherwise useful for the preservation or efficiency of the militia of his time.  Miller's co-defendant, Layton, pleaded guilty to the reinstated NFA charge and chose to forego a trial and corresponding fact-finding.  Frye, *supra*, at 69.  Thus, Miller was

---

[4] "Absent evidence of such large-scale state efforts to procure and distribute public arms, it is probable that the vast majority of the guns returned by militia units were privately owned." Robert H. Churchill, *Gun Ownership in Early America: A Survey of Manuscript Militia Returns*, 60:3 Wm. & Mary Q. 615, 624 (2003).

decided by the Supreme Court without any briefing by the defense (because defendants' attorney, then appointed to the state senate, was never paid).  Denning suggests: "*Miller* is perhaps most notable for the questions it left unanswered. What would have happened, for example, if Miller and Layton had retained an attorney to represent them at oral argument and put on evidence about the militia and weapons that militia members generally possessed? Or what if they had argued that the introductory phrase of the Second Amendment merely expressed a widespread sentiment against standing armies and was not meant to qualify or to limit the 'right of the people to keep and bear arms?' Given the incomplete record before the *Miller* court, as well as the very narrow holding of the case, questions regarding the meaning of the Second Amendment and its outer limits should be regarded as far from settled."  Denning, *supra*, at 976.

In revisiting the *Miller* case – which stood untouched for seventy years – the Court in *Heller* reaffirmed and restated *Miller*'s core holding: that the Second Amendment does not protect a right to keep and bear arms unsuitable to service in a militia.  *Heller*, 554 U.S. at 622, 128 S. Ct. at 2814.  Indeed, even the dissenting opinion of Justice Stevens in *Heller* pointed out that "[t]he view of the Amendment we took in *Miller* – that it protects the right to keep and bear arms for certain military purposes, but that it does not curtail the Legislature's power to regulate the nonmilitary use and ownership of weapons – is both the most natural reading of the

Amendment's text and the interpretation most faithful to the history of its adoption." 554 U.S. at 637-638, 128 S. Ct. at 2823 (Stevens, J., dissenting). As such, we can fairly state that whatever the great argument over the role of the Second Amendment that was represented by both the majority and minority opinions in *Heller*, they all agreed that *Miller* seems to pertain to (if not protect) bearable arms pertinent to militia service.

The Firearms Owners' Protection Act of 1986's complete ban on the ownership of post-1986 machine guns, now codified at 18 U.S.C. § 922(o), on its face, is wholly at odds with the rationale and holding of *Miller* to the extent that it now bans (or otherwise makes unattainable) the private possession of weapons that may be in common use for lawful purposes, are not "dangerous and unusual" *and* suitable for militia service. Under any heightened constitutional scrutiny analysis, a challenging plaintiff must reach the threshold matter of showing that an arm is "in common use for lawful purposes," and once that threshold is met, the burden shifts to the government to prove that the arm in question is "dangerous *and* unusual."[5]

---

[5] Handguns were not themselves in common use by average, law-abiding people within the District of Columbia when the Supreme Court struck down the District's ban on their possession and lawful use of handguns, but "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629, 128 S. Ct. at 2818.

First, let us make clear that we believe this case represents a challenge to the prohibition on the transfer and possession of post-1986 machine guns found at section 922(o), and not – at least for today – the National Firearms Act itself.  As Appellant points out in his opening brief, the NFA itself did not, and was never intended to impose an outright ban on the possession of machine guns, due to the constitutional question involved, but rather, a steep regulatory scheme designed to regulate machine guns through the power of taxation.  (App. Opening Brief, at 29.) Appellant quotes the testimony of Attorney General Cummings who conceded that the NFA did not amount to prohibition, but regulation.

Whether the 1934 Act achieved its primary goal of taking Thompson submachine guns out of the hands of Prohibition and Depression-era gangsters is an interesting but largely academic issue we leave to debate at a further time.  See William J. Helmer, *The Gun That Made the Twenties Roar* 152 (1969) ("After 1934 the Tommy-gun remained in use only by a few status-conscious amateurs[.]").  The point is academic, we say, because repealing the NFA would not result in a return to the Prohibition-era illegal use of machine guns in the streets.  For in the modern era, instant background checks using the National Instant Criminal Check (NICS) system, as administered by law through Federal

Firearm Licensees (FFLs), renders large parts of the original identification[6] and registration scheme of the NFA largely obsolete.  If Depression-era gangsters were no longer interested in obtaining machine guns because of the consequences associated with avoiding registration and the attendant enforcement scrutiny, today's criminals surely are not inclined to undergo instant background checks to obtain those same weapons legally.

Beyond this academic discussion, however, the statistics over time also bear out this fact: Despite vast legal ownership of machine guns, virtually no crime is committed with them.  To put it into perspective, as of 1995, there were over 240,000 machine guns registered with the ATF, half of which were owned by law enforcement and government agencies, and the other half in civilian hands.  Yet, statistically speaking, no crimes have been committed by these registered weapons. Gary Kleck, *Targeting Guns: Firearms and Their Control* 108-109 (1997). Therefore, we can confidently state that permitting legal ownership of fully automatic firearms under the NFA's underlying regulatory scheme by eliminating section 922(o)'s total prohibition would not return us to the Chicago gangster era of the 1930s.

---

[6] The NFA required, from the outset, the transferee of such a regulated weapon to provide identification, including fingerprints and a photograph.  National Firearms Act § 4(a), Pub. Law 73-474, 48 Stat. 1236 (June 26, 1934).

Thus stood the NFA, and for seventy years the *Miller* decision was championed by certain gun control advocates as the "final word" regarding the government's ability to *regulate* the field of firearms, by upholding the National Firearms Act, even if in a somewhat contrived test case. (See footnote, 2, *supra*; see also, *Denning*, *supra*, at 972.) The far more recent ban on machine gun creation and possession generally, found at section 922(o), is neither long-standing, nor merely a regulation, but instead an outright *prohibition* of an entire class of arms that might be protected. The government has not, at this time, proven that the arms at issue in the instant case under section 922(o)'s regulatory scheme are necessarily "dangerous and unusual."

Therefore, we respectfully submit that the district court was mistaken when it cited the *Heller* decision's observation that "[i]t may well be true today that a militia, to be effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change the interpretation of that right." (Memo. Opn. and Order, RE-31, citing *Heller*, 554 U.S. at 627-628.) The district court took *Heller*'s observation that the operative clause *may* be detached from the prefatory clause, and used that observation to justify the inapplicability of

the prefatory clause itself. However, that is not a proper reading of the holding or the import of *Heller*, and a faithful commitment to follow *Miller* as binding precedent compels the creation of a sufficient record through the fact-finding process of a trial.

We are aware, of course, that there is post-*Heller* authority contrary to our position on *Miller*. In *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008), the Eighth Circuit considered the defendant's appeal of a conviction for possession of a machine gun, in violation of 18 U.S.C. §§ 922(o), 924(a)(2), and one count of possession of an unregistered sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. The defendant did not dispute that he possessed these weapons without registering them under the NFA; in fact, he notified state and local officials about the weapons and invited them to view these weapons. 538 F.3d at 871. In spite of his protests under the Second Amendment, the defendant's conviction was upheld.

To be sure, Mr. Fincher's Quixotic approach was ill-advised. Appellant in the instant case is not seeking retroactively to justify a knowing, prior violation of the law, but seeks declaratory and injunctive relief for proscriptive protection from the application of these firearm provisions, to wit: 18 U.S.C. § 922(o), 26 U.S.C. § 5801 *et seq.*, and the associated implementing regulations found at 27 C.F.R. § 479.105(a), on the basis that they "act as an unlawful de facto ban on the transfer

and possession of a machine gun manufactured after May 19, 1986." (RE-10.)

Appellant is a law-abiding citizen, intent on complying fully with the law on one hand, while seeking to secure those rights guaranteed to him by the Second and Fourteenth Amendments to the United States Constitution on the other. See *McDonald v. City of Chicago*, *supra*, 561 U.S. 742, 130 S. Ct. 3020. Beyond the mere differences in approach, however, *Fincher* was primarily an appeal of whether Mr. Fincher was deprived of his ability to argue the Second Amendment in his defense to the jury, an appeal that the court rejected. 538 F.3d at 872. And the court's secondary reliance on the fact that Mr. Fincher was not part of a state-sponsored state militia, to affirm his conviction, is simply misapplication of history. For it was clearly understood, from the early founding of the Republic, that the unorganized militia consisted of the people themselves. See *Heller*, 554 U.S. at 595-596, 128 S. Ct. at 1799 (that "the Militia comprised of all males physically capable of acting in concert for the common defense[]" comports with founding-era sources) (citing *Miller*, *supra*, 307 U.S. at 179). In *Heller*, the majority rejected a narrower view of the militia as having been limited to state and congressionally-regulated military forces. 554 U.S. at 596, 128 S. Ct. at 2799-2800. Those early precepts were not bound for obsolescence merely by the rise of our modern, industrialized society.

Indeed, George Mason predicted this argument in debates before the Virginia ratifying convention in June 1788.  On June 14, 1788, Mason expressly warned against the danger of standing armies, as well as the dangers inherent with the formation of a national militia, when he argued that "the militia would be destroyed by rendering them useless - by disarming them."  Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 223 (2008) (citing Elliot, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 379 (1836)).[7]  Returning to this issue, two days later, on June 16, 1788, Mason argued:

> Who are the militia? They consist of now the whole people, except a few public officers. . . . If that paper on the table gets no alteration, the militia of the future day may not consist of all classes, high and low, rich and poor. . . .

Halbrook concludes that the republican militia was, from the outset, considered to be the armed populace at large, and not a select militia or a standing army.

---

[7] During this debate, Mason also warned against the government control of arms, when he stated: "Forty years ago, when the resolution of enslaving America was formed in Great Britain, the British Parliament was advised by an artful man [Sir William Keith], who was governor of Pennsylvania, to disarm the people; that it was the best and most effectual way to enslave them; but that they should not do it openly, but weaken them, and let them sink gradually, by totally disusing and neglecting the militia."  (Halbrook, *supra*, at 223 (citing Elliot, *supra*, at 380)).  The slow, gradual and quiet erosion of the right of the people to keep and bear arms, commencing in 1934, makes Mason seem quite prescient on this subject.

Halbrook, *supra*, at 226. Mason was, in fact, a leading example of voluntary, unofficial militia service.[8]

In sum, we believe that faithful adherence to *Miller* as precedent compels the conclusion that the Second Amendment protects an individual's right to bear arms which are useful to militia service, in common use for lawful purposes, and which are not "dangerous and unusual."

## II. THE GOVERNMENT HAS NOT PROVEN THAT THE M-16 AT ISSUE IS AN UNCOMMON, DANGEROUS AND UNUSUAL WEAPON.

### A. THE M-16 STYLE SERVICE RIFLE APPELLANT WISHES TO MANUFACTURE AND POSSESS MAY BE IN COMMON USE.

The apparent test under both *Miller* and *Heller* is whether the arms at issue are those "in common use" at the time. *Heller*, 554 U.S. at 627, 128 S. Ct. at 2817 (citing *Miller*, 307 U.S. at 179, 59 S. Ct. at 816). At the outset, we agree with Appellant that the "common use" test cannot be a purely numerical test to apply to the prohibition of categories of weapons in the long term, because it subjects the Second Amendment to both indignity offered to no other constitutional right, as well as impracticality (i.e., no newly-developed weapons are commonly used, and therefore, those weapons would always be prohibit-able at their inception.) See

---

[8] Mason, one of the drafters of the Virginia Declaration of Rights, had formed and organized (along with George Washington) the Fairfax Independent Militia Company, as a defense force against the Royal militia prior to independence in 1776. Halbrook, *supra*, at 129 (citing Robert A. Rutland ed., 1 *The Papers of George Mason* 210-211 (1970)).

*Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J. dissenting) (suggesting that the common-use test is circular "from the obvious fact that common use is aided when a weapon is legal and precluded when it is not.").

But the district court below did not require the government to prove that the arm at issue in this case was both not "in common use for lawful purposes" and "dangerous and unusual." That error should be reversed. At trial, Appellant may be able to demonstrate that the M-16 style service rifle which he wishes to manufacture from the AR-15 lower receiver is a rifle in common use for lawful purposes, at this time, and for at least two generations prior to the enactment of section 922(o)'s total prohibition. And the government, then, must shoulder the burden of proving that the arm, even if "in common use for lawful purposes," are so "dangerous and unusual" such that they are outside the scope of the Second Amendment's protection. The government may or may not be able to clear this required hurdle, but it must do so with evidence and not mere speculation. See., e.g., *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) (in analogous First Amendment context, "the government must supply actual, reliable evidence to justify restricting protected expression based upon secondary public-safety effects.").

Private ownership of M-16 style rifles, manufactured before section 922(o)'s *de facto* ban went into effect, is not uncommon, particularly in states such as Texas that allow for ownership of machine guns if otherwise registered and compliant with the NFA.  Tex. Pen. Code § 46.05(c).  But of course, this is not the final word.

The M-16 rifle, in four general variations, has been the standard service rifle of the U.S. military since 1963.  William H. Hallahan, *Misfire: The History of How America's Small Arms Have Failed Our Military* 491-492 (1994).  It is safe to say that at least three generations of American service personnel have been trained, familiarized and have staked their lives on this weapon.  This would presumably include Appellant, a Marine Corps reservist.  As has been pointed out, the Second Amendment right to keep and bear arms extends, insofar as militia service is concerned, not only to the physical keeping of those weapons, but "implies the learning to handle and use them in a way that makes those who would keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Heller*, *supra*, 554 U.S. at 617-618, 128 S. Ct. at 2811-2812 (citing Thomas Cooley, *General Principles of Constitutional Law* 271 (1880).

Therefore, the mere fact that the M-16 rifle at issue would be derived from, or has primary application in military use, is of no historical moment.  First, we note here that virtually all weapons (firearms or otherwise) are derived from some

form of military use.[9]  Therefore, virtually all arms are derivatives of military weapons, and if that were the appropriate delimiting standard, then virtually no firearms would be protected under the Second Amendment.  However, *Heller* expressly rejected the idea that weapons could be prohibited by the modernity of their features alone: "Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.  We do not interpret constitutional rights that way."  *Heller*, 554 U.S. at 582, 128 S. Ct. at 2791.  Indeed, if *Miller* is to remain respected as authority – and there is no reason to believe that it should not – then modern weapon ownership by a citizen should be respected not in spite of the fact that they are military analogues, but *because of* that fact.

B.  THE M-16 STYLE SERVICE RIFLE MAY NOT BE A "DANGEROUS AND UNUSUAL" WEAPON.

Both the district court below, and the government, undertook understandable reliance upon the apparent limitations of Second Amendment protection asserted by the majority opinion in *Heller*, which ultimately qualified the right as such:

> We also recognize another important limitation on the right to keep and carry arms.  *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'" 307 U.S., at 179, 59 S. Ct. 816.  We think that limitation is fairly supported by

---

[9] The modern handgun, for example, traces its origins to battlefield weapons that were originally developed in tandem with cannons.  The first manuscript reference to handguns dated from 1365. John Childs, *The Military Revolution I: The Transition to Modern Warfare*, in *The Oxford History of Modern War* 24 (Charles Townshend, ed. 1997).

the historical tradition of prohibiting the carrying of "dangerous and
unusual weapons."

*Heller*, 554 U.S. at 627, 128 S. Ct. at 2817 (citing 4 Blackstone 148-149 (1769)

and other authorities).  Indeed, we acknowledge that Justice Scalia even went on

specifically to mention M-16 rifles in particular, when he further elaborated in the

majority opinion: "It may be objected that if weapons that are most useful in

military service – M-16 rifles and the like – may be banned, then the Second

Amendment right is completely detached from the prefatory clause.  But as we

have said, the conception of the militia at the time of the Second Amendment's

ratification was the body of all citizens capable of military service, who would

bring the sorts of lawful weapons that they possessed at home, to militia duty.  It

may well be true today that a militia, to be as effective as militias in the 18th

century, would require sophisticated arms that are highly unusual in society at

large. […] But the fact that modern developments have limited the degree of fit

between the prefatory clause and the protected right cannot change our

interpretation of the right."  554 U.S. at 627-628, 128 S. Ct. at 2817.

Like *Miller*'s short-barreled shotgun, we are aware of no specific briefing on

the issue of whether an M-16 style rifle constitutes the "dangerous and unusual"

weapon that *Heller* refers to (that case, of course, being about handguns).  At the

same time, we also recognize that every Circuit court to consider the issue (of

machine guns generally) has simply followed the language of *Heller* in concluding

that machine guns are "dangerous and unusual weapons" that are not protected by the Second Amendment. See, e.g., *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *United States v. Marzzarella*, 614 F.3d 85, 94-95 (3d Cir. 2010); *United States v. Fincher*, *supra*, 538 F.3d at 874; *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009); *Friedman v. City of Highland Park, Illinois*, *supra*, 784 F.3d at 408.

Our review of these Circuit cases, however, reveals something they have in common: in none of these cases was there actually a trial on the specific issue of whether a fully-automatic weapon (such as Appellant's proposed M-16 style rifle at issue in the instant case) actually and in fact constituted a "dangerous and unusual weapon" that is not "in common use for lawful purposes." Most of these cases were decided as criminal prosecutions, and the primary issue was of possession alone. As far as we are aware, the issue of whether a fully-automatic feature of a weapon, thereby making it a machine gun, made it a "dangerous and unusual" weapon by virtue of that fact alone, was never tried – or even put at issue – in a lower court or reviewed by a court of appeal.

We therefore submit that, at an early stage of this case, the district court here should not have given the government the benefit of all doubts prior to its meeting the burdens of proof required under any level of constitutional scrutiny afforded to fundamental, individual rights. At the very least, Appellant is entitled to a trial on

this issue.  Indeed, the sole feature at issue that might make the M-16 at issue "unusual" is the fully-automatic feature which each court listed above presumes to make it not just dangerous, but unusually so.  We believe that there would be, at the very least, conflicting testimony as to whether this feature alone makes it a dangerous and unusual weapon under the apparent *Heller* and *Miller* tests.

We would also like to dispel the notion – viewed with the comfort inherent in nostalgia – that weapons of the time of the founding of the Republic were not themselves highly lethal.  That was far from the case.  In the hands of any trained marksman, they were deadly, and in the hands of a company of militiamen, even moreso.  In his survey of early militia return records, and in discussing why certain militia members may not have brought those arms to bear during muster, Professor Churchill concluded: "[I]t is clear that early Americans owned guns.  They owned a lot of them.  In 1779, as George Washington was once again lamenting the arrival of unarmed militiamen in his camp, there were 'good guns' sitting on the mantles of almost 40,000 Massachusetts militiamen.  Most of these guns were probably longer or shorter or wider than Washington would have liked. Yet they were in all respects similar to the guns that had decimated four British regiments on the slopes of Breed's Hill in 1775.  North and east of Philadelphia, these guns were as ubiquitous as they were lethal."  Churchill, *Gun Ownership in Early America: A Survey of Manuscript Militia Returns*, *supra*, at 642.

Lethal is lethal, today and yesterday.  No doubt, advances in industry and technology have made weapons more effective, uniformly so, but the same argument as to increased lethality could have been made about cartridge ammunition, the repeating rifle, the Colt revolver, and the semiautomatic pistol, just to name some examples, all of which sprang into existence at various points throughout the history of our country without any question as to whether possession of these weapons are guaranteed by the Second Amendment.  For that matter, the argument predates firearms itself.[10]

In summary, hundreds of thousands of NFA-regulated items, like the proposed M-16 service rifle at issue here, may very well be arms in common use for lawful purposes.  The M-16 may not be (and as Appellant would likely argue at trial), a "dangerous and unusual" weapon.  And, importantly, the M-16 it is *not prohibited* by the NFA.  As a select-fire weapon, Appellant's desired M-16 is only proscribed by the ban on newly-manufactured versions under the Firearms Owners' Protection Act, 18 U.S.C. § 922(o), a *de facto* ban that is relatively recent, and therefore not long-standing, in the far longer and greater history of this Republic.

---

[10] The medieval crossbow was apparently seen as such an "inherently evil" weapon, as it upset the social order of the time by allowing untrained peasants to pierce the armor worn by nobility, that it was purportedly condemned by Pope Urban II, who banned its use by threat of excommunication in 1096, and which was reiterated by the Second Lateran Council in 1139. Generally, Cathal J. Nolan, 1 *The Age of Wars of Religion, 1000-1650*, 200 (2006).

## CONCLUSION

Amici Curiae respectfully submit that this court should remand to the district court with instructions to permit Appellant to proceed to trial on the merits.

Respectfully submitted,

Dated: November 2, 2015

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


s/ *George M. Lee*
George M. Lee

Attorneys for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE – RULE 32**

I hereby certify that the foregoing brief complies with Fed. Rule of App. Procedure 32(a)(7)(C).  According to the word count feature of the word-processing system used to prepare this brief, it contains 6,738 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6).  It was prepared in a proportionately-spaced typeface using 14-point Times New Roman font in Microsoft Word.

Dated: November 2, 2015                SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


                                       _s/ George M. Lee_____
                                       George M. Lee

                                       Attorneys for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I submitted/electronically filed the foregoing document

with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system. I certify that all registered

attorneys in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.

Dated: November 11, 2015          SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


                                  s/ *George M. Lee*
                                  George M. Lee

                                  Attorneys for *Amici Curiae*