# ⓢ Stamboulieh Law, PLLC

P.O. Box 4008, Madison, MS  39130 | (601) 852-3440 | stephen@sdslaw.us

April 9, 2016

Mr. Lyle W. Cayce, Clerk
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130-3408

      **Re:** JAY AUBREY ISAAC HOLLIS v. LORETTA E. LYNCH, et al.; No. 15-10803; Citation of Supplemental Authorities pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure

Dear Mr. Cayce:

      Mr. Hollis submits this supplemental letter under Fed. R. App. P. 28(j) and 5th Cir. R. 28.4 to inform the Court of supplemental authority regarding the phrase "dangerous and unusual" after oral argument on April 6, 2016.

      The attached supplemental authority "examines the historical use and definition of the phrase 'Dangerous and Unusual Weapons' and concludes that it refers not to a class of weapons, but to a class of behavior."[1]  The author reviews each of the sources the Supreme Court of the United States cited in *Heller* for the proposition of the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *D.C. v. Heller*, 554 U.S. 570, 627 (2008).

      As briefed in the Appellant's Opening Brief, pp. 20-26, a reading of the cases cited in *Heller* provides that "dangerous and unusual" does not pertain to mere possession of a firearm, but instead applies to the manner in which that right is exercised.

      Yours very truly,

      /s/ Stephen D. Stamboulieh
      Stephen D. Stamboulieh

---

[1] Page, Daniel Richard, Dangerous and Unusual Misdirection: A Look at the Common Law Tradition of Prohibiting Going Armed with Dangerous and Unusual Weapons to the Terror of the People, as Cited in District of Columbia versus Heller (May 4, 2011). Available at SSRN: http://ssrn.com/abstract=1859395 or http://dx.doi.org/10.2139/ssrn.1859395.  Attached hereto.

cc: All counsel of record (by the Court's electronic filing system)

# Dangerous and Unusual Misdirection

**A look at the common law tradition of prohibiting going armed with dangerous and unusual weapons to the terror of the people as cited in District of Columbia v. Heller**

by
Daniel Page*

Abstract

In dicta, the Supreme Court in Heller cited the historical ban on "Dangerous and Unusual Weapons" to support a common use test on statutes that ban certain types of weapons considered to be "dangerous and unusual". This paper examines the historical use and definition of the phrase "Dangerous and Unusual Weapons" and concludes that it refers not to a class of weapons, but to a class of behavior.

Electronic copy available at: http://ssrn.com/abstract=1859395

*Not a blacksmith could be found in the whole land of Israel, because the Philistines had said, "Otherwise the Hebrews will make swords or spears!"[1]*

In District of Columbia v. Heller, Justice Scalia wrote,

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." See 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New-York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). See also State v. Langford, 10 N.C. 381, 383-384 (1824); O'Neill v. State, 16 Ala. 65, 67 (1849); English v. State, 35 Tex. 473, 476 (1871); State v. Lanier, 71 N.C. 288, 289 (1874).[2]

This paper seeks to review the tradition to which Justice Scalia refers. This paper will examine each of the sources the Court cites in the portion quoted above, and will then examine other sources to attempt to determine the nature and extent of the historical tradition to which the court refers. Finally, this paper will examine what, if any, impact that tradition will have on future firearms litigation.

As will be shown later in this paper, most of the Court's cited case law is in the context of a common law crime known as the affray.

## I.    Affrays and the English Common Law

Timothy Cunningham's 1789 law dictionary defines an affray as follows.

> Affray, Is derived from the French word *effrayer*, to *affright*, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror

---

* Daniel Page can be reached at 208.870.3820 or at drpage@email.wm.edu or at 25145 CheRanda Ln Middleton, Id 83644
[1] 1 Samuel 13:19, New International Version.
[2] Dist. of Columbia v. Heller, 554 U.S. 570, 627, 128 S. Ct. 2783, 2817, 171 L. Ed. 2d 637 (2008).

Electronic copy available at: http://ssrn.com/abstract=1859395

of others; and so is the word used in the statute of Northampton, 2 Ed. 3 c 3. It is now commonly taken for a skirmish, or fighting between two or more. … Yet, as it is there said, they differ in this, that where an assault is but a wrong to the party, an affray is wrong to the commonwealth, and therefore both inquirable and punishable in a leet. … Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in flat 2 Ed 3 c 3. But altho' no bare words, in the judgement of law, carry in them so much terror as to amount to an affray, yet it seems certain, than in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the Common law and is strictly prohibited by Statute. [3]

It is clear from the sources above that an affray is a crime against the public peace.[4] One possible way to commit this crime against the public peace is by "riding armed with dangerous and unusual weapons, to the terror of the public." However, sometimes riding armed with dangerous and unusual weapons to the terror of the public is listed as an offense in of itself, separate from an affray. Whether the two are separate offenses or whether riding armed is a crime unto itself is unclear. What is clear is that both terms cite back to 2 Edw. 3 Stat. Northampt. c. 3 (1328). At least three of the sources cited by the Court in Heller to support a common use test, Blackstone, Wharton, and Stephen, referenced the same statute, enacted in 1328 by King Edward III which reads as follows:

ITEM, it is enacted, That no Man great nor small, of what Condition soever he be, except the King's Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also upon a Cry made for Arms to keep the Peace, and the same in such places where Acts happen, (footnote omitted) be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part

---

[3] Timothy Cunningham A new and complete law-dictionary, or, General abridgment of the law: on a more extensive plan than any law-dictionary hitherto published: containing not only the explanation of the terms, but also the law itself, both with regard to theory and practice. Very useSul to barristers, justices of the peace, attornies, solicitors, &c. Affray, 1789.

[4] See 2 Blackstone 145 (1803).

Electronic copy available at: http://ssrn.com/abstract=1859395

elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure.[5]

This appears to be the origin of the law against affrays, to which the Supreme Court's sources cite.

Cunningham defines Riding Armed, with dangerous and unusual weapons as

an offense at Common law. [citation omitted] By the stat. 2 Ed. 3. Cap. 3. None shall ride armed by day or night to the terror of the people; or come with force and arms before the King's justices...but men may wear common arms according to their quality and fashion, and have attendants with them armed agreeable to their characters; all persons may ride or go armed take felons, suppress riots, execute the King's process…[6]

Unfortunately, this definition merely states the name of the law, followed by the origins. The name of the law is filled with contestable definitions. Which weapons are dangerous and unusual? What does the word, "terror" mean?

### A. Dangerous and Unusual Weapons

The term dangerous weapons, in the English common law, is a legal term of art[7] that usually included weapons designed to kill human beings.[8]

The term, "unusual weapons" does not mean, contrary to the Heller court's opinion, "weapons not in common use". As it was used in the time of the founding fathers, the term, "unusual weapons" appears to mean "surprising or uncommon force". In an English case called <u>Baron Snigge v. Shirton</u>, a long term tenant was in a dispute with his landlord, and "kept the possession [of the house he rented] with drum, guns, and halberts".[9] This was considered

---

[5] 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[6] Cunningham, supra, Riding.
[7] See The King v. Hutchinson and Others 168 E.R. 273 (1784).
[8] "[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life…is…the use of dangerous weapons" United States v. Hare, 26 F. Cas. 148, 163-64 (C.C.D. Md. 1818). See also The King v. Oneby 92 E.R. 465 (Court of the King's Bench 1727) "any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt".
[9] See Generally Baron Snigge v. Shirton 79 E.R. 173 (1607).

keeping "his house with unusual weapons against a purchaser".[10]  In another English case, a

sailor was firing warning shots with a "musqet and ball" across the bow of another ship as a

signal, and killed a man.[11]  This firing was not done with unusual weapons.[12]  In both cases, the

weapons were in common use at the time.  However, in one case, the weapon was unusual, while

in the other case, it was not.  The main difference between the cases is whether the use of force

was a reasonable one.

Other, stricter laws outlawed specific types of weapons for certain individuals. "The

keeping or carrying any gun-powder, shot, club, or other weapon, whatsoever, offensive or

defensive, by any negroe or mulatto whatsoever (except in certain special cases) is an offence,

for which the gun or other weapon may be seized, and the offender whipped, by order of a justice

of the peace."[13] if these weapons were dangerous and unusual, within the meaning of the term,

why did the legislators exhibit such verbosity? Why not simply save paper and ink and time and

say, "The keeping of dangerous or unusual weapons by any negroe or mulatto is an offence"?  It

seems unlikely that the legislature would find this proposed language outlawed certain types of

weapons that they wanted black people to be able to keep.  After all, the legislature outlawed

possession of "any weapon whatsoever" by black people.   Similarly, King George III issued a

statute outlawing the possession of "pistol, hanger, cutlass, bludgeon, or other offensive weapon

with intent feloniously"[14] and declared, "such a person shall be deemed a rogue and a vagabond".

[15] Why didn't the lawmakers use the term dangerous and unusual weapons in this case?  There

are three options.  The first is that the terms mean the same, but the lawmakers simply preferred

---

[10] Id.
[11] See generally Rex v. Rowland Phillips 98 E.R. 1385
[12] Id.
[13] 4 Blackstone 175 (1803).
[14] 5 Blackstone 169 (1803).
[15] Id.

other language.  The second option is that the term, "dangerous and unusual weapons" did not describe enough weapons to suit the lawmakers' desires.  The third option is that the term, "dangerous and unusual weapons" does not describe a class of weapons, but rather describes a class of behavior.

This last option appears to make the most sense when one examines the way the word "unusual" is used in other legal contexts.

When discussing forcible entry or detainer, Blackstone states, "so that the entry now allowed by law is a peaceable one; that forbidden is such as is carried on and maintained, with force, with violence, and unusual weapons."[16] It would make little sense to think that the distinction was being drawn between peaceable entry and entry with weapons that are difficult to purchase or hard to find.  Instead, the term "unusual weapons" means weapons that are being used in a threatening or shocking manner, or weapons that are being used to facilitate an unlawful endeavor.

This definition of unusual is supported by Blackstone's discussion of forfeited recognizance. "A recognizance for the good behavior may be forfeited … by going armed with unusual attendance, to the terror of the people."[17] In other words, terrifying people with gangs constitutes unusual attendance.  Presumably, just as people may own weapons, large people may gather together, so long as their purpose is lawful.  It is when those groups of people become threatening (or  terrifying), that those groups are labeled as unusual attendance to the terror of the public.  Similarly, when the manner in which one carries a weapon becomes threatening, it is labeled an unusual weapon to the terror of the public.

---

[16] 5 Blackstone 148 (1803).
[17] 5 Blackstone 256 (1803).

When used to describe weapons, the word, "unusual" is not being used in a different way than when it is being used to describe attendance. Blackstone states, "Any justice of the peace may… bind all those… who make any affray; or threaten to kill or beat another ; or contend together with hot and angry words ; or go about with unusual weapons or attendance, to the terror of the people"[18]. Just as the common law is not outlawing the assembly of misfits or strange people, the common law is not referring to the type of weapon involved when it mentions unusual weapons. Therefore, when the historical phrase, "dangerous and unusual weapons" is used to justify a ban on a class of weapons, it is a misuse, and an abuse of the historical definition.

Does Timothy Cunningham's definition contradict this analysis? "Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in stat 2 Ed 3 c 3." One might argue that this definition supports the Supreme Court's contention that the weapons protected by the second amendment are those in common use at the time. However, this does not seem to make rational sense. Would Timothy Cunningham have argued that a rare pistol was more frightening than a common pistol? Perhaps a less common weapon, such as an intricate morning star would be more` frightening than a normal club, but the crime described as an affray is essentially a breach of the peace. People used to wear ornamental and defensive weapons as part of their everyday dress[19] or as a necessary accessory to their vehicle[20], and this, more likely, is to what Timothy

---

[18] 5 Blackstone 254 (1803).

[19] George Neumann, The History of Weapons of the American Revolution 150 Harper & Row 1967. "It was considered normal for civilians to carry pocket pistols for protection while traveling."

[20] John George, English Pistols and Revolvers 47 Wheaton and Co. 1938. "Travelers…went heavily armed, and had to be prepared to use their weapons at any moment. … [N]o gentleman would dream of starting upon a journey without a pair of pistols in the pockets of his carriage.

Cunningham referred when he wrote, "weapons not usually worn". With this in mind, a lance-wielding knight in shining armor would be in great contrast to (and much more frightening than) a man in shirt and pantaloons with a rapier.

The mention of armor in Edward III's law[21], and in Blackstone's commentary on it[22] suggests the prohibition is primarily upon the types of armament that the military would use, not upon the small, concealable weapons that were in more common use by the people.[23] Clearly, the English and the Americans know how to outlaw weapons, whether they wish to outlaw all types, or only weapons of a certain class. The term, "dangerous and unusual weapons" did not describe a class of weapons. Rather it described a class of behavior with weapons.

### B.  Terror of the People

A 1675 dictionary defines terror as, "dread, great fear or fright"[24]

An affray may not be committed in private,[25] presumably because then, the public would not be terrified.

Another plain English dictionary from 1768 describes the word, "Bo" (which, I assume, is an older equivalent to the modern day "Boo!") as "A word of terror".[26]

Unfortunately, for our purposes, the oldest legal dictionaries that I could find with a definition of the word, "terror" come from the turn of the twentieth century. The cyclopedia Law Dictionary from 1922 defines terror as

---

[21] 2 Edw. 3 Stat. Northampt. c. 3 (1328).

[22] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the Government of the United States and of the of Virginia 145 1803.

[23] The Complete Encyclopedia of Arms & Weapons, Leonid Tarrassuk and Clause Blair, 369 Simon and Schuster 1982. "Among civilians the pistol became the weapon most commonly used for personal attack and defense." See also George Neumann supra.

[24] An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675).

[25] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

[26] Samuel Johnson, A Dictionary of the English Language (1768).

That state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe; affright from apparent danger.  One of the constituents of the offense of riot is that the acts of the persons engaged in it should be to the terror of the people, as a show of arms, threatening speeches, or turbulent gestures; but it is not requisite, in order to constitute this crime, that personal violence should be committed. [27]

The Collegiate Law Dictionary from 1925 defines terror as "1. The state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe. 2. Affright from apparent danger."[28]

It seems as though the gravamen of the word, "terror" is an apprehension of harm to come.  In describing a mugging, James Wilson writes, "If one assault another with such circumstances of terror as to put him in fear, and he, in consequence of his fear, deliver his money; this is a sufficient degree of violence".[29] Later, Wilson describes arson as "a crime of deep malignity … The confusion and terror which attend arson, and the continued apprehension which follows it, are mischiefs frequently more distressing than even the loss of the property."[30] In describing an ideal judge, Wilson writes, "He ought, indeed, to be a terror to evil doers".[31] Wilson writes, in describing interrogation methods, "terror is frequently added to fraud.  The practice… is said… to have been derived its origin from the customs of the inquisition."[32]  Giles Jacob's law dictionary states, when describing a legal device known as a Surety of the Peace (which appears to be a promise not to harm), "the demand of the Surety of the Peace ought to be soon after the cause of fear; for the suffering much time to pass before it is demanded, shews that

---

[27] The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901).
[28] The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) (1925). See also Bouvier's law Dictionary (Francis Rawle, ed., Vernon Law Book Company and West Publishing Company 1914) (1839).
[29] 3 Wilson 59 (1804).
[30] Id. At 63.
[31] 2 Wilson 300 (1804).
[32] 3 Wilson 155 (1804).

the party has been under no great terror."[33]  Jacob further describes the difference between mere

fear and terror while defining the word, "robbery".  Jacob writes, "[a]nd when it is laid to be

done by putting in fear, this does not imply any great degree of terror, or affright in the party

robbed.  It is enough that so much force, or threatening by word or gesture, be used, as might

create an apprehension of danger, or induce a man to part with his property without or against his

consent."[34] From these sources, terror, is more than mere apprehension of danger; it might more

aptly be described as the apprehension of an extreme danger, or a catastrophe.

Some American case law comports with the above view.  A 1795 case describes "a

defence based upon the ground of duress and terror".[35] Another 1795 case states, "raising a body

of men to …oppose and prevent by force and terror, the execution of a law, is an act of levying

war."[36]

However, other old American case-law treats the word, "terror" as if it were synonymous

with the word, "threat". One case mentions people "armed with all the terrors of forfeiture"[37].

Another case mentions  "the terror of public censure"[38].  A third case mentions "the terrors of a

law-suit"[39].

Clearly, it will be difficult to determine what the word terror means in the context of the

common law tradition that the court in Heller describes, as "terror" has varying levels of severity,

ranging from the feeling one gets when someone says, "bo" to the anticipation of a great

catastrophe.

---

[33] Giles Jacob, The law-dictionary : explaining the rise, progress, and present state of the English law; defining and interpreting the terms or words of art; and comprising copious information on the subjects of law, trade, and government. 149(P. Bryne 1811 first American from the second London edition) (1811).
[34] Id at 546.
[35] U.S. v. Vigol 2 U.S. 346 (1795).
[36] U.S. v. Mitchel 2 U.S. 348 (Pennsylvania circuit court 1795).
[37]  Warder v. Arell 2 Va. 282 (1796).
[38] State v. Norris 2 N.C. 429 (1796).
[39] Neilson & Sarrazin v. Dickenson 1 Des. 133 (1785).

## II.     Heller's secondary sources

### A.  Blackstone

Justice Scalia first cites Blackstone who, in his commentaries, lists the following offense:

The offence of *riding* or *going armed* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III, c. 3 upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner, as by the laws of Solon, every Athenian was finable who walked about the city in armour.[40]

Notice that this is a crime against the public peace.  Presumably, if the public peace was not harmed, or if the peace was disturbed through a means that did not terrify the good people of the land[41], this crime would not be charged. Furthermore, this crime appears to be a crime one cannot commit while alone in the privacy of one's own home.  However, as we will see, modern courts use this common law history to uphold laws banning private, solitary possession of certain classes of weapons, such as fully automatic rifles.   Blackstone does not mention any way of classifying different types of weapons, unless the fallacious definition of dangerous and unusual weapons is applied.  In no way does this source fairly support a prohibition based on which weapons are presently in common use.

### B.  James Wilson

Justice Scalia then cites the James Wilson's explanation of an affray.  James Wilson wrote,

Affrays are crimes against the personal safety of the citizens; for in their personal safety, their personal security and peace are undoubtedly comprehended.  An affray is a fighting

---

[40] 2 St. George Tucker Blackstone's Commentaries with of Reference to the Constitution and Laws of the Government of the United States and of the of the Virginia 145 1803

[41] For example, if one were to disturb the peace by playing a minstrel tune with a very loud trumpet, while carrying a concealed knife, that behavior would probably not terrify anyone and would presumably not constitute a violation of the common law rule against riding with dangerous and unusual weapons to the terror of the public.

of persons in a publick place, to the terror of the citizens. They are considered as common nuisances. They may, and ought to be suppressed by every person present; and the law, as it gives authority, so it gives protection, to those who obey its authority in suppressing them, and in apprehending such as are engaged in them ; if by every person present ; then still more strongly by the officers of peace and justice (footnote omitted). In some cases, there may be an affray, where there is no actual violence ; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terror among the people.[42]

Again, we see that an affray is a crime committed only in the presence of others. The exception listed at the end of the quoted section is not an exception to the public requirement, but is rather an exception to the actual violence requirement. Heller cites this as part of the common law tradition that supports a test of whether a class of weapon was in common use.[43] However, the only possible class of weapons in this quote comes a fallacious definition of the term "dangerous and unusual". To say that this source fairly supports a restriction based on which weapons were in common usage at the time is dubious.

### C. John A. Dunlap

Justice Scalia next points us to John A. Dunlap's <u>The New-York Justice</u>, which discusses the crime of affray,

An affray is the fighting of two or more persons in some public place to the terror of the people; for if the fighting be in private it is not an affray, but an assault ; neither will threatening words amount to an affray, although it seems that the constable may, at the request of the party threatened, carry the person using the threats before a justice of the peace, in order that he may find sureties. … As where two persons coolly and deliberately engage in a duel; this being attended with an apparent intention and danger of murder, and being a high contempt of justice, is a strong aggravation of the affray, though no mischief has actually ensued. It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people. [44]

---

[42] 3 James Wilson, Works of the Honourable James Wilson 79 (1804).

[43] D.C. v. Heller, 554 U.S. at 627.

[44] John Dunlap, The New-York Justice; or, a Digest of the Law Relative to Justices of the Peace in the State of New-York 8 Isaac Riley 1815.

Dunlap's description of an affray also includes the public place requirement, as well as the terror of the people requirement.  Here, Dunlap compares carrying dangerous and unusual weapons with dueling people, with the intention and danger of murder.[45]  This is once again an exception to the Affray's element of actual violence.  Dunlap's exception to actual violence includes a manner element.  The manner in which these arms are carried is what is being compared to dueling.  The manner that is outlawed is the manner that would naturally cause terror to the people.   Dunlap does not support a restriction on the type of weapons being used, but rather on the manner in which they are used.

### D.  C. Humphrey

The court then refers to C. Humphrey's  <u>A Compendium of the Common Law in Force in Kentucky</u>,[46] which says,

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment.  But here it should be remembered, that in this country the constitution guaranties to all person the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily. We have a statute on the subject, relating to concealed weapons.[47]

The crime mentioned by Humphry is a public one that involves terrifying the people.  Notice that it is the manner that the right is exercised, not the type of weapon that is carried that constitutes the crime.   Humphrey makes it explicit that one may carry weapons so long as it is not in a manner that excites people to unnecessary terror. The unnecessary terror of the people appears to be an essential element.   At no point does Humphrey refer to a test of whether the

---

[45] Dueling often resulted in no harm to either party.  "If a duel should lead to the death of one of the principals, an event which was by no means so common as the reader of modern historical novels might be led to suppose". John George, English Pistols and Revolvers 74 Wheaton and Co. 1938. See also "A duel could be declared ended with honor without a wound's being inflicted... a number of duelists pointedly chose to miss their targets." Jack Williams, Dueling in the Old South: Vignettes of Social History 58 Texas A&M University Press 1980.

[46] D.C. v. Heller 554 U.S. at 627.

[47] H. Stephen, Summary of the Criminal Law 48 (1840).

arms mentioned were in common use at the time, unless one uses the fallacious definition of

"dangerous or unusual".

### E.  W. Russell

The court then refers to <u>A Treatise on Crimes and Indictable Misdemeanors</u> by W.

Russell,[48] which states in relevant part,

> [Y]et it seems certain that in some cases there may be an affray where there is no actual violence; as where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the common law, and is strictly prohibited by several statutes. (citation omitted.)[49]

Russell is providing an exception to the violence requirement of the affray.  Notice again

that there is a manner requirement.  Presumably, if one were to arm himself with dangerous and

unusual weapons in a manner that did not naturally cause a terror to the people, one would not be

guilty.  One might do this in several ways.  First, one could do it out of sight, in private.  One

might conceal the weapon from public view.  One might carry the weapon in a peaceable manner

that did not excite anyone to terror.  From the plain meaning of the text, those manners of

carrying dangerous and unusual weapons were not outlawed.  It is worth noting that it is the

manner that is the essential element, not the type of weapon involved, unless one applies the

fallacious definition of dangerous and unusual weapons.

### F.  H. Stephen

The court then refers to H. Stephen's  Summary of the Criminal Law, which states,

"Riding or going armed with dangerous or unusual weapons. By statute of Northampton, 2 Edw.

---

[48] D.C. v. Heller 554 U.S. at 627.
[49] Sir William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831).

III c. 3, this is a misdemeanor, punishable by forfeiture of the arms and imprisonment during the King's pleasure. "[50]

This source was rather bare. However, it uses the same language and cites the same statute as Blackstone. It should be noted that in the statute that Stephens cites, the crime of riding armed was conditioned on being in a public place or before a public official.[51] Because Stephen uses the same language and cites the same sources as the other authors listed by the Heller court, one should not take the bareness of the language to mean that, according to Stephen, the exceptions and restrictions on the common law are not present. All Stephen does is name the offense, cite to <u>Statutes of the Realm</u>, and then state the punishment. It does not investigate the intricacies of what constitutes a violation of the law, nor does it define the law. Rather than read into the bareness of the language, one should assume Stephen simply declines to investigate the details of the common law.

### G. F. Wharton

The Supreme Court then refers to F. Wharton's A Treatise on the Criminal Law of the United States.

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted) There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). … yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute. For by statute 2 Edw. 3., s. 3, in force in several of the United States, it is enacted…[52]

---

[50] Henry John Stephen, Summary of the Criminal Law, 1840.
[51] See 2 Edw. 3 Stat. Northampt. c. 3 (1328).
[52] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

Wharton describes the affray as a crime committed in public, to the terror of the citizens. Wharton includes a restriction on the affray that other sources do not.  Namely, Wharton distinguishes between a sudden attack and a sudden affray.  Supposedly, people committing an affray do not wish to do any great bodily harm.  Notice that Wharton seems to contradict Dunlap, where Dunlap discusses dueling with the intent to commit murder as an aggravation of an affray.

In addition, Wharton includes in his definition of the affray a requirement that the affray be committed in public. If the fight takes place in private, rather than in public, the fighters may be charged with assault, but not an affray.

Wharton also includes a manner requirement to the rule against dangerous and unusual weapons.  The text appears to suggest that if a man armed himself with a dangerous and unusual weapon in such a manner that did not naturally cause a terror to the people, he would not be guilty of an affray.

Once again, a manner restriction as to where and how someone can carry weapons will later be used, by modern courts, to justify a complete prohibition on certain classes of weapons.

After discussing the King's statute, Wharton continues,

In Tennessee, however, it was ruled, that the act of 1837-8 c. 137 s. 2, which prohibits any person from wearing any bowie-knife, or Arkansas tooth-pick[53], or any knife or weapon in form, shape or size resembling a bowie-knife or Arkansas tooth-pick, under his clothes, concealed about his person, conflicts with the 26th section of the first article of the bill of rights, securing to the free white citizens the right to keep and bear arms for their common defence. (Aymette v. State, 2 Hum. 154). The contrary rule, it would seem, has been laid down in Indiana, where it was held that a similar statute was in conformity with the federal and state constitutions (State v. Mitchell, 3 Blackf. 229).  An act of the same character is in force in Virginia. (footnote omitted).  If a person, not being a traveler, carry a pistol concealed on his person, he is guilty of an indictable offence, under the revised statutes of Indiana, of 1843, and his motive for carrying the pistol is immaterial (rev. stat. page 982; Walls v. State, 7 Blackf. 572).  It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law. (State v. Huntley, 3 Iredell, 418; but see State

---

[53] An Arkansas toothpick is a type of Bowie knife with a blade that can be as large as one foot long. See Robert E. Hunt, Randell Military Models: Fighters, Bowies, and Full Tang Knives, 208, Turner Publishing Company 2003).

v. Simpson, 5 Yerger 356). On the same general reasoning, it has been held indictable to drive a carriage through a crowded street, in such a way as to endanger the lives of the passers-by ; (footnote omitted) to disturb a congregation when at religious worship; (footnote omitted) to beset a house, with intent to wound, tar and feather ; (footnote omitted) to raise a liberty-pole, in the year 1794, as a notorious and riotous expression of ill-will to the government ; (footnote omitted) to tear down forcibly and contemptuously an advertisement set up by the commissioners of a sale of land for county taxes ; (footnote omitted) to break into a house in the day-time, and disturb its inhabitants ; (footnote omitted) and to violently disturb a town-meeting, though the parties engaged were not sufficient in number to amount to a riot.'[54]

While Wharton does describe restrictions on certain classes of weapons, all of those restrictions occurred after the constitution was ratified.  If this is the common law to which the Heller court refers, it is common law that would have been subject to the bounds of the constitution.  Normally, when common law is persuasive, it is the common law that came before the constitution was ratified.  That common law speaks to what was considered normal at the time. Common law that arises after the constitutional amendment was adopted and conflicts with the constitution should not be cited as support for a particular interpretation of the constitution.  In a first amendment setting, this would be comparable with citing the Alien and Sedition Acts as speaking to the founders' views on the freedom of speech.  The constitution has been violated on numerous occasions, many of them shortly after the document was ratified.  Simply pointing to a tradition of violating the constitution does not make a statute that is in line with that tradition constitutional.  It is therefore puzzling to see references to cases from the 1870s in an originalist opinion.

Wharton goes on to describe the reasoning behind the rule against "open exhibition of dangerous weapons by an armed man, to the terror of good citizens".  The first thing to which

---

[54] F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).  It should be noted that Aymette v. State, 2 Hum. 154 actually upheld the ban, rather than striking it down.  In Bliss v. Commonwealth 12 Ky. 90, 13 Am. Dec. 251 (Ky. Ct. App. 1822), a Kentucky court held that a similar statute conflicted with the portion of its state constitution that is analogous to the second amendment.  (Special thanks to Robert Dowlut, who alerted me to this error).

Wharton compares carrying dangerous weapons is to reckless driving and reckless endangerment. This makes sense as a manner restriction based upon the terror of the people element. Presumably, just as one may drive a carriage through a crowded street with due care, one could carry a dangerous weapon in a nonthreatening and careful manner without violating a law. Wharton then compares carrying dangerous weapons with disturbing a congregation when at religious worship. This comparison is a little more puzzling. Perhaps if one were to disturb a religious congregation (by, say, entering a church during the middle of Easter mass and screaming that there is no god), it would excite them to violence or to such a state of uproar that the interruption should be illegal. The next comparison makes more sense. To beset a house is to "surround and harass" it or to assail the house on all sides.[55] Tar and feathering was not a pleasant practice, and any reasonable person would raise a general hullaballoo if such a performance would save him from this practice.[56] Therefore, to "beset a house with intent to wound, tar, and feather", is to have an angry mob surround a house with the desire to wound and assault and humiliate the occupants. Wharton is saying that the same reasoning used to outlaw besetting a house with intent to wound, tar, and feather is being used to outlaw riding armed with dangerous weapons to the terror of the people.

The next two examples have to do with insurrection. Raising a liberty pole[57] as a riotous expression of ill-will toward the government and contemptuously tearing down advertisements

---

[55] The New Oxford American Dictionary 156 Erin McKean, 2nd ed (2005).

[56] "When heated, tar would blister the skin, but there is little evidence to suggest it regularly was… Yet even when tar was applied cool, it made for a painful experience. Once dry, tar clung tenaciously to the skin and could be removed only with a tremendous amount of scrubbing, possibly with the aid of turpentine or other chemical solvents that would further irritate the skin. Presumably, most victims lost a good deal of body hair; others may have developed tar acne, a skin condition…" Benjamin Ervin, Tar, Feathers, and the Enemies of American Liberties, pg. 204 New England Quarterly, Vol.76 No.2 Jun. 2003.

[57] "Liberty poles originated as large wooden columns--often fashioned out of ship masts--erected in public squares as part of the "rites of resistance" to British authority during the American Revolution. Simon P. Newman, Parades and the Politics of the Street: Festive Culture in the Early American Republic 25-29 (1997). After the revolution, they were used as symbols of resistance during the Whiskey Rebellion. Id. at 172-73; see In re Fries, 9 F. Cas. 826,

meant to alert people to an auction meant to finance the government were both activities outlawed primarily to curb active resistance against the government.  Wharton says that same reasoning being used to outlaw those two activities is used to outlaw carrying dangerous weapons to the terror of the people.  This suggests that there is an element of curbing insurrection present in the prohibition against carrying dangerous weapons to the terror of the people.  It seems doubtful that the government was outlawing people carrying weapons for self defense.  Instead, the government had an interest in outlawing the type of show of force that could help encourage insurrection the same way a liberty pole could encourage insurrection.  The government also had an interest in outlawing the type of armed presence that would undermine the rule of law in a similar way that hindering tax auctions would undermine the rule of law.

Next, Wharton compares the reasoning behind outlawing the carrying of dangerous weapons to the terror of the people with the reasoning behind outlawing breaking and entering in the middle of the day to disturb the home's inhabitants.  When one imagines the kind of uproar that would happen when one engages in breaking and entering a home to disturb its inhabitants, it speaks to the kind of uproar that might happen if one were to parade down the middle of the street, firing guns into the air, waiving weapons at the population.  It also speaks to the level of danger that is discussed.  If someone suddenly bursts into a man's home, there is at least some likelihood that the occupant will fear for his life or his family members' lives and will attack the

---

862, 864, 870 (C.C.D. Pa. 1799) (No. 5,126) (describing the erection of a liberty pole during the Whiskey Rebellion); Respublica v. Montgomery, 1 Yeates 419, 421 (Pa. 1795) (referring to liberty poles as one of the "avowed standards of rebellion"). They were also adopted by Jeffersonian Republicans as "prominent and easily recognizable symbols of liberty, equality, and republicanism," and as symbols of opposition to the Federalist government and to the Sedition Act. Newman, supra at 80, 97, 170-76. By the middle of the nineteenth century, the erection of liberty poles "on highways and public squares" by "each political party of the country to express its greater devotion to the rights of the people" had come to be viewed as "a custom sanctioned by a hundred years and interwoven with the traditions, memories and conceded rights of a free people." City of Allegheny v. Zimmerman, 95 Pa. 287, 294 (1880). The custom apparently disappeared at the end of the nineteenth century." Seth F. Kreimer, Technologies of Protest: Insurgent Social Movements and the First Amendment in the Era of the Internet, 150 U. Pa. L. Rev. 119, 171 (2001)

intruder.  Even if the intruder meant no violence, but only meant to disturb the inhabitants of the home, there was a risk of violence.  Perhaps, in the same way, the common law outlaws such provocative and public use of weapons in the hopes of avoiding violence when none was intended.

Finally, Wharton compares the reasoning behind outlawing riding with dangerous weapons to the terror of the public with the reasoning behind outlawing the violent disruption of a town-hall meaning, even if it does not amount to a riot.

In order to be charged with rioting, a certain number of people had to be involved.

Blackstone defines a riot as follows,

> Riots, routs, and unlawful assemblies, must have three persons at least to constitute them (footnote omitted). … A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel (footnote omitted): as if they beat a man; or hunt and kill game in another's park, chase, warren, or liberty; or do any other unlawful act with force and violence; or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner. [58]

Here, it is clear that the link between the reasoning behind the two common law rules is clear. In a riot, the situation can spiral out of control.  The rule against riots is meant to help preserve the public peace and to avoid unruly mobs. Similarly, to preserve the peace, the common law has outlawed reckless displays of firearms in public.

### III.    Heller's cited caselaw

#### A.  State v. Langford

In Heller, the Supreme Court also directs the reader to three cases concerning what the court calls "the historical tradition of prohibiting the carrying of 'dangerous and unusual

---

[58]  5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 146 1803.

weapons'".[59] The first of these, <u>State v. Langford</u>, is a case discussing the sufficiency and clarity

of an indictment.  Here, the defendant and several other men armed with guns fired at an elderly

woman's house and killed her dog, "thus exciting her alarm for the safety of her person and her

property".[60]

During the opinion, the court discusses whether the actions that led to the indictment

were a private trespass or a forcible breach of the public peace.  The court wrote,

> For the counsel for the prosecution, in arguing, say, 'one man may commit a breach of
> the peace, though not a riot; he might be armed with pistols for aught that appears, and
> this might be, possibly, proved.' To this the Court answers, "coming with a pistol, though
> possible, is not to be supposed;' thereby implying, that if the fact of coming with a pistol
> had been laid in the indictment, it would have been a circumstance in itself naturally
> implying such a degree of force as was indictable.

One who wishes to interpret this in a manner unfavorable to the civil right to the means to

self-defense could suppose that this is an example of presuming anyone armed with a pistol to be

an aggressor. The anti-civil rights argument would be that the common law made negative

assumptions about people armed with pistols.  If this is the case, it is unclear whether the court

would make a distinction between loaded and unloaded pistols, holstered or unholstered pistols.

It seems as though one who is armed "for aught that appears" is ready to shoot anything that

moves.  However, it seems less than likely that "being armed with pistols for aught that appears"

could describe an unloaded or holstered weapon.

Furthermore, a passage later on in the case would contradict the argument that there was

a negative presumption against people armed with pistols, "[l]aying the offence to have been

committed vi et armis[61] does not itself show … as applied to forcible entry … that a breach of

---

[59] D.C. v. Heller 554 U.S. at 627.
[60] State v. Langford 3 Hawks 281, 10 N.C. 381 (N.C.), 1824 WL 380 (N.C. 1824),
[61] Latin for with force of arms, See Walter Shumaker and George Longsdorf, The Cyclopedic Law Dictionary, 1058 Chicago Callaghan and Company (1922).

the peace had been committed in the cases"[62].   That is to say that just because someone behaved while armed does not show that a breach of the peace has been committed.   Here, it is the manner in which the person with the arms behaved that is the gravamen of the crime.   If, instead of shooting at an old woman's house and killing her dog, the defendant had politely knocked on the old woman's door, with his rifle slung over his shoulder, there would have been much less cause for the old woman to fear for her life, her property, and her dog.

Here, the gravamen of the crime seems to be the breach of the peace.   The court said, "All the law requires in an indictment of this kind is, that the facts shall be so charged, as to show that a breach of the peace had been committed, and not merely a civil trespass."[63]   Here, it seems like the offense was not based on how unusual the weapons were (the court simply said they were armed with guns[64]).   It might be argued that the dangerousness of the weapons was the gravamen of the crime.   However, the death of the dog (the result of the dangerous weapons) was a matter of aggravation, not the "corpus delicti" or body of the crime. Instead, it was the frightening and threatening behavior of the defendant that constituted the crime.   The defendant terrified the victim, and it is the actions that made her feel threatened and fear for her safety and the safety of her property that seem to be the focus of the court, not the type of weapons used.

In any case, it is unclear how the Supreme Court in Heller did or would place significance on this opinion.

### B.  O'Neill v. State

Justice Scalia then references O'Neill v. State, where a man insulted a second man, who then beat the first man with a cane.   The first man did not resist, and the question before the court

---

[62] Id

[63] Id.

[64] Id. "These men were armed with guns, which they fired at the house of an unprotected female, thus exciting her alarm for the safety of her person and her property."

was whether the first man was also guilty of the affray.  The Court states, "[i]t is probable, however, that if persons arm themselves with deadly or unusual weapons *for the purpose of an affray*, and in such a manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."[65]  With this language, the judge seems to suggest that if the persons had armed themselves for a reason other than an affray, and did not actually come to blows, they might not be guilty of the offense.  If we were to apply this rule to modern day statutes, laws that prohibit people arming themselves with intent to engage a public fight would probably fall under the limitation on the second amendment to which Justice Scalia referred. [66]

## C.  English v. State

The next case Justice Scalia mentions is <u>English v. State</u>.  In this 1872 Texas case, Judge Walker, says the following concerning the second amendment, "Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks[67], daggers, slungshots,[68] swordcanes,[69] spears, brass-knuckles and bowie knives." [70]  Judge Walker continues,

> If we look to this question in the light of judicial reason, without the aid of specific authority, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such are

---

[65] 16 Ala. 65, 1849 WL 407 (Ala.) Emphasis added.

[66] See D.C. v. Heller 554 U.S. at 627.

[67] "Dirk and dagger are used synonymously and consist of any straight stabbing weapon, as a dirk, stiletto, etc. (Century Dict.) They may consist of any weapon fitted primarily for stabbing. The word dagger is a generic term covering the dirk, stiletto, poniard, etc. (Standard Dict.)'" People v. Bain, 5 Cal. 3d 839, 851, 489 P.2d 564, 570 (1971).

[68] California case law provides a clear definition of "slungshot." In People v. Williams (1929) 100 Cal.App. 149, 279 P. 1040 (Williams ), the  court adopted the following dictionary definition: "a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon." People v. Fannin, 91 Cal. App. 4th 1399, 1401-02, 111 Cal. Rptr. 2d 496, 498 (Cal. Ct. App. 2001)

[69] "A sword cane looks like an ordinary cane but is in fact a sword with a sheath made to look like the lower part of a cane." State v. McCoy, 618 N.W.2d 324, 326 (Iowa 2000), quoting Commonwealth v. Walton, 252 Pa.Super. 54, 380 A.2d 1278, 1279 n. 1 (1977).

[70] English v. State 35 Tex 473 (Supreme Court of Texas, 1872).

properly known by the name of 'arms'. … To refer the deadly devices and instruments called in the statute "(sic)"deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of artillery, the field piece, siege gun, and mortar, with side arms. The Terms dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives, belong to no military vocabulary. Where a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline. … We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together.[71]

It seems as though Judge Walker believes that the Second Amendment only protects

military arms. Confusingly, he glosses over the fact that pistols are, by his own admission, used

by the military and regulated by the challenged statute. In retrospect, his reasoning is also

suspect, as several of the other weapons mentioned have been used by the military at one point or

another. American soldiers used brass-knuckle knives for trench warfare in WWI.[72] Bowie

knives, dirks, and daggers are not so different from the K-Bar knives carried by the Navy Seals[73]

or the Kukri carried by some of the most feared soldiers in the world, the Gurkhas,[74] or the

trench knives that have been standard issue in various armed forces around the world.[75] Spears

were standard for the Spartan military[76]. Perhaps Judge Walker meant that the Second

---

[71] Id.
[72] See Evan Nappen, Knuckle Down With Knuckle Knives, Knives 2008 at 42 (2007). See also Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).
[73] See Fred Pushies, Weapons of the Navy Seals, 93-95 MBI publishing company (2004).
[74] See Mike Chappell, The Gurkhas 31 Osprey Publishing, 1994.
[75] Sharon Spencer, Weapon: a Visual History of Arms and Armor 284 Dk Publishing (2006).
[76] Nick Sekunda, The Spartan Army 52 Osprey Publishing 1998.

Amendment only protected what the U.S. military currently used.  It seems doubtful that the founders would allow the state to ban muskets on the basis that the military now uses M-16s.

The Supreme Court did not adopt Judge Walker's reasoning, nor did the Supreme Court adopt Judge Walker's interpretation of the Second Amendment.  Justice Scalia merely cited to Judge Walker's opinion when referring to "historical prohibitions on the carrying of 'dangerous or unusual weapons'"[77].

Perhaps this is part of the history to which the Supreme Court refers.  After all, this 1872 case misuses the term, "dangerous and unusual weapons" in much the same way that Supreme Court misuses it in Heller.  However, English v. State does not rely upon the phrase "dangerous and unusual weapons".  Instead, they rely upon an interpretation of the prefatory clause that is contrary to the interpretation that the Supreme Court in Heller used[78], combined with a definition of arms that is contrary to the interpretation that the Supreme Court in Heller used.[79]

### D.  State v. Lanier

It is perplexing that the court cites <u>State v. Lanier</u>.  The court in Heller was pointing to the tradition of riding armed with dangerous and unusual weapons as support for the constitutionality of legislation against particular types of uncommon weapons as seen in <u>Miller</u>.  In <u>State v. Lanier</u>, a man rode unarmed through an empty courthouse.  The Lanier court does say "The elementary writers say that the offence of going armed and dangerous or unusual weapons

---

[77] See D.C. v. Heller 554 U.S. at 627.

[78] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "To refer the deadly devices and instruments called in the statute 'deadly weapons', to the proper or necessary arms of a 'well-regulated militia,' is simply ridiculous" with D.C. v. Heller 544 U.S. 570, 578(2008), "apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause."

[79] Compare English v. State 35 Tex. 473 (Texas Supreme Court 1872) "The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense" with D.C. v. Heller 544 U.S. 570, 581 (2008), "The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity."

is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in State v. Huntley 3 Ired. 418"[80]

However, the court also states, "In this case we attach no importance to the fact that the defendant had no arms, for we think it may be conceded that driving or riding without arms through a court house or a crowded street at such a rate or in such a manner as to endanger the safety of the inhabitants amounts to a breach of the peace and is an indictable offence at the common law."[81]   Clearly this is not a case about outlawing certain types of weapons.  If dangerous and unusual weapons really did describe classes of weapons rather than classes of dangerous behavior, why mention dangerous and unusual weapons in this case where the defendant was unarmed? State v. Lanier is a case punishing a certain types of behavior, whether the person was armed or not.  It mentions dangerous and unusual weapons because that is common law outlawing a certain type of dangerous behavior; it is not common law outlawing certain classes of rare weapons.

## IV.     Post-Heller interpretations of dangerous and unusual weapons

In the third district of California, Judge Sims upheld California's ban on so-called "assault weapons" based primarily on Heller's reasoning that prohibitions based upon classes of weapons were fairly supported by the traditional prohibition on the carrying of dangerous and unusual weapons.[82] California law outlaws possession of so-called "assault weapons", a term that is defined in a way that baffles the mind.  The law outlaws a semi-automatic centerfire rifle that can accept a clip and has a thumbhole stock.[83] A thumbhole stock is a stock that one can put his

---

[80] State v. Lanier 71 N.C. 288, 1874 WL 2582 (N.C.) (1874).
[81] Id at 2
[82] See Generally People v. James 174 Cal. App. 4th 662, 94 Cal. Rptr. 3d 576 (2009).
[83] Id at 669.

thumb through as he grips the rifle.  The same rifle without a thumbhole stock is legal.[84]  That

legal rifle would then be illegal if the owner installed a forward pistol grip.[85]  A forward pistol

grip is a piece of material (usually plastic or metal) that attaches to the underside of the barrel.

It allows the shooter to hold the rifle with his knuckles facing horizontally rather than vertically.

With and without the modifications, the rifle has the same capabilities.  With the modifications,

the rifle is deemed to be an "assault weapon", and is therefore illegal.  Without it, the rifle is not

classified as an "assault weapon" and is therefore lawful. Other authors have noticed the

misleading definition of the scare term "assault weapons".[86] "For example, the term 'assault

weapon' has become so elastic that it has been applied to a revolving firearm and even a single

shot firearm."[87]

    The part of this statute that was challenged was the prohibition on so-called "assault weapons"

and a prohibition on a gun that shoots a particular type of bullet, a 50 caliber bmg.[88] The court

upheld this law based on a faulty definition of dangerous and unusual.  The court found that "the

Legislature enacted the [law]in order to address the proliferation and use of unusually dangerous

weapons."[89]  "[The Second Amendment] is the right to possess and carry weapons typically

possessed by law-abiding citizens for lawful purposes such as self-defense. …as the court's

discussion makes clear, the Second Amendment right does not protect possession of a military

M-16 rifle."[90] This represents a fundamental misunderstanding of the term "dangerous and

unusual weapons" as well as a fundamental misunderstanding of the Second Amendment.

---

[84] Id.
[85] Id.
[86] For a more in-depth look at the absurdity for California's "assault weapons" ban, see Eric C. Morgan's note, Assault Rifle Legislation: Unwise and Unconstitutional, 17 Am. J. Crim. L. 143 (1990).  Available online at http://www.saf.org/LawReviews/EMorgan1.html.
[87] Robert Dowlut 5 St. Thomas L. Rev. 203, 208 (1992).
[88] Id at 666.
[89] Id at 674.
[90] Id at 676.

To review, the Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[91]  Judge Sims interpreted that amendment to not protect the possession of the United States Army's standard issue rifle.  This rifle is used by all branches of the military, including the National Guard.  He arrived at this conclusion through the reasoning in Heller that was supposedly supported by the tradition of prohibiting the carrying of dangerous and unusual weapons.

Judge Sims goes on to say, "These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war."[92]  Reading this alongside a case Heller cited, English v. State (the case that upheld a law banning non-military weapons), the government could ban all firearms.  Obviously, one of these cases must be wrong.    Judge Sims continues,

> [O]ur conclusion that Heller does not extend Second Amendment protection to assault weapons and .50 caliber BMG rifles is supported by post-Heller federal precedent.  In U.S. v. Fincher (8th Cir. 2008) 548 F.3d 868 (Fincher), the Eighth Circuit Court of Appeals held that Fincher's possession of a machine gun was "not protected by the Second Amendment" because "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."[93]

Judge Sims also states that .50 caliber BMG rifles are also dangerous and unusual.[94] This case upheld an asinine law through historically inaccurate reasoning.

The defendant in the case over which Judge Sims presided, Michael Eugene James, was on a state registry for firearms.  He was then subject to a restraining order that directed him to "turn in

---

[91] U.S. Const. amend. 2.
[92] People v. James 174 Cal. App. 4th at 676.
[93] Id.
[94] Id.

or sell all firearms in his possession by a certain date."[95] The information on the state database was enough to obtain a search warrant for his house.  The police then found the banned weapons in Mr. James' house. Michael Eugene James went to prison because of a law that was upheld through the misinterpretation of a historical phrase.  A similar law was upheld in Cook county, Illinois in Wilson v. Cook County.[96]

In Heller v. District of Columbia[97], Heller challenges, among other things, the ban on so called "assault weapons" in the District of Columbia.[98] The district court says the following, "As the Heller Court made clear, the Second Amendment does not confer the right to use *any* type of firearm in self-defense. [citation omitted] Rather, the Second Amendment protects only those weapons 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes' [citation omitted], as opposed to weapons considered 'dangerous and unusual'".[99]

## V.    Common Use as Used Today

Under the current interpretation of the Second Amendment, the common use test is valid and is being used by several lower courts.[100] Under this test, courts are upholding prohibitions on certain classes of firearms.  The courts ask whether a type of firearm is commonly used by law-abiding citizens.  This is an insidious question, as some of these bans have been in place for some time.  When the government prohibits the possession of a type of firearm, the possessors of those firearms cease to be law-abiding citizens. Therefore, under a common use test, no court would strike down a firearms ban that had been in place for an

---

[95] Id at 665.
[96] See generally, Wilson v. Cook County 943 N.E. 2d 768, 348 ill. Dec. 160 (appellate Court of Illinois, First District, Third Division, 2011).
[97] This is not to be confused with D.C. v. Heller.  Heller v. D.C. is a case involving the same parties and was brought in D.C. District Court.
[98] See Generally, Heller v. District of Columbia 698 F. Supp. 2d 179 (D.C. District Court, 2010).
[99] Id at 193.
[100] See generally, Wilson v. Cook County 943 N.E. 2d 768, People v. James 174 Cal. App. 4th 662, and Heller v. District of Columbia 698 F. Supp. 2d 179.

extended period of time.  Applying the common use test without falling into this circular trap is a difficult task.  It is also difficult to determine how much weight the Supreme Court is willing to place on a common use test.  After all, in Heller, the Supreme Court struck down a ban on pistols that had in effect since 1976.[101]

Apparently, the Supreme Court did not think these weapons were dangerous and unusual enough to outweigh the plaintiffs' rights to self defense. But if no law-abiding private citizen our nation's capital had a handgun for thirty-two years, what could be more unusual?  Or did the court look to see if the weapon were unusual in places where it was not banned?  Many questions about the nature of this test remain unresolved.  This murky test is bound to bring about differing results to similar fact patterns.

Another puzzle arises when one considers the idea of a new weapon.  Suppose the starship Enterprise landed in Oklahoma tomorrow, and set up a factory producing phasers. A court would have no problem upholding a ban on these 'dangerous and unusual' weapons.  Nobody owns them, and they can be set to stun or disintegrate a victim.  This type of reasoning could ban any type of new weapon, yet this is obviously not what the Supreme Court envisioned.  It said,

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, e.g., Reno v. American Civil Liberties Union, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, e.g., Kyllo v. United States, 533 U.S. 27, 35-36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.[102]

---

[101] See http://voices.washingtonpost.com/rawfisher/2008/06/dc_gun_ban_the_decision.html.
[102] D.C. v. Heller 554 U.S. at 582

So if the court wants modern firearms to be protected under the Second Amendment, how should the common use test be applied to newly invented weapons?

The most frustrating part of the common use test is that it doesn't measure how dangerous a society would be if a given ban remained in effect or if it was lifted.[103] What place does popularity have in determining whether a gun ban should be constitutional?  Under Heller, the answer is "it has at least some weight".

The common use test is not supported under an originalist style of interpretation, and it was not included in the original meaning or understanding of the Second Amendment. It is circular, allows for arbitrary and cosmetic distinctions between firearms, and will result in differing outcomes for similar fact patterns. However, it is currently the law of the land.  Why is this included in D.C. v. Heller?

There are several possible reasons.  First, it could be a mistake.  The authors could have wanted a one hundred percent historically accurate originalist interpretation.  Maybe the court missed it.

Another possibility is that the court did not care about the history as much as they did the outcome of the case and the precedent it sets.  But if this is the case, why write an originalist opinion?  Was Justice Scalia simply trying to inundate the reporters with his style of interpretation?  And if this is the case, why not explain why the policy outweighs the history in this particular matter?

---

[103] Both sides of the gun control debate can probably agree with this statement.  On one side, people who want more gun control want the court to be able to determine how dangerous a weapon is to society when deciding whether to keep a ban.  On the other side, people who want less gun control want a court to consider how undesirable society will become when that option for self defense (against private or governmental aggressors) is taken away, along with their liberty to possess a type of weapon.

A third possibility is strategic fallacy.  If Justice Scalia wanted to write an opinion that protected firearms, save for three exceptions,[104] and if one of the other judges that was needed for a majority wanted a fourth exception,[105] what does a strategic judge do?  A strategic judge would provide the strongest possible support for every part of the majority opinion, save for the part with which he or she disagreed.  Perhaps, in the hopes that someday when the makeup or the disposition of the court is different the court will revisit the issue, Justice Scalia posited the shakiest argument that he thought would escape unnoticed by his colleagues.  This would set the stage for a future court to examine the case, upholding three of the exceptions, striking down the fourth, and declaring, "The Supreme Court never had a good reason for this."

**Conclusion**

The future of firearms litigation is far from clear.  So long as courts continue to use the historically inaccurate definition of "dangerous and unusual weapons" embraced in Heller, common use tests are bound to be a part of second amendment jurisprudence.  A re-examination of the definition of "dangerous and unusual weapons" may result in a more historically accurate Second Amendment jurisprudence, as well as a more rational approach to firearms regulation.

---

[104] For example, restrictions on place, manner of use, and manner of manufacture.
[105] For example, an exception to certain classes of weapons.