# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2016

Lyle W. Cayce
Clerk

No. 15-10803

JAY AUBREY ISAAC HOLLIS, Individually and as Trustee of the Jay
Aubrey Isaac Hollis Revocable Living Trust,

        Plaintiff – Appellant

v.

LORETTA E. LYNCH, Attorney General of the United States; THOMAS E.
BRANDON, Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and
Explosives,

        Defendants - Appellees

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before KING, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal concerns the constitutionality of a 1986 federal statute that makes possession of a "machinegun" unlawful. Jay Aubrey Isaac Hollis, as trustee of his own revocable trust, submitted an application to the Bureau of Alcohol, Tobacco, Firearms and Explosives to manufacture a machinegun. ATF denied his application pursuant to the 1986 statute. Hollis filed suit, challenging the constitutionality of the 1986 statute. The district court dismissed the suit, holding that Hollis lacked standing, and, in the alternative, that machineguns are not protected by the Second Amendment. We disagree about standing, but we AFFIRM the district court's judgment.

No. 15-10803

FACTUAL AND PROCEDURAL BACKGROUND

We begin by reviewing the statutory and regulatory background before turning to the facts of this case. Two federal laws are relevant to this appeal, the National Firearms Act of 1934 and the Gun Control Act of 1968. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") administers both laws. 28 C.F.R. § 0.130(a)(1)–(2).

The National Firearms Act regulates the manufacturing of machineguns. It defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The National Firearms Act states that "[n]o person shall make a firearm[1] unless he has (a) filed . . . a written application . . . to make and register the firearm"; "(b) paid any tax payable"; "(c) identified the firearm to be made"; "(d) identified himself in the application form"; and "(e) obtained . . . approval" from the ATF "to make and register the firearm . . . ." *Id*. § 5822. An application will "be denied if the making or possession of the firearm would place the person making the firearm in violation of law." *Id*. Whether a machinegun may be made or registered thus depends on whether its possession is prohibited by some other law.

That prohibition arose in 1986 when Congress amended the Gun Control Act of 1968 to make it "unlawful for any person to transfer or possess a machinegun," subject to certain exceptions for government entities and machineguns lawfully possessed before 1986. 18 U.S.C. § 922(o). The Gun Control Act's definition of "machinegun" is the same as the one adopted in the National Firearms Act. *See id*. § 922(a)(4). Finally, "[t]he term 'person' . . .

---

[1] The National Firearms Act's definition of "firearm" includes a "machinegun." 26 U.S.C. § 5845(a).

2

No. 15-10803

include[s] any individual, corporation, company, association, firm, partnership, society, or joint stock company." *Id.* § 921(a)(1).

Taken together, because the National Firearms Act states that no application to manufacture a firearm may be granted if the possession of the firearm would place the applicant in violation of federal law, and Section 922(o) of the Gun Control Act makes possession of a machinegun illegal, no application to make a machinegun may be approved.

Against this statutory backdrop, we turn to the facts of this case. Jay Aubrey Isaac Hollis established the Jay Aubrey Isaac Hollis Revocable Living Trust ("Hollis Trust"), with himself as trustee. In May 2014, Hollis, in his capacity as trustee, submitted ATF Form 5320.1 to the ATF to manufacture an M-16 machinegun from AR-15 components.[2] On September 8, 2014, the ATF approved Hollis's application. Two days later, though, the ATF informed Hollis his application was granted in error and revoked approval of the application. The ATF then delivered a letter to Hollis acknowledging the mistake. The letter explained the "ATF may not approve any private person's application to make and register a machinegun after May 19, 1986," and any continued possession of a machinegun would be a violation of the National Firearms Act.

Hollis filed suit. First, he claimed that Section 922(o), which bans machineguns, violates the Second Amendment. Second, he claimed that Congress exceeded its power under the Commerce Clause in enacting Section 922(o). Third, he alleged the Government took his property, the M-16 machinegun, without due process of law. Fourth, he asserted the ATF has approved other machinegun applications after 1986, and therefore, the ATF's

---

[2] The M-16 is a rifle in service with the United States military. It is capable of automatic fire, that is to say, firing more than one round per trigger-action. Because federal law refers to such a weapon as a "machinegun," we refer to the M-16 as a machinegun to avoid confusion. The AR-15 is essentially a semi-automatic version of the M-16, that is to say, it fires only one round per trigger-action.

No. 15-10803

denial of his application was an equal protection violation. Fifth, he claimed Section 922(o) does not prohibit an unincorporated trust from manufacturing or possessing a machinegun.

The Government moved to dismiss the case for lack of subject matter jurisdiction and for failure to state a claim. Opposing the motion, Hollis also requested, pursuant to Federal Rule of Civil Procedure 56(d), discovery in order to ascertain whether the ATF had in fact approved machineguns since 1986. Finally, Hollis requested leave to amend his complaint if the district court determined it lacked subject matter jurisdiction over the case.

On August 7, 2015, the district court granted the motion to dismiss. As to Hollis's Second Amendment claim, the court determined that there was no subject matter jurisdiction because Hollis lacked standing. It also concluded that even if Hollis had standing, Hollis's Second Amendment, Commerce Clause, due process, equal protection, and statutory trust claims should be dismissed for failure to state a claim. Finally, the district court ruled moot Hollis's request for discovery under Rule 56(d). Hollis timely appealed.

## DISCUSSION

We address standing and whether Hollis should be allowed to amend in Part I of our opinion. In Part II, we discuss the argument that Section 922(o) does not explicitly bar a trust from possessing a machinegun. In Part III, we analyze whether Section 922(o) infringes Hollis's Second Amendment rights. Finally, we explain in Part IV that Hollis has waived his equal protection argument on appeal.[3]

---

[3] Hollis has not briefed his Commerce Clause and due process claims; they are therefore waived. *See United States v. Cervantes*, 706 F.3d 603, 609 n.1 (5th Cir. 2013).

No. 15-10803

*I.     Standing and Motion to Amend Complaint*

Federal courts have jurisdiction only over "cases" or "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting U.S. CONST. art. III, § 2, cl. 1).   One element of the case-or-controversy requirement is that Hollis must have standing to sue.   *Id.*   "We review questions of standing *de novo.*"   *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir. 2012).

"[S]tanding . . . focuses on whether the plaintiff is the proper party to bring this suit . . . ."   *Raines*, 521 U.S. at 818.   For standing, Hollis must show: (1) he suffered an injury in fact, which is a concrete and particularized invasion of a legally protected interest; (2) the injury is traceable to the challenged action of the Government; and (3) it is likely, rather than merely speculative, the injury will be redressed by a favorable decision.   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).   When a suit, like this one, is "challenging the legality of government action[,] . . . the nature and extent of facts that must be . . . proved . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action . . . .   If he is, there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."   *Id.* at 561–62.

The district court determined Hollis lacked standing to bring his Second Amendment claim.   It accepted that there was an injury, namely, being barred from possessing a machinegun.   Where Hollis failed was in satisfying prongs two and three of the standing inquiry – traceability and redressability – because a Texas statute also would bar Hollis's claim even if Section 922(o) were to fall away.   Thus, Hollis's injury would not be traceable to federal action and would not be redressed by striking down Section 922(o).

The Texas statute on which the district court relied is a criminal statute that prohibits possession or manufacture of a machinegun:

5

(a) A person commits an offense if the person intentionally or knowingly possesses, manufactures, transports, repairs, or sells:

> (1) any of the following items, unless the item is registered in the National Firearms Registration and Transfer Record maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives . . . :
>
> > (A) an explosive weapon; [or]
> > (B) a machine gun.

TEX. PENAL CODE § 46.05(a)(1)(A)-(B).

We disagree with the district court that the Texas statute moots the federal claim. The rights embodied in the Second Amendment apply with equal force to the states. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). Accordingly, if we were to hold Section 922(o), a federal law, unconstitutional on Second Amendment grounds, it is likely that Section 46.05, a state law, would also be unconstitutional. Two of our prior cases are illustrative. In one case, we upheld a federal law, which prohibits federally licensed firearms dealers from selling handguns to persons under the age of 21, against a Second Amendment challenge. *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 188 (5th Cir. 2012) ("*NRA I*"). In the second case, we upheld a Texas law, which prohibits those between the ages of 18 and 20 from carrying handguns in public, against a Second Amendment challenge because we were bound by our decision in *NRA I*. *National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 342 (5th Cir. 2013) ("*NRA II*"). *NRA I* and *NRA II* demonstrate that in Second Amendment cases, the fates of federal and state laws are intertwined.

Moreover, a judgment in favor of Hollis on his Second Amendment challenge would also likely put him in compliance under Texas law, erasing it as a separate bar. If Hollis were to prevail in this case, the likely effect would be approval of Hollis's application to make a machinegun, which would satisfy the Texas requirement that lawful possession of a machinegun is dependent

No. 15-10803

on being "registered in the National Firearms Registration and Transfer Record . . . ." TEX. PENAL CODE § 46.05(a)(1). Hollis has standing.

Because Hollis has standing, his arguments as to amending his complaint to achieve standing are moot.

II.   *Statutory Argument*

Our review of a district court's interpretation of a statute is *de novo*. *Teemac v. Henderson*, 298 F.3d 452, 456 (5th Cir. 2002). The Gun Control Act makes it "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). As defined in the Gun Control Act, the "term 'person' . . . *include[s]* any individual, corporation, company, association, firm, partnership, society, or joint stock company." *Id.* § 921(a)(1) (emphasis added).

Hollis contends that it is not he, personally, who would make and possess the machinegun but rather the Hollis Trust. Hollis argues that Section 922(o) only bars "persons" from making and possessing such weapons, and the relevant definition of persons does not include a trust. Therefore, because it is the Hollis Trust, with Hollis as trustee acting on its behalf, that desires to manufacture and possess the machinegun, Section 922(o) does not apply.

This argument strains common sense and misunderstands trust law. Historically, "a trust was not considered a distinct legal entity[;]" it was "a 'fiduciary relationship' between multiple people." *Americold Realty Tr. v. ConAgra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016). While in some jurisdictions trusts have a separate legal existence, Texas is not one of those. According to Hollis's complaint, the Hollis Trust "is created and existing under the laws of the State of Texas." Under Texas law, "[t]he term 'trust' refers not to a separate legal entity but rather to the fiduciary relationship governing the trustee with respect to the trust property." *Ray Malooly Tr. v. Juhl*, 186 S.W.3d 568, 570

No. 15-10803

(Tex. 2006). Indeed, the "Texas Trust Code[] explicitly defines a trust as a relationship rather than a legal entity." *Id.*

In Texas, a "trustee is vested with *legal title and right of possession* of the trust property but holds it for the benefit of the beneficiaries, who are vested with equitable title to the trust property." *Faulkner v. Bost*, 137 S.W.3d 254, 258–59 (Tex. App.—Tyler 2004, no pet.) (emphasis added). Thus, Hollis, a person, would in fact possess the machinegun even if he is a trustee. A trust cannot possess anything as it is not an entity under Texas law. Hollis is subject to Section 922(o)'s ban on possessing a machinegun.

In addition, the relevant definition of "person" uses the term "include," signifying a non-exhaustive list. 18 U.S.C. § 921(a)(1). The statutory use of a non-exhaustive list of illustrative examples does not exclude items not expressly specified. *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 264 (5th Cir. 2014). Thus, even when a trust is a separate legal entity that can possess property, it may well be included in the definition of "person."

III.    *Second Amendment*

Hollis argues that Section 922(o) is unconstitutional because it infringes his Second Amendment rights. The constitutionality of statutes is reviewed *de novo*. *NRA I*, 700 F.3d at 192. We begin by explaining Second Amendment jurisprudence and laying out our analytic approach to such cases before discussing the present claim.

A. Second Amendment Jurisprudence

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

No. 15-10803

The Supreme Court has explored the meaning of the Second Amendment in depth. *See District of Columbia v. Heller*, 554 U.S. 570 (2008). In *Heller*, the plaintiff challenged a D.C. law that almost totally banned private handgun ownership. *Id.* at 574. In striking down the law, the Court held that the Second Amendment codified a pre-existing individual right to keep and bear arms. *Id.* at 592. Important to our analysis is the Supreme Court's explanation of why the Second Amendment guarantees such an individual right.

The Court held that the first clause of the Second Amendment, which deals with the militia, is prefatory and not a limitation on the amendment itself. The second clause is the "operative" one. *Id.* at 577. While the Second Amendment was no doubt concerned with the effectiveness of militias, "[t]he prefatory clause does not suggest that preserving the militia was the only reason" for the Second Amendment. *Id.* at 599. Instead, its main purpose was to "guarantee the individual right to possess and carry weapons in case of confrontation," which *Heller* later clarified to mean "an individual right to bear arms for defensive purposes." *Id.* at 592, 602. Indeed, in a subsequent case, the Court confirmed that "self-defense is the *central component*" of the Second Amendment. *McDonald*, 561 U.S. at 767. *Heller* went on to hold that because the Second Amendment is about the defense of "hearth and home," and because "the American people have considered the handgun to be the quintessential self-defense weapon[,] . . . a complete prohibition of their use" is invalid. 554 U.S. at 635, 629. *Heller*'s reach goes beyond handguns, though, because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582.

While *Heller* recognized the right of individual Americans to keep and bear arms, it also recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court then gave a non-

9

exhaustive list of "longstanding prohibitions on the possession of firearms" that are "presumptively lawful" and pass muster under *Heller*:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 & n.26. While these longstanding and presumptively lawful measures are one set of limitations, *Heller* recognized "another important limitation on the right to keep and carry arms." *Id.* at 627. That limitation comes from *United States v. Miller*, 307 U.S. 174 (1939), a case that represented the Supreme Court's only analysis of the Second Amendment in the 20th Century. *Heller*, 554 U.S. at 621; *see generally* Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & LIBERTY 48 (2008).

In *Miller*, the defendants were arrested for, among other things, transporting an unregistered sawed-off shotgun and thereby violating the National Firearms Act. 307 U.S. at 175. *Miller* upheld the National Firearms Act against a Second Amendment challenge, concluding that

> [i]n the absence of any evidence tending to show that possession or use of a [sawed-off shotgun] . . . has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment [protects] such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.* at 178 (quotation marks omitted). Relying on this passage, Hollis argues that "if evidence is presented . . . [that] an item is part of the ordinary military equipment, then it is protected by the Second Amendment." Because an "M-16 is the quintessential militia-styled arm for the modern day," Hollis argues he has a Second Amendment right to possess one.

No. 15-10803

*Heller* soundly rejected this interpretation of *Miller*. Particularly relevant for us, *Heller* referred to machineguns as the quintessential example of why that reading is wrong:

> Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional, machineguns being useful in warfare in 1939.

*Heller*, 554 U.S. at 624. The Court held that *Miller* "must be read in tandem" with what was a "traditional militia," which was "a pool of men bringing arms in common use at the time for lawful purposes like self-defense." *Id.* (quotation marks omitted). The weapons brought to militia duty were "the sorts of lawful weapons that they possessed at home." *Id.* at 627. As a result, *Heller* read "*Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625.

*Heller*, therefore, distinguished between two classes of weapons: (1) those that are useful in the militia or military, and (2) those that are "possessed at home" and are in "common use at the time for lawful purposes like self-defense." *See id.* at 621−27 (quotation marks omitted). The individual right protected by the Second Amendment *applies only to the second category of weapons*, though that category at times may overlap with the first. The Second Amendment does not create a right to possess a weapon solely because the weapon may be used in or is useful for militia or military service.

We find further support for this restriction in *Heller*'s discussion about what *Miller* meant by weapons that were in "common use at the time":

> We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." It may be objected that if weapons that are most useful

in military service – M-16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty.

*Id.* at 627 (citation omitted). The Court acknowledged that an effective militia today, i.e., the National Guard, likely requires "sophisticated arms that are highly unusual in society at large." *Id.* Still, even though "the degree of fit between the prefatory clause and the protected right" has changed, the interpretation of the Second Amendment is still tied to weapons in common use for protection of hearth and home. *Id.* at 627–28. We glean the following principles from what we just discussed.

First, protected weapons are "those in common use at the time." *See id.* at 627 (quotation marks omitted). If a weapon is dangerous and unusual, it is not in common use and not protected by the Second Amendment.

Second, *Heller* took it as a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment. Indeed, Justice Breyer wrote in his dissent: "The majority says that [the] Amendment protects those weapons 'typically possessed by law-abiding citizens for lawful purposes.' . . . *This definition conveniently excludes machineguns*, but permits handguns . . . ." *Id.* at 720 (Breyer, J., dissenting) (emphasis added).

Third, the Court recognized the divergence of these two classes of weapons. "In the colonial and revolutionary war era . . . weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id.* at 624–25. Today, though, ordinary military weaponry is far more advanced than the weapons typically found at home and used for defense. A state's "militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large." *Id.* at 627.

No. 15-10803

Even so, the fact that a modern day militia, constituted with persons bringing weapons from home in common use, would be ineffective "against modern-day bombers and tanks," "cannot change our interpretation of the right." *Id.* at 627–28. Thus, to state again, *Heller* rejected a functionalist interpretation of the Second Amendment premised on the effectiveness of militia service.

Another recent decision confirms our analysis. At issue was a Massachusetts law that banned stun guns. *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016). The Supreme Judicial Court of Massachusetts upheld the law against a Second Amendment challenge, in part because it "found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.'" *Id.* at 1028. The Court vacated the Massachusetts court's opinion, explaining that "*Heller* rejected the proposition that only those weapons useful in warfare are protected." *Id.* (quotation marks omitted). *Caetano* reaffirmed that whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection.

In summary, the Second Amendment protects an individual right to keep and bear arms in defense of hearth and home. Two restrictions limit that right. The first concerns "longstanding" and "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626–27 & n.26. The second focuses on the types of arms that enjoy protection. The Second Amendment protects the class of weapons that enable "citizens to use them for the core lawful purpose of self-defense . . . ." *Id.* at 630. Therefore, because "[t]he Second Amendment protects an individual right to possess a firearm unconnected with service in a militia," whether a weapon is effective in a militia is not the relevant inquiry for determining whether that weapon is protected under the Second Amendment. *Id.* at 577. We now turn to our analytic framework.

No. 15-10803

B. Framework for Analyzing Second Amendment Claims

After *Heller*, we adopted a two-step inquiry for analyzing laws that might impact the Second Amendment. First, we "determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ." *NRA I*, 700 F.3d at 194. If it does not, the "law passes constitutional muster," but if it does, we proceed to "the second step[, which] is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Id.* at 194–95.

In *NRA I*, we held that the first *Heller* restriction, "longstanding, presumptively lawful regulatory measure[s]," "would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." 700 F.3d at 196. *NRA I*, however, did not have occasion to consider the second *Heller* restriction, that the constitutional right applies only to weapons that are "in common use at the time" and "possessed at home" for "lawful purposes like self-defense." *Heller*, 554 U.S. at 624, 627. We see no need to distinguish between these two restrictions, however, and therefore hold that a law that regulates a class of weapons that are not in common use will be upheld at step one.

C. Analysis

Taking step one of our inquiry, we examine "whether the conduct at issue falls within the scope of the Second Amendment right." *NRA I*, 700 F.3d at 194. Here, the conduct is the keeping and bearing of an M-16 machinegun. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. There is no *prima facie* case, though, when the weapon is not one "in common use at the time," "possessed at home," and for "lawful purposes like self-defense." *Id*. at 627, 624. Further, a firearm

14

No. 15-10803

is not "in common use" if it is "dangerous and unusual." *Id.* at 627. As explained above, both the *Heller* majority and dissent identified the M-16 to be a dangerous and unusual weapon.

Hollis counters that *Heller* in no way affected *Miller*'s statement "that if evidence is presented [that a weapon] is part of the ordinary military equipment, then it is protected by the Second Amendment." As explained above in our examination of the Second Amendment, this statement is patently incorrect. *Heller* refuted this interpretation of *Miller*, stating that such an interpretation would be "startling." *Id.* at 624. Indeed, under Hollis's theory of *Miller*, the only limitation on what arms can be owned would be those weapons not "part of the ordinary soldier's equipment." Fortunately, that theory has already been refuted as to grenades, which presumably are standard issue to soldiers but may lawfully be barred from private ownership. *See Staples v. United States*, 511 U.S. 600, 608–12 (1994).

Hollis next argues that the Second Amendment is what protects "the Right of the People to alter or abolish" a government that becomes destructive of the people's rights. Hollis seeks equality between the people and the Government so that those seeking to abolish the government will have a fair chance. But self-defense, not revolution, "is the *central component* of the Second Amendment." *McDonald*, 561 U.S. at 767 (quotation marks omitted).

Hollis then argues that *Heller*'s dangerous and unusual test refers not to the characteristics of a class of weapons but the manner in which weapons are used. *Heller*, though, said "that the sorts of *weapons* protected [are] those in common use at the time . . . [and] that [this] limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual *weapons*." 554 U.S. at 627 (emphasis added) (quotation marks and citation omitted). Thus, Hollis's argument is tantamount to asking us to overrule the Supreme Court. Indeed, Hollis in a Rule 28(j) letter cites to an online paper

that advances his view that dangerous and unusual refers only to the manner in which weapons are used.    Daniel R. Page, *Dangerous and Unusual Misdirection: A Look at the Common Law Tradition of Prohibiting Going Armed with Dangerous and Unusual Weapons to the Terror of the People, as Cited in* District of Columbia v. Heller (last rev'd June 28, 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1859395.    But that very paper acknowledged this "inaccurate definition of 'dangerous and unusual weapons' [was] embraced in *Heller* . . . ." *Id.* at 32.    We leave changes in Supreme Court caselaw to the Supreme Court.

Finally, amici argue that to the extent we rely on these passages from *Heller*, they are dicta.    Amici may well be right as to some of the statements. Still, we are generally bound by Supreme Court dicta, especially when it is "recent and detailed." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013).    These relevant passages from *Heller* are recent and detailed.

We conclude that these passages from *Heller* directly apply to the claims Hollis advances.    Still, it is appropriate to undertake an independent inquiry as to whether machineguns are protected by the Second Amendment because these passages are dicta.    We do so below.

### 1.  Machineguns and "Dangerousness"

In cases pre-dating *Heller*, we stated that machineguns are "dangerous" weapons.    In one case, we held that the unlawful possession of a machinegun in violation of Section 922(o) was a crime of violence because it "constitutes conduct that presents a serious risk of physical injury to another" due to the "inherently dangerous nature of machine guns." *United States v. Golding*, 332 F.3d 838, 840 (5th Cir. 2003).    In another case, we put machineguns and pipebombs in the same category, noting that both were "primarily weapons of

war and have no appropriate sporting use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999).

While these precedents addressed whether machineguns were dangerous for the purposes of a sentence enhancement and not for the purposes of the Second Amendment, they are persuasive to our analysis. Moreover, every one of our sister circuits that have addressed this issue have agreed that machineguns are dangerous and unusual weapons for the purposes of the Second Amendment.[4] Finally, the Supreme Court has held that the machinegun is of "quasi-suspect character," in the same category as hand-grenades, and that these weapons generally fall "outside those categories [of weapons that have] traditionally . . . been widely accepted as lawful possessions . . . ." *Staples*, 511 U.S. at 612. We therefore conclude that machineguns are dangerous weapons.

## 2. Machineguns and "Unusualness"

*Heller* concluded that handguns are "the most popular weapon chosen by Americans for self-defense in the home" and are therefore not unusual. 554 U.S. at 629. Every post-*Heller* case to grapple with whether a weapon is "popular" enough to be considered "in common use" has relied on statistical data of some form, creating a consensus that "common use is an objective and largely statistical inquiry." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) (quotation marks omitted). Still, "what line

---

[4] *See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804,* No. 15-2859, 2016 WL 2893670, at *7 (3d. Cir. May 18, 2016); *Kolbe v. Hogan,* 813 F.3d 160, 177, *reh'g en banc granted*, 636 F. App'x 880 (4th Cir. Mar. 4, 2016); *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015); *Friedman v. City of Highland Park,* 784 F.3d 406, 408 (7th Cir. 2015); *United States v. Henry,* 688 F.3d 637, 639–40 (9th Cir. 2012); *United States v. Allen,* 630 F.3d 762, 766 (8th Cir. 2011); *Hamblen v. United States,* 591 F.3d 471, 472, 474 (6th Cir. 2009).

No. 15-10803

separates 'common' from 'uncommon' ownership is something the Court did not say." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). As a result, courts have differed in the statistics used and methodological approaches adopted.

Some courts have taken the view that the total number of a particular weapon is the relevant inquiry. The Second Circuit determined that "large-capacity magazines" are in common use solely because of their high absolute number: 50 million. *Cuomo*, 804 F.3d at 255. Other courts have relied on proportions and percentages. The Fourth Circuit found that AR-15s are in common use because they accounted for "5.5 percent of all firearms, and 14.4 percent of all rifles produced in the [United States] . . . ." *Kolbe v. Hogan*, 813 F.3d 160, 174, *reh'g en banc granted*, 636 F. App'x 880 (4th Cir. Mar. 4, 2016). The Seventh Circuit, though, held the opposite when it determined that AR-15s are not in common use because only "9% of the nation's firearms owners have assault weapons." *Friedman*, 784 F.3d at 409. These cases indicate there is considerable variety across the circuits as to what the relevant statistic is and what threshold is sufficient for a showing of common use.

More recently, two Supreme Court justices observed that the "relevant statistic" involves the counting of jurisdictions. In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:

> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point. . . . The more relevant statistic is that [200,000] . . . stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States. . . . While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

*Caetano*, 136 S. Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, *plus* that 45 states

No. 15-10803

have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use. *Id.*

This wide variety in methodological approaches suggest that these statistics – raw number, percentage and proportion, jurisdiction-counting – identify potentially relevant data for the common use inquiry. For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon.

As for raw numbers, an ATF report provided by Hollis indicates that there are 175,977 pre-1986 civilian-owned machineguns in existence. This number is far below the 50 million large-capacity magazines the Second Circuit held was sufficient for a showing of common use. *Cuomo*, 804 F.3d at 255. It is also below the "more than 8 million AR- and AK-platform semi-automatic rifles" "manufactured in or imported into the United States" the Fourth Circuit held was sufficient for a showing of common use. *Kolbe*, 813 F.3d at 174.[5] We also note that *Kolbe*, which is the only opinion striking down a law that banned AR-15 style "assault rifle[s]," has been vacated for rehearing en banc. *Kolbe v. Hogan*, 636 F. App'x 880 (4th Cir. 2016). Three other circuits have upheld similar bans. *Cuomo*, 804 F.3d at 269; *Friedman*, 784 F.3d 412; *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011).

Hollis, in another Rule 28(j) letter, relies on Justice Alito's *Caetano* concurrence, arguing that because the number of machineguns in existence is similar to the number of stun guns, machineguns are also in common use. But as explained above, Justice Alito did not think the absolute number by itself was sufficient. Rather, he thought the number was sufficient when paired with the statistic that stun guns may be lawfully possessed in 45 states. The same

---

[5] While we used *Kolbe* above as an example of an opinion that undertook percentage or proportionality analysis, *Kolbe* also looked at raw numbers.

No. 15-10803

showing cannot be made for machineguns. Twelve states and the District of Columbia entirely ban machineguns even if the weapon is legal under the Gun Control Act.[6] An additional 22 states, like Texas in the present case, ban machineguns unless the weapon is legal under federal law.[7] Thus, 34 states and the District of Columbia prohibit possessing machineguns. Only 16 states have no such prohibition, but even some of these states have some sort of restriction affecting or limiting machinegun possession.[8]

Percentage analysis may also be relevant. There is, though, no evidence in the record regarding the total number of machineguns produced or manufactured, or the total number of private citizens that own guns or rifles. Thus, we do not undertake such an analysis. Suffice it to say that had we run such an analysis, the results would be unfavorable for Hollis. In our discussion of AR-15s, we noted that other circuits determined that over 8 million AR-15s are in existence. If we were to run the same calculations these other circuits did, but with 176,000 instead of 8 million, the percentages would be quite low.

---

[6] See CAL. PENAL CODE § 32625; D.C. CODE ANN. § 22-4514; FLA. STAT. § 790.221; 720 ILL. COMP. STAT. 5/24-1; IOWA CODE § 724.1; LA. STAT. § 40:1752; MASS. GEN. LAWS ch. 140, § 131; MINN. STAT. § 609.67; N.J. STAT. § 2C:39; N.Y. PENAL LAW § 265.02; OHIO REV. CODE § 2923; 11 R.I. GEN. LAWS § 47-8; WIS. STAT. § 941.26.

[7] See ALASKA STAT. § 11.61.200; ARIZ. REV. STAT. ANN. §§ 13-3101, 13-3102; COLO. REV. STAT. § 18-12-102; DEL. CODE tit. 11, § 1444; GA. CODE ANN. §§ 16-11-122–16-11-124; IND. CODE §§ 35-47-5–35-47-8; KAN. STAT. ANN. §§ 21-6301–21-6302; ME. STAT. tit. 17-A, §§ 1051–1052; MICH. COMP. LAWS § 750.224; MO. REV. STAT. § 571.020.1; NEB. REV. STAT. § 28-1203; NEV. REV. STAT. § 202.350; N.C. GEN. STAT. § 14-409; N.D. CENT. CODE § 62.1-05-01; OR. REV. STAT. § 166.272; 18 PA. CONS. STAT. § 908; S.C. CODE ANN. §§ 16-23-230–16-23-250; S.D. CODIFIED LAWS §§ 22-1-2(8), 22-14-6(2); TENN. CODE § 39-17-1302; TEX. PENAL CODE § 46.05; WASH. REV. CODE § 9.41.190; W. VA. CODE § 61-7-9.

[8] For example, it is legal to possess a machinegun in Montana only when use is not for an offensive or aggressive purpose. See MONT. CODE ANN. §§ 45-8-302–45-8-307. Other states having machinegun laws similar to that of Montana are Virginia, see VA. CODE ANN. §§ 18.2-288–18.2-296, Arkansas, see ARK. CODE ANN. §§ 5-73-202–5-73-205, and Connecticut, see CONN. GEN. STAT. § 53-202. The states having no restrictions on the possession of machineguns are Alabama, Hawaii, Idaho, Kentucky, Maryland, Mississippi, New Hampshire, New Mexico, Oklahoma, Utah, Vermont, and Wyoming.

No. 15-10803

Our summary reveals that irrespective of the metric used, Hollis does not have the numbers to support his claims.

Hollis and amici make one more argument. They claim the reason machineguns are not more popular is because they have been banned. This exact point was made by Justice Breyer in his dissent in *Heller*. Justice Breyer said that the majority's common use test would mean that

> [I]f Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns . . . the Court will have to reverse course and find that the Second Amendment *does,* in fact, protect the individual self-defense-related right to possess a machinegun. On the majority's reasoning, if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so. . . . There is no basis for believing that the Framers intended such circular reasoning.

554 U.S. at 720–21 (Breyer, J., dissenting). This argument was made in dissent, though, illustrating that it was considered by the *Heller* majority and rejected. This argument was insufficient to carry the day in *Heller* and accordingly must fail here too.

Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection, so we uphold Section 922(o) at step one of our framework.

IV.  *Equal Protection and Rule 56(d)*

Hollis's equal protection claim is barely presented in his appellate briefing. The term "equal protection" appears only once in the body of Hollis's opening brief. That lone mention is a reference to the procedural history of the case as opposed to an explanation of the claim. Indeed, there is no argument in Hollis's opening brief as to equal protection. A "passing reference to his

equal protection claim . . . is insufficient to prevent . . . waiver." *Jin Choi v. Univ. of Tex. Health Sci. Ctr.*, 633 F. App'x 214, 215 n.1 (5th Cir. 2015). Hollis, addressing the waiver argument in his reply brief, states that his "Equal Protection argument is subsumed in his Second Amendment argument." Reply briefs cannot be used to raise new arguments. *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008). Perhaps Hollis should consider that any necessary Equal Protection analysis is subsumed in our discussion of the Second Amendment.

Hollis also requested discovery under Rule 56(d) to, presumably, make out his equal protection argument. We review the district court's denial of a motion for discovery pursuant to Rule 56(d) for abuse of discretion. *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013). Discovery under Rule 56(d) is permitted to oppose a motion for summary judgment. The district court ruled on the Government's motion to dismiss under Rules 12(b)(1) and 12(b)(6). Therefore, Rule 56(d) is inapplicable.

Finally, Hollis filed a motion for judicial notice of an approved post-May 19, 1986 application, i.e., approval after Congress banned possession of machineguns in 1986, to manufacture a machinegun. The motion is DENIED.

\*\*\*

We restate our determinations. Hollis has standing, rendering his arguments regarding amending his complaint moot. Trusts are "persons" within the Gun Control Act, and machineguns are not protected arms under the Second Amendment. We AFFIRM on these grounds. Hollis has not briefed his other arguments, and they are therefore WAIVED. We AFFIRM the district court's denial of discovery under Rule 56(d). Finally, Hollis's motion for judicial notice is DENIED as MOOT.