No. 15-10803

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

―――――――

JAY AUBREY ISAAC HOLLIS, Individually and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust,

Plaintiff - Appellant,

v.

LORETTA E. LYNCH, Attorney General of the United States; Thomas E. BRANDON, Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants – Appellees.

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
D. Ct. Civil No. 3:14-CV-3872
(The Honorable Judge Barbara M.G. Lynn)

―――――――

**APPELLANT'S PETITION FOR REHEARING EN BANC**

―――――――

Stephen D. Stamboulieh
Stambouliehh Law, PLLC
P.O. Box 4008
Madison, MS 39130
(601) 852-3440

Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA 92122
(619) 905-9105

# CERTIFICATE OF INTERESTED PERSONS

*Jay Isaac Hollis v. Loretta Lynch, et al.*, No. 15-10803

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff**:

Jay Aubrey Isaac Hollis, Individually and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust

**Defendants**:

Loretta Lynch
Thomas E. Brandon

**Counsel**:

Stephen D. Stamboulieh
Stamboulieh Law, PLLC

Alan Alexander Beck
Law Office of Alan Beck

Elisha M. Hollis
Attorney at Law

Daniel M. Riess
Eric J. Soskin
Michael S. Raab
Patrick J. Nemeroff
U.S. Department of Justice

**Amici Curiae**:

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of

California, Inc., The Heller Foundation, Conservative Legal Defense and Education Fund, Institute on the Constitution, and Sheriff Bradley D. Rogers and their counsel, Herbert W. Titus, Robert J. Olson, William J. Olson, John S. Miles, and Jeremiah L. Morgan.

Firearms Policy Coalition, Inc, Firearms Policy Foundation, Inc., Colorado Second Amendment Association, Lone Star Gun Rights, The Madison Society, Inc., Mississippi Carry, Inc. and their attorney, George M. Lee, Seiler Epstein Ziegler & Applegate LLP.

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh
Counsel for Appellant

# STATEMENT REGARDING EN BANC REVIEW

En banc review is necessary for this Court to consider a question of exceptional importance: whether the Second Amendment protects a bearable arm; an M16 machinegun lawfully owned by a law-abiding citizen. In holding that the Second Amendment does not protect bearable machineguns, the panel diminished the holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008) then elevated *Heller*'s dicta to binding precedent. The panel did not address or resolve Appellant's as-applied challenge to the law. The panel did not conduct a historical analysis to determine if the arm was in the scope of the Second Amendment as understood when the Second Amendment was ratified because, as *Heller* stated: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. *Id.* at 634–35.

# TABLE OF CONTENTS

                                                                  **Pages(s)**

CERTIFICATE OF INTERESTED PERSONS……………………….………………ii

STATEMENT REGARDING EN BANC REVIEW………………...……………iii

TABLE OF AUTHORITIES…………………………………………....………..v

STATEMENT OF THE ISSUES………………………………….………....……1

STATEMENT OF THE COURSE OF PROCEEDINGS…………….…….……1

STATEMENT OF THE CASE………………………………………….………..1

ARGUMENT

    I.     THE PANEL'S DECISION CONFLICTS WITH THE HOLDINGS OF *HELLER* AND *MILLER*………………………………………………………………...3

    II.    THE PANEL MISAPPLIED *CAETANO*……………………………………10

    III.   THE PANEL DID NOT CONDUCT A HISTORICAL ANALYSIS……....………...11

    IV.   THE PANEL DID NOT EVALUATE HOLLIS' AS-APPLIED CHALLENGE……12

CONCLUSION…………………………………………………..………..13

CERTIFICATE OF SERVICE…………………………………….....…………..14

CERTIFICATE OF COMPLIANCE……………………………….……………..14

APPENDIX: PANEL OPINION

# TABLE OF AUTHORITIES

**Cases**

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................................................ 8

*Caetano v. Massachusetts*, ⎯⎯ U.S. ⎯⎯, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) iv, 3, 10, 11

*D.C. v. Heller*, 554 U.S. 570 (2008) ..........................................................................passim

*Hollis v. Lynch*, 15-10803, 2016 WL 3568063 (5th Cir. June 30, 2016) ............................ 3

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) (Kleinfeld, J.) (Dissenting) ................... 5

*United States v. Golding*, 332 F.3d 838 (5th Cir. 2003) ..................................................... 2

*United States v. Jennings*, 195 F.3d 795 (5th Cir. 1999) .................................................... 2

*United States v. Miller* 307 U.S. 174 (1939) ...............................................................passim

**Statutes**

18 U.S.C. § 922(o) ......................................................................................................1, 2, 12

26 U.S.C. § 5801 ................................................................................................................. 2

**Other Authorities**

Declaration of Independence, Clause 2, July 4, 1776 ......................................................... 9

## STATEMENT OF THE ISSUES

Whether the Second Amendment protects a bearable arm, in this case, an M16 machinegun lawfully owned by a law abiding citizen and whether 18 U.S.C. § 922(o) is unconstitutional facially or as-applied to Appellant.

## STATEMENT OF THE COURSE OF PROCEEDINGS

The district court entered its Memorandum Opinion and Order August 7, 2015, granting Defendants' 12(b)(1) Motion to Dismiss Plaintiff's Second Amendment and Commerce Clause claims for lack of standing; and granting Defendants' 12(b)(6) Motion to Dismiss Plaintiff's due process, equal protection, and alternative request for declaratory relief that §922(o) does not apply to Appellant.

A panel of this Court held (1) that Hollis had standing to bring his challenge, (2) that "persons" within the definition of the Gun Control Act include trusts, (3) that Hollis waived his equal protection, due process and commerce clause challenge, (4) and most importantly, that the Second Amendment does not protect machineguns.

## STATEMENT OF THE CASE

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
> (2) This subsection does not apply with respect to—
>     (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

This provision was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, which amended the Gun Control Act of 1968. Machineguns are additionally regulated through the National Firearms Act ("NFA"), codified at 26 U.S.C. § 5801 et seq. The NFA imposes a $200 tax on machineguns, suppressors, short-barreled rifles, short-barreled shotguns and destructive devices. Despite the ban on post-May 19, 1986 machineguns and the tax upon them, there are thousands of machineguns lawfully possessed by private individuals. But for the ban, there would likely be hundreds of thousands more lawfully possessed machineguns by private individuals.

Appellant, Jay Aubrey Isaac Hollis, Individually and as Trustee of the Jay Aubrey Isaac Hollis Revocable Living Trust ("Hollis") challenged the constitutionality of 18 U.S.C. § 922(o), both facially and as applied, under the Second Amendment. Additionally, Hollis alleged that, as a trustee of the trust, he was not prohibited as the definition of "person" under the Gun Control Act did not preclude his trust from manufacturing a machinegun.

The panel disagreed and held that a trust was a "person" for these purposes. The panel additionally held that the Second Amendment did not apply to a machinegun, as it was a dangerous and unusual weapon. The panel relied on *United States v. Golding*, 332 F.3d 838 (5th Cir. 2003) and *United States v. Jennings*, 195 F.3d 795 (5th Cir. 1999), both pre-*Heller* and *McDonald* cases, for the proposition that machineguns are "primarily

weapons of war and have no appropriate sporting use or use for personal protection." *United States v. Jennings*, 195 F.3d 795, 799 n. 4 (5th Cir. 1999). However, the government believes machineguns, and specifically the M16 variant, has personal defense value. In fact, in one of its proposals, it specifically requests the following: "DHS and its components have a requirement for a 5.56x45mm NATO, select-fire firearm suitable for personal defense use in close quarters and/or when maximum concealment is required."[1] As such, these firearms are in fact used and are useful for personal protection.

As for unusualness, the panel found *Caetano v. Massachusetts*, ⸻ U.S. ⸻, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) instructive. The panel stated, "… two Supreme Court justices observed that the 'relevant statistic' involves the counting of jurisdictions. In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important…" *Hollis v. Lynch*, 15-10803, 2016 WL 3568063, at *9 (5th Cir. June 30, 2016). But the panel further read into *Caetano* that the weapon must be "accepted as a legitimate means of self-defense." *Id.*

### ARGUMENT

I. **The Panel's Decision Conflicts with the Holdings of *Heller* and *Miller***

---

[1] https://www.fbo.gov/utils/view?id=09c3d5e933bc24416b752b57294a17b3 (last accessed 7/29/2016).

The panel relied on *Heller* for the proposition that *Heller* rejected *Miller*'s test that if evidence is presented that a firearm is part of the ordinary soldier's equipment or preserves the efficiency of the militia, it receives Second Amendment protection. The panel said *Heller*:

> soundly rejected this interpretation of *Miller*. Particularly relevant for us, *Heller* referred to machineguns as the quintessential example of why that reading is wrong:
>
>> Read in isolation, *Miller*'s phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns [(not challenged in *Miller*)] might be unconstitutional, machineguns being useful in warfare in 1939.

*Hollis v. Lynch*, 15-10803, 2016 WL 3568063, at *5 (5th Cir. June 30, 2016) (citation omitted). However, when read in context, the "startling" language, refers to the National Firearms Act's taxation on machineguns and *not* the Gun Control Act's ban on post-May 19, 1986 machineguns. This statement should not be read for more than what it states. But in order to understand the reference, it is important to look at *United States v. Miller* 307 U.S. 174 (1939) which held that:

> …in **the absence of any evidence** tending to show that a possession or use of 'a shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or the efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within the judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. (emphasis added).

4

*Id. Miller* did not "hold" that a short-barreled shotgun was not protected by the Second Amendment, only that the Court had no evidence before it to determine whether or not a short-barreled shotgun was related to the preservation or the efficiency of the militia.[2] The *Heller* Court, while not limiting the scope of *Miller*, stated that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *D.C. v. Heller*, 554 U.S. 570, 623 (2008). As stated in *Heller*:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is *fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."* (emphasis added).

*Heller*, 554 U.S. at 627.

*Heller*'s discussion of arms "in common use" does not order the lower courts to engage in a numerical count of a particular weapon in order to determine whether or not it is protected by the Second Amendment. This is an invitation by the Court to review its earlier decision in *Miller* alongside *Heller* in order to determine whether an arm is protected by the Second Amendment. In *Miller* the Court ruled only arms that

---

[2] "… *Miller* qualified even the rejection of sawed-off shotguns, by limiting the holding to a case where there was no evidence, and judicial notice could not be taken, of any 'reasonable relationship' of sawed-off shotguns to militia use." *Silveira v. Lockyer*, 328 F.3d 567, 587 (9th Cir. 2003) (Kleinfeld, J.) (Dissenting).

5

aid in the preservation or the efficiency of the militia are protected. Based on *Heller,* we know that aiding with personal self-defense fulfills that test and grants Second Amendment protection. *Miller* established that an arm being part of the ordinary soldier's equipment is another way to fulfill that test.

The fact that weapons which fulfill this test are protected is fairly supported by the tradition of prohibiting carrying dangerous and unusual weapons. The antecedent of this argument holds true as well. There are weapons that are outside of the militia right. Weapons such as surface to air missiles are neither part of the ordinary soldier's equipment nor useful for personal self-defense. Therefore, they are not weapons in common use. Hence, not only is it lawful to ban their ownership, but their carry is not implicated via the dangerous and unusual doctrine. Rather their carry can be banned without a government interest shown. This is because these arms are presumably outside the scope of the Second Amendment. Accordingly, *Heller*'s common use language is an order by the Court to refer to its previous decision in *Miller* and to history in order to determine the scope of the Second Amendment.

Weapons in common use are protected which is supported by the tradition of prohibiting carrying dangerous and unusual weapons. This tradition only refers to the regulations on the carrying of protected arms and armor. At Common Law, subjects had a general right to carry protected arms as these arms were protected by our Common Law right to defense. If an arm was protected, English and early American

6

governments could not strip the right to carry it without cause. Rather to strip one of their rights, the government had to establish conduct with a dangerous weapon was unusual. For example, walking down to the market in full plate with a head axe could be prohibited because this conduct disturbed the peace or "terrified" normal citizens.

A modern day comparison would be if one carried a rifle dressed in SWAT gear or military fatigues through a residential area. This conduct would certainly be unusual because this behavior would be unusual and it would likely disturb the peace or "terrify." However, if these arms are determined to be protected under the Second Amendment, the burden, per *Heller*, now shifts to the government to prove that they have an interest in regulating said activity. Shifting the burden to the government fairly supports the premise that certain arms are protected. With arms that were not protected, the government can restrict carry without any interest shown. The tradition of prohibiting dangerous and unusual *carry* of arms in common use supports the fact one had a historical right to *own* protected arms at Common Law. The carry of unprotected arms can be banned with no government interest shown because these arms receive no Second Amendment protection. Thus, there was no need to apply the dangerous and unusual doctrine. The tradition of prohibiting the carry of dangerous and unusual weapons supports that weapons in common use are protected. And a faithful reading of *Heller* supports that the weapons in common use are those that survive the *Miller* test.

If, however, as the panel held, machineguns are not protected by the Second Amendment, then Justice Scalia's comments in 2012 about the scope of the Second Amendment make little sense: "I mean, obviously, the (2nd) amendment does not apply to arms that cannot be hand-carried. It's to 'keep and bear.' So, it doesn't apply to cannons. But I suppose there are hand-held rocket launchers that can bring down airplanes that will have to be -- it will have to be decided."[3] There would simply be no need to question whether the Second Amendment protects a hand-held rocket launcher as under the panel's interpretation of *Heller*, it is a foregone conclusion that it is not protected.

However, it is clear that machineguns are protected under the Second Amendment. A machinegun is the modern musket. A proper historical analysis demonstrates that a machinegun is protected under the Second Amendment. See *Aymette v. State*, 21 Tenn. 154, 158 (1840) (limiting "arms" to mean those "such as are usually employed in civilized warfare, and that constitute the ordinary military equipment"). This definition of arms was expanded, not limited, by *Heller*.

The panel then states that "Hollis seeks equality between the people and the Government so that those seeking to abolish the government will have a fair chance." Hollis, at *7. This casts a negative light on the Appellant who merely quoted in the

---

[3] http://cnsnews.com/news/article/justice-scalia-2nd-amendment-limitations-it-will-have-be-decided (last visited 7/26/2016).

8

Opening Brief a section of the Declaration of Independence. For fuller context, here is the relevant quote from the Declaration of Independence:

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.--That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, --That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

(Declaration of Independence, Clause 2, July 4, 1776). The *Heller* court likewise cited to the Declaration of Independence.[4] The *Heller* court even spoke about tyranny:

> There are many reasons why the militia was thought to be "necessary to the security of a free State." See 3 Story § 1890. First, of course, it is useful in repelling invasions and suppressing insurrections. Second, it renders large standing armies unnecessary—an argument that Alexander Hamilton made in favor of federal control over the militia. The Federalist No. 29, pp. 226, 227 (B. Wright ed.1961). **Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny.**
> 
> \*\*\*
> 
> We reach the question, then: Does the preface fit with an operative clause that creates an individual right to keep and bear arms? It fits perfectly, once one knows the history that the founding generation knew and that

---

[4] "The phrase "bear Arms" also had at the time of the founding an idiomatic meaning that was significantly different from its natural meaning: 'to serve as a soldier, do military service, fight' or 'to wage war.' …But it *unequivocally* bore that idiomatic meaning only when followed by the preposition 'against,' which was in turn followed by the target of the hostilities. See 2 Oxford 21. (That is how, for example, our Declaration of Independence ¶ 28 used the phrase: 'He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country ....')" *D.C. v. Heller*, 554 U.S. 570, 586 (2008).

> we have described above. That history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia **but simply by taking away the people's arms**, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights.

*D.C. v. Heller*, 554 U.S. 570, 597–98 (2008). Despite *Heller*'s historical analysis, the panel simply restates that self-defense is the "central component" of the Second Amendment.

## II.    The Panel Misapplied *Caetano*

While the panel addressed *Caetano*, it misapplied a test that does not exist and then demonstrated why "common use" cannot be a meaningful test. The panel stated that there is "… a wide variety in methodological approaches suggest that these statistics—raw number, percentage and proportion, jurisdiction-counting—identify potentially relevant data for the common use inquiry. For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon." *Hollis*, at *9. Yet this is one of the reasons Hollis requested discovery. Hollis was dismissed from district court on standing for his Second Amendment claim and thus, was unable to engage in any discovery as to how many of these machineguns exist to attempt to even comply with any of the panel's methodological approaches. With the burden on proving a statistical number shifted to Hollis, and without the ability to put forth evidence (and having a Motion for Judicial Notice denied on a post-May 19, 1986 machinegun), Hollis is simply prevented from demonstrating what this Court might wish to see.

In the panel's treatment of *Caetano*, however, it looked at a jurisdiction-counting method for demonstrating usualness. It stated:

> Twelve states and the District of Columbia entirely ban machineguns even if the weapon is legal under the Gun Control Act. An additional 22 states, like Texas in the present case, ban machineguns unless the weapon is legal under federal law. Thus, 34 states and the District of Columbia prohibit possessing machineguns. Only 16 states have no such prohibition…

*Hollis*, at *9. The panel's logical conclusion is that 34 states and the District of Columbia ban machineguns, but in reality only 12 states and the District of Columbia totally ban machineguns. The panel admits that 22 states allow the machinegun if it is legal under federal law. So, an accurate total number of jurisdictions where machineguns are legal, as long as in compliance with federal law is 38, which is quite substantial.

### III. The Panel did not Conduct a Historical Analysis

The Court has a duty to conduct a proper historical analysis with regard to machineguns and the Second Amendment. *Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. There is no question that an M16 machinegun is a bearable arm which the Second Amendment protects. Respectfully, that other courts have declined to do a proper analysis, instead merely stating they are dangerous and unusual, should not be the basis for this Court to do the same.

It is also important to point out that the *Heller* court specifically addressed what the courts engage in when it stated the following:

> The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, at 634–35. As such, at a minimum, the panel erred when it did not do a historical analysis as to whether a machinegun, and in this case, specifically a bearable-on-the-person machinegun M16, would have been understood to be protected when the Second Amendment was ratified.

### IV. The Panel Did Not Evaluate Hollis' As-Applied Challenge

There is not one mention of the panel evaluating Hollis' as-applied challenge to §922(o). Hollis properly raised this argument to the panel in his briefing, yet the panel did not address it. Hollis maintains that as-applied to him, the government has no interest in banning him from possession of a lawfully registered post-May 19, 1986 machinegun.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that the case be reheard en banc.

Respectfully Submitted,

/s/ Alan Beck
Alan Alexander Beck
Counsel for Appellant

/s/ Stephen D. Stamboulieh
Stephen Dean Stamboulieh
Counsel for Appellant

# CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2016, I electronically filed the foregoing Brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/Stephen D. Stamboulieh
Stephen@sdslaw.us
Counsel for Appellant

# REQUIRED CERTIFICATIONS

I certify to the following 1) all required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper copy; and 3) the document is free from viruses and has been scanned by Kaspersky Internet Security, and has been reported free of viruses.

I certify that this brief complies with the type-volume limitation of Rule 35(b)(2) and 5th Cir. R. 35.5 because it does not exceed 15 pages, excluding material not counted under Rule 32, and complies with the typeface and style requirements of Rule 32(a) and (c)(2) because it was prepared in Microsoft Word using 14-point Garamond typeface.

/s/Stephen D. Stamboulieh
Stephen@sdslaw.us
Counsel for Appellant